## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY REINVESTMENT
COALITION,

                    Plaintiff,

      v.

ACCREDITED HOME LENDERS HOLDING
COMPANY, 15090 Avenue of Science, San Diego,
CA 92128,

ACCREDITED HOME LENDERS, INC., 15090
Avenue of Science, San Diego, CA 92128, and

ACCREDITED MORTGAGE LOAN REIT
TRUST, 300 East Lombard Street, Baltimore, MD
21202,

                    Defendants.

Case No. 1:07-cv-01357-EGS

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants Accredited Home Lenders Holding Company ("Holding Company"), Accredited

Home Lenders, Inc. ("Accredited"), and Accredited Mortgage Loan REIT Trust ("REIT") move

that Plaintiff's Complaint be dismissed.  In particular, the Court should dismiss Plaintiff's

Complaint because (1) this Court does not have personal jurisdiction over the Holding Company

and REIT; (2) Plaintiff lacks standing; (3) Plaintiff fails to state a claim upon which relief can be

granted under Section 804 of the Fair Housing Act ("FHA"); (4) the FHA does not permit claims

for discrimination under a disparate impact theory; and (5) even if the FHA permitted disparate

impact claims, Plaintiff fails to state a cognizable disparate impact claim.

For these reasons, and as discussed in greater detail in Defendants' memorandum of law supporting this motion, Defendants respectfully request that the Court dismiss Plaintiff's Complaint.

Respectfully submitted,

_____/s/_____
Matthew P. Previn

Matthew P. Previn (DC Bar No. 460228)
Kirk D. Jensen (DC Bar No. 477629)
   (federal court application pending)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
202-349-8000 (telephone)
202-349-8080 (fax)

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 21, 2007, a copy of the above and foregoing was electronically filed in this case and was duly served upon counsel of record by operation of the Court's ECF system

_____/s/_____
Matthew P. Previn

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY REINVESTMENT
COALITION,

                Plaintiff,

      v.

ACCREDITED HOME LENDERS HOLDING
COMPANY, ACCREDITED HOME LENDERS,
INC., and ACCREDITED MORTGAGE LOAN
REIT TRUST,

                Defendants.

Case No. 1:07-cv-01357-EGS

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Matthew P. Previn (DC Bar No. 460228)
Kirk D. Jensen (DC Bar No. 477629) (federal
    court application pending)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
202-349-8000 (telephone)
202-349-8080 (fax)

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

ARGUMENT ................................................................................................................. 3

I.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE HOLDING
      COMPANY AND THE REIT. ............................................................................. 3

      A.    There is No Basis to Assert General Jurisdiction Over the Holding Company or
            the REIT.................................................................................................... 5

      B.    Specific Jurisdiction Does Not Exist Because Plaintiff's Claims Do Not Arise
            From the Holding Company or the REIT "Transacting Any Business" in the
            District of Columbia. ................................................................................. 8

      C.    Exercising Personal Jurisdiction Over the Holding Company or the REIT Would
            Not Satisfy Due Process............................................................................ 9

II.   PLAINTIFF LACKS STANDING TO BRING ITS CLAIMS. ...................................... 10

      A.    Frustration of Mission Does Not Create Standing. ................................... 12

      B.    Expenditure of Resources on Investigations and Litigation to Combat Practices
            Does Not Confer Standing. ....................................................................... 13

      C.    Plaintiff's Allegations Regarding Expenditure of Resources to Educate Are
            Insufficient to Establish Standing. ........................................................... 14

III.  PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM UNDER SECTION 804 OF
      THE FAIR HOUSING ACT................................................................................ 19

      A.    Section 804 Does Not Apply to Mortgage Lending. ................................. 20

      B.    Even if Section 804 Applied to Mortgage Lending, Plaintiff Has Failed to State a
            Claim Under Section 804 Upon Which Relief May be Granted. ................. 24

IV.   PLAINTIFF FAILS TO STATE A COGNIZABLE DISPARATE IMPACT CLAIM
      UNDER THE FAIR HOUSING ACT.................................................................... 27

      A.    The Fair Housing Act Does Not Permit Disparate Impact Claims............. 27

      B.    Even if the Fair Housing Act Permitted Disparate Impact Claims, Plaintiff Fails to
            State a Cognizable Disparate Impact Claim. ............................................ 38

CONCLUSION.............................................................................................................. 41

# TABLE OF AUTHORITIES

## STATUTES AND RULES

Age Discrimination in Employment Act § 4(a), 29 U.S.C. § 623(a) ...................................... 27-32

Civil Rights Act, Title VII § 703(a), 42 U.S.C. § 2000e-2(a) ..................................... 28-32, 35-36

D.C. Code § 13-334 ........................................................................................................... 4-5

D.C. Code § 13-423(a)(1) .................................................................................................... 7

Equal Credit Opportunity Act § 706(i), 15 U.S.C. 1691e(i) ............................................ 22-23, 33

Fair Housing Act § 804, 42 U.S.C. § 3604 ......................................................... *passim*

Fair Housing Act, § 805, 42 U.S.C. § 3605 ......................................................... *passim*

Fed. R. Evid. 201 ............................................................................................................... 25

Home Mortgage Disclosure Act, 12 U.S.C. § 2801, *et seq.* .......................................... 24

Pub. L. No. 90-284 § 804, 82 Stat. 73 (Apr. 11, 1968) .................................................... 21

Pub. L. No. 90-284 § 805, 82 Stat. 73 (Apr. 11, 1968) .................................................... 20

Pub. L. No. 90-284 § 812, 82 Stat. 73 (Apr. 11, 1968) .................................................... 23

Pub. L. No. 94-239 § 6, 90 Stat. 251 (Mar. 23, 1976) ..................................................... 23

Pub. L. No. 100-430 § 6(c), 102 Stat. 1619 (Sept. 13, 1988) .......................................... 20

Pub. L. No. 100-430 § 8(2), 102 Stat. 1619 (Sept. 13, 1988) .......................................... 23

## CASES

*\* Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006), *aff'd* --- F.3d ---, 2007 WL 2238914
(D.C. Cir. Aug. 7, 2007)(en banc) .............................................................. 11-12, 14

*Acree v. Rep. of Iraq*, 370 F.3d 41 (D.C. Cir. 2004) ............................................ 19, 32

*Allen v. Wright*, 468 U.S. 737 (1984) ...................................................................... 10

*Alexander v. Choate*, 469 U.S. 287 (1985) ............................................................. 32

*\* Alexander v. Sandoval*, 532 U.S. 275 (2001) ...................................................... 19, 32

*Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138 (D.D.C. 2005) ..........................................18

*American Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005)..................................................18

*Anderson v. City of Aplharetta*, 770 F.2d 1575 (11th Cir. 1985) ............................................11, 18

*Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998)
(*en banc*) ..............................................................................................................................................10

*Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986) ............................................................37

*Association for Retarded Citizens v. Dallas County Mental Health &
Mental Retardation Center Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994)....................................13

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) ........................................4

*Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995) ....................................................37

*Barrett Comp. Servs. V. PDA, Inc.*, 884 F.2d 214 (5th Cir. 1989) ................................................18

*Barry v. Mortg. Servicing Acquisition Corp.*, 909 F. Supp. 65 (D.R.I. 1995) ................................7

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984) ......................................................39

*Brown v. Artery Organization, Inc.*, 654 F. Supp. 1106 (D.D.C. 1987)......................................36

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)..................................................................9

*Burlington Northern & Sante Fe Ry. Co. v. Poole Chemical Co., Inc.*,
2005 WL 1132851 (N.D. Tex. 2005)...........................................................................................25

*Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252 (1st Cir. 1993)...................................37

*Castenada v. Pickard*, 648 F.2d 989 (5th Cir. 1981)............................................................. 32-33

*Chisom v. Roemer*, 501 U.S. 380 (1991) ..................................................................................32

*Chrysler Corp. v. General Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984) ...........................6, 8

*City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985) ........................................................................36

* *Clifton Terrace Assocs., Ltd. v. United Technologies Corp.*, 929 F.2d 714
(D.C. Cir. 1991) .........................................................................................................................24, 26

*Connecticut  Nat'l Bank v. Germain*, 503 U.S. 249 (1992)..........................................................19

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987) .................................................................... 5, 7-8

*Dardana Limited v. Yuganskneftegaz*, 2001 WL 1131987 (S.D.N.Y. Sept. 24, 2001) ..................7

*Doherty v. Rutgers School of Law – Newark*, 651 F.2d 893 (3d Cir. 1981) .................................18

*Donnelly v. R.I. Bd. of Govs. for Higher Educ.*, 929 F. Supp. 583 (D.R.I. 1996),
*aff'd* 110 F.3d 2 (1st Cir. 1997) ..........................................................................................38

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing*,
28 F.3d 1268 (D.C. Cir. 1994) ............................................................................................14

*Fair Housing in Huntington Committee, Inc.  v. Town of Huntington, New York*,
316 F.3d 357 (2d Cir. 2003) ................................................................................................18

*Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir. 1991) ...................40

* *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. Cir. 2002) ..............................4-5, 7

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ..........................................................23

* *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ....................................................28, 32, 34-36

*GTE New Media Servs. Inc. v. Bellsouth Corp.*, 199 F.3d 1343
(D.C. Cir. 2000) .............................................................................................................3-4, 8-9

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ..............................................................................20

*Estate of Kunze v. Comm'r of Internal Revenue*, 233 F.3d 948 (7th Cir. 2000) ...........................23

* *Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) .....................................................11, 16, 18

*Hanson v. Veterans Administration*, 800 F.2d 1381 (5th Cir. 1986) .............................................37

* *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................10, 13, 15-16

*Hibbs v. Winn*, 542 U.S. 88 (2004) ...............................................................................................20

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ...............................................11

*In re ATI Technologies, Inc. Securities Litig.*, 216 F. Supp. 2d 418 (E.D. Pa. 2002) ...................25

*In re Netflix, Inc. Securities Litig.*, 2005 WL 3096209 (N.D. Cal. Nov. 18, 2005) ......................25

*In re Russell*, 72 B.R. 855 (Bankr. E.D. Pa. 1987) ......................................................................25

*In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15 (D.D.C. 2003) .................................................4

*International Union v. Brock*, 477 U.S. 274 (1986) ......................................................................11

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) .........................................................32

*Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994) ......................................................37

*Keeton v. Hustler Magazine*, 465 U.S. 770 (1984) ........................................................4

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) ...............................................................37

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .......................16

*Laufman . Oakley Bld'g & Loan Co.*, 408 F.Supp. 489 (S.D. Ohio 1976) ..................22

*Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712 (7th Cir. 1998) ...........................35

*Limbach v. Hooven & Allison Co.*, 466 U.S. 353 (1984) ..........................................34, 38

* *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*,
---F. Supp. 2d ---, 2007 WL 2172793 (D.D.C. June 30, 2007) .............................. 10-12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................10

* *Mackey v. Lanier Collection Agency & Serv., Inc.*, 724 F.2d 419 (4th Cir. 1984)............. 21-22

*Minerals Ltd. V. Rep. of Kazakhstan*, 116 F. Supp.2d 98, 106 (D.D.C. 2000)...............8

*Moore v. Matthews*, 445 F. Supp. 2d 516 (D. Md. 2006) ............................................25

*Mountain Side Mobile Home Estates Partnership v. HUD*, 56 F.3d 1243
(10th Cir. 1995)..............................................................................................................37

*NAACP v. Harris*, 607 F.2d 514 (1st Cir. 1979)..........................................................18

* *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*,
208 F. Supp. 2d 46 (D.D.C. 2002) ............................................................... 18, 27, 36-37

*National Law Center on Homelessness and Poverty v. Kantor*, 91 F.3d 178
(D.C. Cir. 1996) .............................................................................................................10

*National Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428 (D.C. Cir. 1995)......................13

*National Treasury Employees Union v. U.S.*, 101 F.3d 1423 (D.C. Cir. 1996)...................... 12-13

*Potts v. Howard Univ.*, 240 F.R.D. 14 (D.D.C. 2007).................................................25

*P.O.W.E.R. v. Thompson*, 727 F.2d 167 (7th Cir. 1984) ...........................................12

*Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539 (D.C. Cir. 2003).............................18

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)........................................................32

* *Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*,
489 F.3d 1267 (D.C. Cir. 2007) ....................................................................................16

* *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) .......................................... 35-37

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222 (D.D.C. 2007)........................................................25

*Robinson v. Paragon Foods, Inc.*, 2006 WL 2661110 (N.D. Ga. Sept. 15, 2006) .......................33

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979) ..................................................37

*Rush v. Savchuk*, 444 U.S. 320 (1980).......................................................................................3, 9

* *Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673
(D.C. Cir. 2006) ............................................................................................................................33

* *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ...........................................................13, 17

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ................................................................................12

*Simms v. First Gibraltar Bank*, 83 F.3d 1546 (5th Cir. 1996).....................................................37

* *Smith v. City of Jackson*, 544 U.S. 228 (2005) ...........................................27-31, 33, 35-36, 38

*Smith v. Doe*, 538 U.S. 84 (2003) ................................................................................................22

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) .........................................................37

*Southend Neighborhood Improvement Ass'n v. County of St. Clair*,
743 F.2d 1207 (7th Cir. 1987) ......................................................................................................24

* *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990)....................................10, 14, 16

*Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992)......................................................................36

* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ---, 127 S. Ct 2499 (2007) ............. 1-2, 25

*Truckers United for Safety v. Mead*, 251 F.3d 183 (D.C. Cir. 2001)............................................11

*Trudeau v. Federal Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006)............................................39

*United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004) ......................19

* *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) .........................33-34, 36-37

*United States v. Marengo County Comm'n*, 731 F.2d 1546 (11th Cir. 1984) ...............................37

*United States v. Mitchell*, 580 F.2d 789 (5th Cir. 1978)...............................................................36

*United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007)..............................................................20

*United States v. Starrett City Assoc.*, 840 F.2d 1096 (2d Cir. 1988) ............................................37

*United States v. Wilson*, 290 F.3d 347 (D.C. Cir. 2002)................................................23

*U.S. v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992)........................................................16

*U.S. v. Hartsock*, 347 F.3d 1 (1st Cir. 2003) ..............................................................23

*U.S. v. S.C.R.A.P.*, 412 U.S. 669 (1973) ....................................................................19

\* *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977)............................................................................................34, 35

\* *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
558 F.2d 1283 (7th Cir. 1977) .......................................................................... 34-35, 37

\* *Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990)......................... 35-36

*WAKA LLC v. DC Kickball*, 2007 WL 1549091 (D.D.C. May 25, 2007)....................25

\* *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989).......................................27

\* *Warth v. Seldin*, 422 U.S. 490 (1975).................................................................11, 18

\* *Washington v. Davis*, 426 U.S. 229 (1976)........................................................34, 37

\* *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) .................................27-28

*World Wide Minerals v. Republic of Kazakhstan,* 116 F. Supp.2d 98 (D.D.C. 2000)....................7

## ARTICLES AND OTHER MATERIALS

Home Mortgage Disclosure Act Data*, available at* http://www.ffiec.gov/hmda/ ........................25

John P. Relman, *Housing Discrimination Practice Manual* § 2:24 (2005)...................................27

NCRC Letter regarding Interagency Guidance on Non-traditional Mortgage Products, *available at* http://www.federalreserve.gov/SECRS/2006/April/20060411/OP-1246/OP-1246_48_1.pdf (March 15, 2006) ...............................................................................................................17

Peter E. Mahoney, *The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 EMORY L.J. 409 (1998)................... 33-34

Peter N. Cubita & Michelle Hartmann, *The ECOA Discrimination Proscription and Disparate Impact – Interpreting the Meaning of the Words that Actually are There*, 61 BUS. LAWYER 829 (2006)........................................................................................................................30, 32

Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266 (Apr. 15, 1994)................38

Securities and Exchange Commission, Accredited Home Lenders Holding Company Form 10-K, *available at* http://www.secinfo.com/d14D5a.u54Eu.a.htm...........................................................1

## INTRODUCTION

Plaintiff's Complaint should be dismissed because this Court lacks jurisdiction to adjudicate this case. First, the Court lacks personal jurisdiction over Defendants Accredited Home Lenders Holding Company ("Holding Company") and Accredited Mortgage Loan REIT Trust ("REIT"), which both lack minimum contacts with the District of Columbia. Additionally, Plaintiff lacks standing to bring the claims it asserts in its Complaint. Accordingly, Plaintiff's Complaint should be dismissed pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.

Even if this Court had jurisdiction to adjudicate Plaintiff's claims, the majority of Plaintiff's claims under the Fair Housing Act ("FHA") should be dismissed because Plaintiff's Complaint fails to state a claim upon which relief can be granted. Specifically, Plaintiff's Complaint fails to state a cognizable claim under Section 804 of the FHA. Plaintiff's Complaint also fails to state a cognizable claim for disparate impact because (1) the FHA does not permit disparate impact claims; and (2) even if the FHA permitted disparate impact claims, Plaintiff's Complaint fails to state a cognizable disparate impact claim. Accordingly, Plaintiff's claims under Section 804 and Plaintiff's disparate impact claims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

Accredited Home Lenders, Inc. ("Accredited") is a nationwide lender strongly committed to fair lending practices. Accredited is not a portfolio lender, meaning that it does not keep the

loans it originates.  Rather, Accredited sells the loans it makes on the secondary market.[1]  As has

been common practice for non-portfolio mortgage lenders, Accredited arranges with loan

purchasers in advance (i.e., prior to making the loans) to sell its loans.  The purchasers identify in

advance the types of loans (including pricing, loan terms, property value and type, etc.) they

would purchase.  Like other non-portfolio lenders, Accredited then tailors its lending policies to

ensure the loans it makes satisfy the criteria set by the loan purchasers to ensure it can sell the

loans to those purchasers.  Neither the Holding Company nor the REIT make or service any

loans in any jurisdictions, and engage in no activities relevant to the claims in Plaintiff's

Complaint.

Accredited, the Holding Company and the REIT strongly deny Plaintiff's allegations that

they have discriminated against minority borrowers in any way.  If required to do so, Accredited

will show that its lending policies are fair and do not discriminate against minority borrowers

either in purpose or in effect.  Accredited will also show, if necessary, that it has a legitimate

business justification for its lending policies.

---

[1]    This background information is contained in the Holding Company's Form 10-K filed
with the Securities and Exchange Commission.  *See* http://www.secinfo.com/d14D5a.u54Eu.a.
htm.  Because Plaintiff has cited the Holding Company's Form 10-K, *see* Compl. ¶ 13, the Court
may consider the Holding Company's Form 10-K in this motion to dismiss.  *See, e.g.*, *Tellabs,
Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ---; 127 S.Ct. 2499, 2509 (2007) (holding that when
ruling on a motion to dismiss, a court may consider documents "incorporated into the complaint
by reference").

## ARGUMENT

### I.   THIS COURT LACKS PERSONAL JURISDICTION OVER THE HOLDING COMPANY AND THE REIT.

Plaintiff's Complaint names as defendants two entities that have no connection to the actions alleged in Plaintiff's Complaint and over which the Court does not have jurisdiction. Plaintiff's Complaint is directed at the lending decisions and policies of Accredited.  However, in addition to Accredited, Plaintiff has named as defendants two of Accredited's affiliates[2]— the Holding Company and the REIT—which do not make loans or conduct any other activities related to Plaintiff's allegations.[3]

Neither the Holding Company nor the REIT is organized in the District of Columbia.  *See* Compl. ¶¶ 13, 16.  As such, the Holding Company and the REIT are nonresident defendants.  For the Court to assert personal jurisdiction over them, Holding Company and REIT must have engaged in the requisite "minimum contacts" in the District of Columbia.  *See Rush v. Savchuk*,

---

[2]      In addition to the three named defendants, Plaintiff also describes Home Funds Direct ("HFD") in the complaint.  Compl. ¶ 15.  However, because HFD is a service mark, not a corporate entity, and because Plaintiff has not named HFD as a defendant and has not defined it as part of "Accredited," *see* Compl. ¶ 1, we have not addressed whether the court has personal jurisdiction over HFD.

[3]      Plaintiff inaccurately describes the activities of the three defendants by collectively referring to them as "Accredited" in the Complaint.  Compl. ¶ 1.  Of the three defendants, only Accredited Home Lenders, Inc. makes lending policies and decisions, originates loans, or services loans.  Redding Decl. ¶ 4.  Contrary to the allegations in ¶ 13 of the Complaint, the Holding Company represents in its filings with the SEC that the *Accredited group of companies*, and not the Holding Company, originates mortgage loans in all fifty states and the District of Columbia.  Redding Decl. ¶ 5.  Contrary to the allegations in ¶ 16 of the Complaint, the REIT is a passive investment vehicle that merely acquires Accredited's loans and holds them in securitizations.  Redding Decl. ¶ 3.

444 U.S. 320, 332 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). They have not.

In order to determine whether a court has personal jurisdiction over a nonresident defendant, the court must engage in a two-part inquiry. First, the court must determine whether the District of Columbia's long-arm statute provides jurisdiction, either via general jurisdiction or specific jurisdiction. *See GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). "General jurisdiction arises from a party's contacts with the forum that are unrelated to the particular claims in the litigation," while "specific jurisdiction attaches over a nonresident … defendant solely for causes of action arising from the defendant's contacts with that forum." *In re Vitamins Antitrust Litig.*, 270 F. Supp.2d 15, 19-29 (D.D.C. 2003). Second, the court must determine whether a finding of jurisdiction would satisfy the constitutional requirements of the Due Process Clause. *GTE*, 199 F.3d at 1347.

In determining whether personal jurisdiction exists, the court must assess each defendant's contacts with the forum individually. *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984) (quoting *Rush*, 444 U.S. at 332). Plaintiff has the burden of establishing personal jurisdiction over each defendant. *Atlantigas Corp. v. Nisource, Inc.*, 290 F.Supp.2d 34, 42 (D.D.C. 2003). Plaintiff must "allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Id.* Factual allegations concerning multiple defendants cannot be aggregated to find personal jurisdiction over any individual defendant. *Id.* The court is not required to treat Plaintiff's allegations as true; rather, it may receive affidavits and other evidence to determine whether jurisdiction exists. *Id.*

### A. There is No Basis to Assert General Jurisdiction Over the Holding Company or the REIT.

General jurisdiction is based on contacts of a defendant with the forum that are unrelated to the plaintiff's claims. *Atlantigas*, 290 F.Supp.2d at 50. Under District of Columbia law, a court may exercise general jurisdiction over a nonresident corporation only if the corporation is "doing business" in the District of Columbia. D.C. Code § 13-334(a); *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509-10 (D.C. Cir. 2002). "'[G]eneral jurisdiction must be predicated on contacts that are sufficiently continuous and systematic to justify haling the defendant into a court in that state.'" *Gorman*, 293 F.3d at 510 n.2 (quoting Wright & Miller § 1067.5).

### 1. The Complaint was Not Served on the Holding Company or the REIT in the District of Columbia.

In the District of Columbia, for a court to assert general jurisdiction over a nonresident defendant, the complaint must be served on the nonresident defendant in the District of Columbia. D.C. Code § 13-334; *Gorman*, 293 F.3d at 514 ("Where the basis for obtaining jurisdiction over a foreign corporation is § 13-334(a), a plaintiff who serves the corporation by mail outside the District is 'foreclosed from benefiting from [the statute's] jurisdictional protection.'"). Here, Plaintiff did not meet this strict procedural requirement. The complaint was served on the Holding Company in Delaware and on the REIT in Maryland. *See* Declaration of John C. Redding ¶¶ 2, 3 ("Redding Decl."). For this reason alone, there is no basis for the court to assert general jurisdiction over either of the parties.

### 2. The Holding Company and the REIT Do Not "Do Business" in the District of Columbia.

Even if improper service was not enough to preclude general jurisdiction over the Holding Company or the REIT, there still would not be a basis to assert general jurisdiction over

5

these companies.  General jurisdiction over a foreign corporation is only permissible if the

defendant's business contacts with the forum district are "continuous and systematic."  *Gorman*,

293 F.3d at 509-10 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408,

414 (1984)); *Crane v. Carr*, 814 F.2d. 758, 763 (D.C. Cir. 1987) (each defendant must operate

"continuously and substantially within [the] state").  Neither the Holding Company nor the REIT

has had "continuous and systematic" contacts within the District of Columbia.

The Holding Company is registered in Delaware and has its principal place of business in

San Diego, California.  Redding Decl. ¶ 2.  It has never been registered or licensed to do business

in the District of Columbia, nor has it ever maintained an office, employee, telephone, mailing

address, or a registered agent for service of process in the District of Columbia.  Redding Decl. ¶

2.  The Holding Company also has never maintained any business records in the District of

Columbia, or owned or leased any real property there.  Redding Decl. ¶ 2.  Further, it has never

engaged in any marketing to residents of the District of Columbia.  Redding Decl. ¶ 2.  Indeed,

the Holding Company's only contacts with the District of Columbia have been in connection

with filing reports with the Securities and Exchange Commission ("SEC") required by the

Holding Company's status as a public company.  Redding Decl. ¶ 2.  However, these contacts

are excluded from the jurisdictional analysis by the "government contacts" doctrine.  *See, e.g.*,

*Chrysler Corp. v. General Motors Corp.*, 589 F. Supp. 1182, 1196 (D.D.C. 1984) (holding that

"a defendant's relationships with federal agencies do not enter the calculus of minimum contacts

with the District of Columbia for jurisdictional purposes").  Thus, the Holding Company has had

*no contacts* with the District of Columbia for purposes of the jurisdictional analysis.  And, as a

result, the Court does not have general jurisdiction over the Holding Company.

Similarly, the Court lacks general jurisdiction over the REIT. The REIT is a Maryland real estate investment trust. Redding Decl. ¶ 3. It has never been registered or licensed to do business in the District of Columbia, nor has it ever maintained an office, employee, telephone, mailing address, or a registered agent for service of process in the District of Columbia. Redding Decl. ¶ 3. The REIT also has never maintained any business records in the District of Columbia, or owned or leased any real property there. Redding Decl. ¶ 3. Further, it has never engaged in any marketing to residents of the District of Columbia. Redding Decl. ¶ 3. The REIT has never made Accredited's lending policies or decisions, or originated or serviced loans for it. Redding Decl. ¶ 3.

The REIT is a passive investment vehicle that acquires and holds in securitization trusts mortgage loans originated by Accredited. Redding Decl. ¶ 3. Accredited sells the REIT loans made by Accredited, which the REIT holds for a very short time (no longer than 30 days) until the loans are placed into a securitization trust. Only a very small fraction of the loans included in these securitization trusts have borrowers who are District of Columbia residents or are secured by property located in the District of Columbia. Redding Decl. ¶ 3. None of the sales of loans to the REIT takes place in the District of Columbia. While the REIT holds an ownership interest in the securitization trusts that hold the loans for each securitization, none of the securitization trusts is organized in the District of Columbia. Redding Decl. ¶ 3. The REIT was not involved in deciding whether to originate such loans, it did not originate such loans, and it has never serviced such loans. Redding Decl. ¶ 3. On this basis, the REIT cannot be found to be operating "continuously and substantially" within the District of Columbia, and as such, the Court does not have general jurisdiction over it. *See Crane v. Carr*, 814 F.2d. at 763; *see also Dardana Limited*

*v. Yuganskneftegaz*, 2001 WL 1131987, at *4 (S.D.N.Y. Sept. 24, 2001); *Barry v. Mortg.*

*Servicing Acquisition Corp.*, 909 F. Supp. 65, 75-76 (D.R.I. 1995).

> **B.      Specific Jurisdiction Does Not Exist Because Plaintiff's Claims Do Not Arise From the Holding Company or the REIT "Transacting Any Business" in the District of Columbia.**

In order for a court to exercise specific jurisdiction over a nonresident defendant, the

plaintiff's claims must arise from the nonresident defendant's particular contacts with the District

of Columbia. *Gorman*, 293 F.3d at 510 n.2 (quoting Wright & Miller § 1067.5).  A District of

Columbia court may exercise specific jurisdiction over a person for claims arising from the

person's "transacting any business in the District of Columbia."  D.C. Code § 13-423(a)(1).  To

find that a defendant "transacted business" in the District of Columbia, the court must conclude

that the defendant's District of Columbia "business is of a 'substantial character.'"  *World Wide*

*Minerals Ltd. v. Rep. of Kazakhstahn*, 116 F. Supp.2d 98, 106 (D.D.C. 2000).

There is no basis to assert jurisdiction over the Holding Company based on the

"transacting business" standard.  As noted, the Holding Company's activity in the District of

Columbia is limited to submitting filings to the SEC, and, under the "government contact"

doctrine, such interactions with the government "do not enter the calculus of minimum contacts

with the District of Columbia for jurisdictional purposes."  *Chrysler*, 589 F. Supp. at 1196.  For

purposes of the jurisdictional analysis the Holding Company has *transacted no business* in the

District of Columbia.  Therefore, Plaintiff's claims cannot arise from the Holding Company's

transaction of business in the District of Columbia.  And, as a result, the Court does not have

specific jurisdiction over the Holding Company.

Similarly, the Court lacks specific jurisdiction over the REIT.  The allegations in the

complaint relate to Accredited's lending policies and decisions.  The REIT has had no

involvement in Accredited's lending policies and decisions.  Redding Decl. ¶ 3.  As noted, the

REIT's only potential "contacts" with the District of Columbia involve a very small number of the loans included in its securitization trusts that have borrowers who are District of Columbia residents or that are secured by property located in the District of Columbia. Redding Decl. ¶ 3. Plaintiff's claims did not arise as a result of the REIT holding such loans in its securitization trusts, and as such, the court does not have specific jurisdiction over the REIT.

> **C.    Exercising Personal Jurisdiction Over the Holding Company or the REIT Would Not Satisfy Due Process.**

Even if the general jurisdiction or specific jurisdiction tests were satisfied, in order for this court to exercise personal jurisdiction over the Holding Company or the REIT, Plaintiff would need to show that exercising jurisdiction would not violate the right to due process of the Holding Company or the REIT. *GTE*, 199 F.3d at 1347. The District of Columbia's long-arm statute is coextensive with the Constitution's due process limit. *Crane v. Carr*, 814 F.2d at 762. "The Due Process Clause exists, in part, to give 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *GTE*, 199 F.3d at 1350 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Exercising personal jurisdiction over the Holding Company or the REIT would be impermissible under the Due Process Clause. In order for "minimum contacts" to be sufficient to satisfy the Due Process Clause, they must be based in "some act by which the defendant purposefully availed itself of the privileges of conducting activities with the forum State, thus involving the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Requiring "purposeful availment" is designed to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (citations omitted). "The Due Process Clause 'does not contemplate that a state

may make binding a judgment … against an individual or corporate defendant with which the state has no contacts, ties, or relations.'" *Rush*, 100 S.Ct. at 579 (quoting *International Shoe*, 326 U.S. at 319).

Neither the Holding Company nor the REIT has had contacts with the District of Columbia sufficient to meet due process requirements. They have not taken any actions to invoke the benefits and protections of the District of Columbia's laws. In fact, other than sending required filings to the SEC, the Holding Company has had *absolutely no contacts* with the District of Columbia, and these contacts are not relevant for purposes of jurisdictional analysis. The REIT's contacts have been, at most, de minimis, and involve holding certain loans in securitization trusts that are completely unrelated to this litigation.

For these reasons, all claims against the Holding Company and the REIT should be dismissed.

## II.    PLAINTIFF LACKS STANDING TO BRING ITS CLAIMS.

Plaintiff does not have standing to pursue its asserted claims. While it is accepted that "Congress intended standing under the Fair Housing Act to extend to the full limits of Article III," *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982), that does not mean the principal of standing has no limits. Indeed, "federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *National Law Center on Homelessness and Poverty v. Kantor*, 91 F.3d 178, 180 (D.C. Cir. 1996) (internal quotations omitted) (*quoting FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) and *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

To establish standing under Article III, a plaintiff must establish that it suffered an "injury in fact" which is "fairly traceable to the challenged action of the defendant" and which can be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *accord Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) (*en banc*).  An organization can show injury in fact by identifying a "concrete and demonstrable injury to [its] activities, not simply a setback to the organization's abstract social interests." *Spann*, 899 F.2d at 27 (internal quotations omitted).  The alleged injury must have "perceptibly impaired" those activities.  *Havens*, 455 U.S. at 379, 102 S.Ct. at 1124.

Plaintiff bears the burden of demonstrating standing to bring suit for each form of relief sought.  *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, --- F. Supp. 2d ----, 2007 WL 2172793, *3 (D.D.C. June 30, 2007) (citing *Lujan*, 504 U.S. at 561, and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000)).  While it is true that on a motion to dismiss, a court must accept all material allegations of the complaint as true, the plaintiff must clearly allege facts demonstrating that it is a proper party.  *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).  Rather than conclusory allegations, "factual averments are required in order to demonstrate standing."  *Anderson v. City of Alpharetta*, 770 F.2d 1575, 1581 (11th Cir. 1985).  Courts often consider affidavits when analyzing important questions of standing.  *See Warth*, 422 U.S. at 501-02; *see also Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987) ("In considering standing under 12(b)(1) . . . the court . . . can elicit information outside the pleadings.  This permits the court to undertake an independent investigation to assure itself of its own subject matter jurisdiction.").  Quite simply, if standing is not apparent from "all materials of record," the complaint must be dismissed.  *Warth*, 422 U.S. at 501-02.

Plaintiff appears to base standing on three grounds, all three of which result from an alleged direct injury to itself,[4] and none of which confers standing. First, Plaintiff alleges that it has been injured because its missions have been frustrated by Accredited's conduct. Second, Plaintiff alleges that it has been injured because Accredited's alleged conduct has forced it to expend resources on investigations and litigation to identify and combat that conduct. Finally, Plaintiff alleges that its expenditure of resources to "develop educational materials to identify and counteract the unlawful actions of Accredited, thus diverting NCRC's resources from other testing, education, counseling, and capacity-building services" creates standing. Compl. ¶ 67. None of these grounds establishes standing.

## A.    Frustration of Mission Does Not Create Standing.

According to the Complaint, Plaintiff's mission and purpose is to increase "fair and equal access to credit, capital, and banking services and products for all Americans, regardless of

---

[4]    Importantly, Plaintiff does not attempt to base standing to sue on behalf of its members. Nor could it. An association can only sue on behalf of its members if it can show that (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members of the association. *Long Term Care Pharmacy Alliance*, --- F. Supp. 2d ----, 2007 WL 2172793 at *5 (D.D.C. July 30, 2007) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). While Plaintiff alleges injury to "African Americans and Latinos, and homeowners and prospective homeowners in African-American and Latino neighborhoods," Compl. ¶ 11, Plaintiff does not allege that such individuals are its members. Rather, Plaintiff's members include "community development corporations, civil rights groups, community reinvestment advocates, local and state government agencies, and churches." Compl. ¶ 12. Plaintiff's allegation of injury to "individuals in the communities served by the NCRC," Compl. ¶ 68, is insufficient because associational standing requires an injury to a "member." *Hunt*, 432 U.S. at 343; *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133-34 (D.C. Cir. 2006); *see also Truckers United for Safety v. Mead*, 251 F.3d 183, 188-89 (D.C. Cir. 2001); *International Union v. Brock*, 477 U.S. 274, 289-90 (1986) (warning of the risks associated with creating an organization just to bootstrap standing). Furthermore, if Plaintiff was hoping to derive standing from an injury to its member's constituents, such an attempt is too attenuated to form the basis of associational standing. *P.O.W.E.R. v. Thompson*, 727 F.2d 167, 172 (7th Cir. 1984).

race," and to increase "the flow of private capital into underserved communities." Compl. ¶¶ 2,

12.  Plaintiff asserts that these missions have been frustrated by Accredited's alleged policies and

practices.  *Id.* ¶¶ 12, 67, 69.  However noble these asserted missions may be, the alleged

frustration of that mission alone is not an injury capable of justifying standing.  *Sierra Club v.*

*Morton*, 405 U.S. 727 (1972); *Abigail Alliance for Better Access to Developmental Drugs v.*

*Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) ("The court has distinguished between

organizations that allege that their activities have been impeded from those that merely allege

that their mission has been compromised."), *aff'd* --- F.3d ----, 2007 WL 2238914 (D.C. Cir.

Aug. 7, 2007) (*en banc*); *Long Term Care Pharmacy Alliance*, --- F. Supp. 2d ----, 2007 WL

2172793 at *4.  "We, of course, recognize that conflict between a defendant's conduct and an

organization's mission is alone insufficient to establish Article III standing."  *National Treasury*

*Employees Union v. U.S.*, 101 F.3d 1423, 1429 (D.C. Cir. 1996).  Frustration of an organization's

objectives "is the type of abstract concern that does not impart standing."  *National Taxpayers*

*Union, Inc. v. U.S.*, 68 F.3d 1428, 1433 (D.C. Cir. 1995); *see also Havens*, 455 U.S. at 379, 102

S.Ct. at 1124 (distinguishing injury to an "organization's activities" from "a setback to the

organization's abstract social interests").  Plaintiff cannot allege an injury based on "a setback to

[its] abstract social interests," and therefore cannot obtain standing on this basis.

### B.    Expenditure of Resources on Investigations and Litigation to Combat Practices Does Not Confer Standing.

Nor may Plaintiff pin standing on any alleged investigation or lawsuit expenditures.

Specifically, Plaintiff alleges that it has made "substantial" efforts and "considerable"

expenditure of "resources to investigate the existence and effects of Accredited's lending

policies" and litigate against them.  Compl. ¶¶ 12, 68.  But no matter how "substantial" or

"considerable," such efforts and expenditures do not create standing.  Courts universally agree

that the expenditure of organizational resources on investigations and litigation to identify and combat allegedly actionable practices cannot form the basis for standing. *Spann*, 899 F.2d at 27. As the D.C. Circuit has recognized, "[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002); *see also Association for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Center Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

Indeed, a panel of the District of Columbia Court of Appeals—whose decision was affirmed en banc—recently reminded that "an organization is not injured by expending resources to challenge the [act] itself; we do not recognize such self-inflicted harm." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006), *aff'd* --- F.3d ----, 2007 WL 2238914 (D.C. Cir. Aug. 7, 2007) (*en banc*). Accordingly, Plaintiff's allegation pertaining to any injury associated with investigating and/or litigating its claims here is unavailing to its efforts to establish standing.

### C.    Plaintiff's Allegations Regarding Expenditure of Resources to Educate Are Insufficient to Establish Standing.

Plaintiff's third asserted basis for standing requires more discussion than the first two, but ultimately fares no better. Plaintiff asserts that Accredited's alleged conduct has caused it to expend its "scarce" resources on education and outreach programs, and to develop educational materials to identify and counteract that conduct, thus diverting those resources from other testing, education, counseling, and capacity-building services. Compl. ¶¶ 12, 67.

14

As an initial matter, to the extent the allegations are based on any diversion of resources from other activities, as Plaintiff alleges, such allegations are not sufficient to establish injury in fact. *See Fair Employment Council of Greater Washington, Inc. v. BMC Marketing*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) ("diversion of resources" is "self-inflicted" harm, not injury-in-fact). Indeed, this Circuit makes clear that Plaintiff must make "concrete" allegations that the alleged conduct "*increases* the resources [it] must devote to programs independent of its suit challenging the action." *Spann*, 899 F.2d at 27, 29 (emphasis added).

To the extent Plaintiff is alleging that Accredited's conduct has forced it to expend money or resources it was not already expending, Plaintiff's allegations are not specific enough to establish standing. Plaintiff alleges the following injuries:

- "Accredited's racially discriminatory policies and practices have…caused NCRC to expend its scarce resources on educational programs…to identify and combat such practices." Compl. ¶ 2.

- "Accredited's discriminatory lending policies and practices have required the NCRC to engage in an education and outreach campaign, and to develop educational materials to identify and counteract the unlawful actions of Accredited, thus diverting the NCRC's resources from other testing, education, counseling, and capacity-building services." *Id.* ¶ 67.

- "Defendants' discriminatory lending policies and practices have required the NCRC, and will require the NCRC in the future, to spend additional resources to counteract Accredited's discriminatory conduct." *Id.*

- "In response, the NCRC has made substantial efforts and expended considerable resources to investigate the existence and effects of Accredited's lending policies and to ensure equal lending opportunities for potential borrowers." *Id.* ¶ 68.

Plaintiff never identifies what programs, campaigns or materials it developed, when it developed them, or how those programs were directly attributable to Accredited's alleged conduct or could have counteracted it.

Undoubtedly, Plaintiff will respond that by paraphrasing the language of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982),[5] it has sufficiently established standing. Plaintiff's talismanic allegations as to its injury, hoping that this repetition will get it past the pleading stage, should not be entertained. To allow Plaintiff to proceed on that basis here would be to ignore the fact that Plaintiff's allegations cannot—as a matter of logic—be true.[6] *Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("[A] bald allegation of standing is not enough to survive even a motion to dismiss where neither the factual allegations nor their logic establish [an element of standing].") (citing *Nat'l Wrestling Coaches Ass'n v. Dep't of Education*, 366 F.3d 930, 938, 941-43 (D.C. Cir. 2004)); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987) (recognizing court's obligation to dismiss cases where claim is "logically defective"). Plaintiff cannot conjure up standing by alleging that it devoted resources to educate and counteract when no amount of education could possibly do so. *See Spann*, 899 F.2d at 28-29 (upholding standing where allegations of increased education and

---

[5] The *Havens* Court found that an organization whose purpose was to further equal opportunities in housing had standing in its own right to sue for violations of fair housing laws. 455 U.S. at 379. The plaintiff in *Havens* alleged that the defendant's illegal racial steering practices rendered plaintiff less able to provide counseling and referral services to low-income homeseekers, and that it had been forced to divert significant resources to counteracting defendant's practices. *Id.* at 369. According to the Court, "[s]uch concrete and demonstrable injury to the organization's activities-with the consequent drain on the organization's resources-constitutes far more than simply a setback to the organization's abstract social interests." *Id.* at 379.

[6] In this case, the threshold issue of standing is especially important—Plaintiff is the only party bringing the claims, there are no borrowers or would-be borrowers represented, and moving forward with these claims would be extremely costly to Accredited and hamper the Court's efficiency. Other courts have recognized the need to conclusively determine standing in such cases. *U.S. v. AVX Corp.*, 962 F.2d 108, 114-16 (1st Cir. 1992) (where standing is an important issue, heightened pleading is appropriate).

counseling to counteract defendant's alleged conduct "could *plausibly* be required") (emphasis added); *see also Havens*, 455 U.S. at 379 (alleged injury must be "demonstrable"). This Court need not accept such an allegation when those allegations could not possibly pan out. To do so would be to waste the Court's time and resources and would expose Accredited to considerable expense in defending these unfounded claims.

In particular, Plaintiff alleges that, for certain loan products, Accredited does not make loans under a particular minimum property value or on row houses or on row houses under a certain value. Compl. ¶¶ 5, 48-64. These policies are alleged to have a discriminatory effect, which allegedly has caused Plaintiff to expend resources on educational programs to counteract this conduct. *Id.* ¶¶ 2, 6, 12, 67. But nowhere is it made clear what these programs are. Indeed, Accredited cannot fathom any educational program that could *plausibly* counteract what Plaintiff is alleging. What type or amount of education—other than on how to sue—could force Accredited to make certain types of loans, or could protect borrowers from loans Accredited is not making?[7] The only resources Plaintiff could possibly be expending to counteract Accredited's alleged conduct is to investigate and sue Accredited, or to tell others how to do so. Such efforts, as demonstrated above, cannot justify standing. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

---

[7]    Additionally, it seems highly unlikely that Plaintiff is educating owners or purchasers of row houses regarding how they could obtain loans from Accredited when the terms of such loans are generally opposed by Plaintiff. For example, Plaintiff alleges that Accredited's refusal to make certain loans above 80% loan-to-value ("LTV") has a discriminatory effect. Compl. ¶ 51. Considering that Plaintiff has expressed concern regarding loans with high LTVs, *see, e.g.*, NCRC Letter regarding Interagency Guidance on Non-traditional Mortgage Products, at 2 (Mar. 15, 2006) (opining that borrowers' repayment abilities must be "conservatively assessed" through reviewing factors such as LTV), *available at* http://www.federalreserve.gov/SECRS/2006/April/20060411/OP-1246/OP-1246_48_1.pdf, any attempt to argue that Plaintiff has developed or implemented educational programs to counteract Accredited's alleged policy is disingenuous.

17

The Court should not accept the allegation of unspecified "educational programs" without being able to determine if there is any reasonable connection between those programs and Accredited's alleged conduct.  In light of the implausibility of any reasonable nexus between an educational program and Plaintiff's allegations, the Court should not accept them, and therefore Plaintiff may not maintain standing on that basis.

In the alternative, Plaintiff should be required to make specific factual averments or provide additional evidence as to how Accredited's alleged conduct has caused diversion or expenditure of resources, and how these resources were used—other than for investigation and suit—to counteract that conduct, and how the diversion or expenditure is attributable to counteracting Accredited's alleged conduct.  The case law is replete with examples of courts ordering amendment, evidence or hearings on the standing issue.[8]

---

[8]    *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975); *U.S. v. S.C.R.A.P.*, 412 U.S. 669, 689 n.15 (1973); *American Library Ass'n v. FCC*, 406 F.3d 689, 696-97 (D.C. Cir. 2005) (court required briefing—including 13 affidavits from party asserting jurisdiction—and oral argument in an effort to determine whether plaintiff had standing); *Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003) (requiring plaintiff to produce "actual evidence . . . of facts that support its standing," not mere allegations); *Haase*, 835 F.2d at 906-07 (holding that when ruling on a motion to dismiss for want of standing, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.  If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed"); *Fair Housing in Huntington Committee, Inc. v. Town of Huntington, New York*, 316 F.3d 357, 361-62 (2d Cir. 2003); *Barrett Comp. Servs. v. PDA, Inc.*, 884 F.2d 214, 219-20 (5th Cir. 1989) (preliminary hearing most appropriate where merits and standing issue is distinct); *Anderson v. City of Alpharetta*, 770 F.2d 1575, 1580 (11th Cir. 1985) (court ordered parties to submit briefing and held oral argument on the standing issue); *Doherty v. Rutgers School of Law-Newark*, 651 F.2d 893, 898 n.6 (3d Cir. 1981); *NAACP v. Harris*, 607 F.2d 514, 526 and n.15 (1st Cir. 1979) (recognizing usefulness of preliminary evidentiary hearing on standing to "avoid an unnecessary trial"); *see also Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142, 144-45 (D.D.C. 2005) (noting that "it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case").

As the Court in *Doherty* stated, "[a]lthough courts must accept as true all material allegations in the complaint and construe the complaint in favor of the complaining party, it is within the trial court's power to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." 651 F.2d at 898 n.6. "Similarly, to avoid an unnecessary trial, the district court may conduct a preliminary evidentiary hearing on standing." *Id.* (*citing Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59 (3d Cir. 1979)).[9]

In short, Plaintiff does not have standing to sue on the claims it raises because it has not shown any plausible or concrete injury that would confer such standing. Accordingly, the Court should dismiss Plaintiff's claims.

## III. PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM UNDER SECTION 804 OF THE FAIR HOUSING ACT.

Section 805 of the FHA, not Section 804, applies to mortgage lending.[10] Section 804 of the FHA addresses only actions other than lending that affect the availability of housing. Because Plaintiff's claims are based solely on Accredited's alleged lending practices, and because Plaintiff does not allege that Accredited's actions affected the availability of housing in any way, Plaintiff has failed to state a claim under Section 804.

---

[9] Accredited notes that in *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46 (D.D.C. 2002), the Court found that an organization had alleged an injury sufficient to withstand a motion to dismiss for lack of standing. *Id.* at 52-54. Because the allegations in this case differ substantially from those in *National Fair Housing Alliance*, that case is distinguishable.

[10] Section 804 of the FHA is codified at 42 U.S.C. § 3604. Section 805 is codified at 42 U.S.C. § 3605.

A.      **Section 804 Does Not Apply to Mortgage Lending.**

When interpreting the meaning of a statute, the search for Congress's intent begins (and, if the statute is clear, ends) with the statute's text and structure.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).  The Supreme Court repeatedly has noted that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *accord Acree v. Rep. of Iraq*, 370 F.3d 41, 64 (D.C. Cir. 2004) (Roberts, J., concurring).

When analyzing the text and structure of a statute, "[i]t is, of course, a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 499 (D.C. Cir. 2004) (Roberts, J.) (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461 n.13 (2004)).  Indeed, it is well-established that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'"  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 46:06 (6th ed. 2000)); *accord Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (holding that courts should "avoid a reading [of statutory language] which renders some words altogether redundant"); *United States v. Oruche*, 484 F.3d 590, 598 n.1 (D.C. Cir. 2007) (same).

Even a cursory reading of the FHA shows that Congress did not intend Section 804 to apply to mortgage lending.  In the FHA as it was originally enacted, Section 805 provided:

DISCRIMINATION IN THE FINANCING OF HOUSING

Sec. 805.  After December 31, 1968, it shall be unlawful for any bank, building and loan association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, *to deny a loan or other financial assistance to a person applying therefor* for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate

20

against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of race, color, religion or national origin of such person or of any person associated with him in connection with such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given....

Pub. L. 90-284 § 805, 82 Stat. 73, 83 (Apr. 11, 1968) (emphasis added). Thus, Section 805 of

the FHA applied to mortgage lending—and only to mortgage lending.[11]

In contrast, Section 804 applies only to discrimination in the *sale or rental* of housing and

the availability of housing, not to the financing of housing. As enacted in the original FHA,

Section 804 provided in relevant part:

DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING

Sec. 804. As made applicable by section 803 and except as exempted by sections 803(b) and 807, it shall be unlawful—
(a) To *refuse to sell or rent* after the making of a bona fide offer, or to *refuse to negotiate for the sale or rental* of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.
(b) To discriminate against any person in the terms, *conditions or privileges of sale or rental* of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.
(c) To make, print, or publish, or cause to be made printed or published any notice, statement, or advertisement, *with respect to the sale or rental* of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation or discrimination.

Pub. L. 90-284 § 804, 82 Stat. 73, 83 (Apr. 11, 1968) (emphasis added). Section 804 did not

contain, and still does not contain, any reference to mortgage lending.[12] Congress clearly knew

---

[11]    In 1988, this section was amended into its current form, which still plainly applies to mortgage lending. *See* Pub. L. 100-430 § 6(c), 102 Stat. 1619, 1622 (Sept. 13, 1988) (emphasis added) (amending FHA § 805, 42 U.S.C. § 3605). By also bringing their claims under Section 805, Plaintiff's Complaint acknowledges this. *See* Compl. ¶ 73.
[12]    The portions of Section 804 under which Plaintiff brings its claims remain the same in all relevant respects as when the FHA was originally enacted. *See* FHA § 804(a)-(c), 42 U.S.C. § 3604(a)-(c).

how to draft language applicable to mortgage lending—and did so in Section 805, not Section 804.

Congress's inclusion of Section 805 in the FHA shows that it could not have intended Section 804 to apply to mortgage lending. As originally enacted, Section 805 applied *only* to mortgage lending. Any interpretation of the original Section 804 that would also apply it to mortgage lending would have rendered Section 805 superfluous and altogether redundant. *See, e.g.*, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 724 F.2d 419, 423 (4th Cir. 1984). And, because Section 804 remains identical in all material respects, Section 804 cannot now be interpreted in a way it could not have been interpreted as originally enacted. Plaintiff no doubt will argue that the words "otherwise make unavailable" in Section 804(a), "provision of services or facilities in connection therewith" in Section 804(b), and "with respect to the sale or rental" of housing extend to mortgage lending.[13] Even if Section 804 could bear such a broad interpretation when viewed in isolation, it must be interpreted in light of the entire structure of the FHA—including Section 805. *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 92 (2003) ("We consider the statute's text and its structure to determine the legislative objective.") It is simply beyond belief that Congress could have intended the general provisions of Section 804 to render Section 805 wholly superfluous. If Congress intended such a broad reading of the language of 804, it would have had no reason to enact Section 805. Whatever the reach of the language of Section 804, it cannot apply to mortgage lending.

---

[13]     While some courts have held that Section 804 applies to mortgage lending, *see, e.g.*, *Laufman v. Oakley Bld'g & Loan Co.*, 408 F. Supp. 489, 493 (S.D. Ohio 1976), others have not. *See, e.g.*, *Mackey*, 724 F.2d at 423. Cases such as *Laufman* are unsupported by the plain language of the FHA, its structure, and congressional intent manifested in Section 706(i) of the Equal Credit Opportunity Act discussed below.

Furthermore, subsequent congressional action in the credit discrimination arena shows that Congress intended only Section 805—not Section 804—to apply to mortgage lending. The Equal Credit Opportunity Act ("ECOA") prohibits a person bringing a mortgage lending-related discrimination claim from recovering under both the ECOA and the FHA. Section 706(i) of ECOA provides:

> (i) No person aggrieved by a violation of this title and by a violation of section 805 of the Civil Rights Act of 1968 [i.e., Section 805 of the FHA] shall recover under this title and section 812 of the Civil Rights Act of 1968, if such violation is based on the same transaction.

ECOA § 706(i), 15 U.S.C. 1691e(i).[14] Thus, a person with a mortgage lending-related discrimination claim can recover either for a violation of ECOA or a violation of Section 805 of the FHA, but not both. The omission of any reference to Section 804 of the FHA in this section shows that Congress believed that only Section 805 applied to mortgage lending. Indeed, any interpretation that Section 804 applies to mortgage lending would lead to an absurd result under ECOA § 706(i): If a person brings a mortgage lending-related claim under both the ECOA and Section 805 of the FHA—the section of the FHA that expressly applies to mortgage lending— the person could only recover under one of the statutes. However, if a person brings a mortgage lending-related claim under both the ECOA and Section 804 of the FHA—a section that contains

---

[14]    When ECOA § 706(i) was enacted in 1976, the FHA section governing "Enforcement by Private Persons" was Section 812. *See* Pub. L. 94-239 § 6, 90 Stat. 251, 254-55 (Mar. 23, 1976); Pub. L. 90-284 § 812, 82 Stat. 73, 88 (Apr. 11, 1968). In 1988, the FHA was amended and the section governing "Enforcement by Private Persons" was moved to Section 813. *See* Pub. L. 100-430, § 8(2), 102 Stat. 1619, 1625 (Sept. 13, 1988). While the reference in ECOA § 706(i) has not been updated to reflect this change, Congress clearly intended Section 706(i) to reference the section of the FHA that addresses enforcement by private persons. *See, e.g.*, *U.S. v. Hartsock*, 347 F.3d 1, 6 & nn. 7-8 (1st Cir. 2003) (ignoring erroneous cross-reference when Congress's intent was clearly to apply cross-reference to different section); *Estate of Kunze v. Comm'r of Internal Revenue*, 233 F.3d 948, 953 (7th Cir. 2000) (holding that a clearly erroneous cross-reference "can hardly be construed to have changed the legislative intent . . . or to have affected the substantive rights [at stake]").

no express language addressing mortgage lending—the person could recover under both statutes. Such an absurd result could not have been intended by Congress, and weighs heavily against interpreting Section 804 of the FHA as applying to mortgage lending. *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *United States v. Wilson*, 290 F.3d 347, 361 (D.C. Cir. 2002) (stating that when interpreting statutes, "'absurd results' are strongly disfavored").

Because Section 804 does not apply to mortgage lending, Accredited requests that the Court dismiss Plaintiff's claims under Section 804.

**B.   Even if Section 804 Applied to Mortgage Lending, Plaintiff Has Failed to State a Claim Under Section 804 Upon Which Relief May be Granted.**

Plaintiff fails to allege any facts that would support its claim that Accredited's alleged lending practices have made housing unavailable, and therefore fails to state a cognizable claim under Section 804(a).

To state a cognizable claim under Section 804(a), Plaintiff was required to allege that Accredited has somehow impaired the availability of housing. *Clifton Terrace Assocs., Ltd. v. United Technologies Corp.*, 929 F.2d 714, 719 (D.C. Cir. 1991) (holding that Section 804(a), by its plain terms, "reach[es] only discrimination that adversely affects the availability of housing"); *accord Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1987) ("Section 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons . . . .").

Plaintiff alleges no facts to support such a claim. The only reference in Plaintiff's Complaint to housing availability is Plaintiff's conclusory statement in the cause of action. *See* Compl. ¶ 73(a). Plaintiff presumably wishes the Court to infer, without so stating, that the

24

property type limitations in Accredited's loan programs somehow restricts the availability of

housing.  Such an inference is unjustified.  Plaintiff has not alleged that Accredited's market

share in any of the metropolitan areas named in the Complaint is large enough to affect the

availability of housing in any way.  Nor could it.  According to the publicly available lending

data collected by the federal government under the Home Mortgage Disclosure Act ("HMDA"),

Accredited's market share in the metropolitan areas named in Plaintiff's Complaint is

miniscule.[15]  It is not reasonable to infer that a lender with Accredited's trifling market share in

these metropolitan areas could have any impact on the availability of housing in those areas.

Consequently, Plaintiff's conclusory statement is insufficient to withstand a motion to dismiss.

*See, e.g.*, *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 235 (D.D.C. 2007) ("[T]he Court does

not have to accept asserted inferences or conclusory allegations that are unsupported by facts set

forth in plaintiff's complaint."); *Potts v. Howard Univ.*, 240 F.R.D. 14, 17 (D.D.C. 2007) ("While

many well-pleaded complaints are conclusory, the court need not accept as true inferences

---

[15]    According to the publicly available HMDA data, in 2004-2006 the loans made by
Accredited accounted for less than 1% of all mortgage loans made in the Baltimore, Cleveland,
Detroit, Philadelphia and Washington DC metropolitan areas, and only slightly more than 1% in
St. Louis.  *See* http://www.ffiec.gov/hmda.  Accredited asks the Court to take judicial notice of
the publicly available HMDA data.  *See* Fed. R. Evid. 201; *Tellabs, Inc. v. Makor Issues &
Rights, Ltd.*, --- U.S. ----; 127 S.Ct. 2499, 2509 (2007) (holding that when ruling on a motion to
dismiss, a court may consider "matters of which a court may take judicial notice"); *see also
Moore v. Matthews*, 445 F. Supp. 2d 516, 525 n.7 (D. Md. 2006) (taking judicial notice of the
time it would take plaintiff to travel 120 feet to the other jet ski, if the facts established defendant
was driving his jet ski at a particular speed); *Burlington Northern & Sante Fe Ry. Co. v. Poole
Chemical Co., Inc.*, 2005 WL 1132851, *5 (N.D. Tex. 2005) (unpublished) (taking judicial
notice of calculations to determine the volume of a gallon of water); *In re Netflix, Inc. Securities
Litig.*, 2005 WL 3096209, *1 (N.D. Cal. Nov. 18, 2005) (taking judicial notice of, among other
things, calculations based upon information in SEC filings); *In re ATI Technologies, Inc.
Securities Litig.*, 216 F.Supp.2d 418, 439 n.14 (E.D. Pa. 2002) (taking judicial notice of a
NASDAQ stock price of shares, the court calculated the proceeds of the entity in question); *In re
Russell*, 72 B.R. 855, 865 and n.1 (Bankr. E.D. Pa. 1987) (taking judicial notice of court's own
calculation of a TILA maximum finance charge and APR).

unsupported by facts set out in the complaint or legal conclusions cast as factual allegations."). Nor is Plaintiff's use of the statutory language in its conclusory allegation sufficient to withstand a motion to dismiss.  *See, e.g.*, *WAKA LLC v. DC Kickball*, 2007 WL 1549091, at *2 (D.D.C. May 25, 2007) (holding that "plaintiffs must do more than paraphrase the language" of the statute or "state in conclusory terms" that the defendant has violated those laws).

Plaintiff also fails to state a claim under Section 804(b).  To state a claim under Subsection (b), Plaintiff must allege that Accredited either provides housing or "services or facilities" in connection with housing.  Plaintiff has neither alleged that Accredited provides housing, nor has it alleged that Accredited provides "services or facilities" in connection with housing.  *See Clifton Terrace Assocs.*, 929 F.2d at 720 (holding that Section 804(b) is "limited to services and facilities provided in connection with the sale or rental of housing" and is "directed at those who provide housing and then discriminate in the provision of attendant services or facilities, or those who otherwise control the provision of housing services and facilities").

Similarly, Plaintiff also fails to state a claim under Section 804(c).  To state a claim under Subsection (c), Plaintiff must allege that Accredited made, printed or published, or caused to be made printed or published a notice, statement or advertisement "with respect to the sale or rental of a dwelling . . . ."  FHA § 804(c), 42 U.S.C. § 3604(c).  Nowhere in the Complaint does Plaintiff allege that Accredited has engaged in the sale or rental of housing.  Indeed, it does not. As a result, no notices, statements or advertisements made, printed or published by Accredited can be considered to be "with respect to the sale or rental of a dwelling" as required by the statute.

Accordingly, if the Court concludes that Section 804 can apply to mortgage lending, Accredited respectfully requests that Plaintiff's claims under Sections 804(a), 804(b) and 804(c) be dismissed.

## IV.    PLAINTIFF FAILS TO STATE A COGNIZABLE DISPARATE IMPACT CLAIM UNDER THE FAIR HOUSING ACT.

Because the FHA does not provide for disparate impact claims of discrimination, Plaintiff's disparate impact claims are not cognizable.  Furthermore, even if the FHA permitted disparate impact claims, Plaintiff fails to state a cognizable disparate impact claim.

### A.    The Fair Housing Act Does Not Permit Disparate Impact Claims.

The Supreme Court's recent decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005), demonstrates that the FHA does not permit disparate impact claims.[16]  It also shows that lower court decisions permitting disparate impact claims under the FHA are now untenable. Accredited acknowledges that this Court has held previously that the FHA permits disparate impact claims.  *See Nat'l Fair Housing Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 59-60 (D.D.C. 2002).  However, counsel for Accredited has reviewed the briefs in that case and discovered that the Court did not have the benefit of a briefing of the arguments presented below.  In light of the doubt *Smith* casts upon previous case law (including the cases on which the Court relied in *National Fair Housing Alliance*), and the new arguments presented below, Accredited respectfully requests that the Court reconsider the legal analysis underlying its holding in *National Fair Housing Alliance*.

---

[16]    Plaintiff's counsel has previously acknowledged that *Smith* "may have implications for the direction the Supreme Court will take should it decide to address the applicability of disparate impact claims under the Fair Housing Act in a future case."  1 John P. Relman, *Housing Discrimination Practice Manual* § 2:24, at 2-72 (2005).

**1.     The Text of the FHA Does Not Permit Disparate Impact Claims.**

The Supreme Court's opinion in *Smith* shows that the text of an anti-discrimination statute, not merely a broad reading of the statute's purpose, determines whether the statute permits disparate impact claims.  In *Smith*, the Court considered whether the Age Discrimination in Employment Act ("ADEA") permits disparate impact claims.  Noting the similarity between the ADEA and Title VII, the Court reviewed its Title VII jurisprudence for guidance—and, in the process, clarified and emphasized that its Title VII disparate impact jurisprudence is firmly rooted in the plain language of the statutory text.  Justice Stevens' plurality opinion clarifies that the Court's holding in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), was based on the "interpretation of § 703(a)(2) of Title VII."  *Smith*, 544 U.S. at 234.  While the Court acknowledged that its opinion in *Griggs* relied in part on the purposes of Title VII, the Court has "subsequently clarified" that its Title VII disparate impact jurisprudence is based on the text of Section 703(a)(2) of Title VII, not on an analysis of the overall purposes of the Act. *Id.* at 235.[17] By showing that the original disparate impact holding in *Griggs v. Duke Power Co.* was rooted in specific language in the text of Title VII rather than being implied by the overall purposes of the statute—and by basing its disparate impact analysis under the ADEA on the text of the statute—the Supreme Court's decision in *Smith* reaffirms the primacy of the statutory text in construing anti-discrimination statutes.

---

[17]     *See also Griggs*, 401 U.S. at 426 (quoting Section 703(a)(2), but omitting quotation of Section 703(a)(1)); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (quoting Section 703(a)(2) in discussing disparate impact); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 655 n.9 (1989) (same).

The Supreme Court's textual analysis in *Smith* also shows that the text of the FHA does not permit disparate impact claims.  The Court explained that disparate impact claims under Title VII are permitted by the "effects" language of Section 703(a)(2).  Section 703(a) provides:

> (a) It shall be an unlawful employment practice for an employer -
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or o*therwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Title VII § 703(a), 42 U.S.C. § 2000e-2(a) (emphasis added).[18]  The Court held that the text of ADEA § 4(a)(2)—which mirrors Title VII § 703(a)(2)—led to the conclusion that the ADEA permits disparate impact claims.  *Smith*, 544 U.S. 235-38.  This is because the language of the ADEA, like Title VII, prohibits actions that "otherwise adversely affect" the employee's status.  *Id.* at 236.  "Thus, the text focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer."  *Id.*; *see also Watson*, 487 U.S. at 991 (explaining that in disparate impact cases, "the employer's practices may be said to 'adversely affect' [an individual's status] as an employee").

In addition to explaining that Title VII § 703(a)(2) and ADEA § 4(a)(2) permit disparate impact claims, the Court clarified that subsection (a)(1) of each statute—the subsection which the FHA mirrors—does not.  The Court noted that there are "key textual differences" between subsections (a)(1) and (a)(2) of both Title VII § 703 and the ADEA § 4.  *Smith*, 544 U.S. at 236

---

[18]    Section 4(a) of the ADEA, the statute at issue in *Smith*, contains comparable language. *See* 29 U.S.C. § 623(a); *Smith*, 544 U.S. at 233.

n.6.  Whereas Subsection (a)(2) permits disparate impact claims, the Court explained that

Subsection (a)(1) encompasses disparate treatment, but "**_does not encompass disparate-impact_**

**_liability_**," and requires a showing of intent.  *Id.* at 236-38 (emphasis added).  This is because "the

focus of the paragraph is on the employer's actions with respect to the targeted individual."  *Id.*

at 236 n.6.  And, while the Justices disagreed as to whether Subsection (a)(2) of ADEA § 4

permits disparate impact claims, the Court was unanimous that Subsection (a)(1) does not.  *See*

*id*. at 236 n.6; *id.* at 243 (Scalia, J., concurring) ("I agree with all of the Court's reasoning . . . .");

*id.* at 249 (O'Connor, J., dissenting) ("Neither petitioners nor the plurality contend that the first

paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not.

That provision plainly requires discriminatory intent . . . .").

      The Court's clarification of the disparate treatment and disparate impact provisions of

Title VII and the ADEA shows that the FHA does not permit disparate impact claims.  The

language of Section 805 of the FHA mirrors Section 703(a)(1) of Title VII and Section 4(a)(1) of

the ADEA, which permit disparate treatment claims but not disparate impact claims.  *Compare*

Title VII, § 703(a)(1), 42 U.S.C. 2000e-2(a)(1), *and* ADEA § 4(a)(1), 29 U.S.C. 629(a)(1), *with*

FHA § 805(a), 42 U.S.C. 3605(a).  Moreover, Section 805 of the FHA does not contain any

language comparable to Section 703(a)(2) or Section 4(a)(2), the provisions of Title VII and the

ADEA that permit disparate impact claims.  Stated differently, the FHA does not have any

language focusing on the effects of actions comparable to the language of Title VII § 703(a)(2)

or ADEA § 4(a)(2) that support disparate impact claims.  This is demonstrated in the following

table:[19]

---

[19]      A similar chart addressing the Equal Credit Opportunity Act is found in Peter N. Cubita
& Michelle Hartmann, *The ECOA Discrimination Proscription and Disparate Impact—*

*(continued on following page...)*

| | Title VII | ADEA | FHA |
|---|---|---|---|
| **Disparate Treatment Language** | (a) It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, sex, or national origin; | (a) It shall be unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual or otherwise *discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* age; | (a) In general.  It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to *discriminate against any person* in making available such a transaction, or in the terms or conditions of such a transaction, *because of* race, color, religion, sex, handicap, familial status, or national origin. |
| **Disparate Impact Language** | (a) It shall be an unlawful employment practice for an employer – (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin. | "It shall be unlawful for an employer: . . . (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's age. . . . | **None.** |

These differences are dispositive of Congress's intent in enacting the FHA.  The Supreme Court has explained that "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."  *Smith*, 544 U.S. at 233-34.  Indeed, this was the basis for the Court concluding that an "effects" provision in the

---

(*...continued from previous page*)
*Interpreting the Meaning of the Words That Actually Are There*, 61 BUS. LAWYER 829, 834 (2006).

ADEA comparable to Title VII's "effects" provision meant Congress intended to permit

disparate impact claims. *Id.* at 235-38. The reverse is also true: "This use of different language

in two statutes so analogous in their form and content, enacted so closely in time, suggests that

the statutes differ in their meaning . . . ." *Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir.

2004) (Roberts, J., concurring). The absence in the FHA of an "effects" provision comparable to

Title VII § 703(a)(2) and ADEA § 4(a)(2) shows that the FHA does not permit disparate impact

claims.

      The Supreme Court's interpretation of other anti-discrimination statutes further

demonstrates that the FHA does not permit disparate impact claims. When the statutory text

creates a cause of action based on the "effects" or "results" of actions, the Court has held that the

statute permits disparate impact claims.[20] *See, e.g.*, *Griggs*, 401 U.S. at 429-31 (Title VII);

*Smith*, 544 U.S. at 232-35 (ADEA); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)

(Americans with Disabilities Act ("ADA"), which mirrors Title VII); *Chisom v. Roemer*, 501

U.S. 380, 404 (1991) (Voting Right Act, which addresses "results"); *Alexander v. Choate*, 469

U.S. 287, 299 (1985) (Rehabilitation Act, which incorporates the ADA).

      In contrast, when the statutory text does not contain a provision creating a cause of action

based on "effects" of actions, the Court has held that the statute does not permit disparate impact

claims.[21] *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005) (Title IX);

*Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (Title VI); *see also Castenada v. Pickard*,

---

[20]    For the Court's convenience, the relevant statutory text of statutes permitting disparate impact claims is compiled in tabular form and attached hereto as Exhibit A.

[21]    For the Court's convenience, the relevant statutory text of statutes that do not permit disparate impact claims is compiled in tabular form and attached hereto as Exhibit B.

648 F.2d 989, 1001 (5th Cir. 1981) (Equal Education Opportunities Act); *Robinson v. Paragon Foods, Inc.*, 2006 WL 2661110, at *6 (N.D. Ga. Sept. 15, 2006) (Title II).[22]

Because the FHA does not contain any "effects" language necessary for disparate impact claims to be permissible, the Court should dismiss Plaintiff's disparate impact claims.[23]

### 2. *Smith* Casts Serious Doubt on Lower Court Decisions Permitting Disparate Impact Claims Under the FHA.

A review of the lower court jurisprudence regarding disparate impact claims under the FHA shows that the jurisprudence is a house built upon sand.[24]  The foundation for this jurisprudence was weak before *Smith*.  After *Smith*, it is apparent that the house has fallen.[25]

The first cases holding that the FHA permits disparate impact claims relied not on the statutory text of the FHA, or even employment law disparate impact cases, but on equal protection cases.  In *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) ("*Black*

---

[22]    While the Supreme Court has not addressed whether the ECOA permits disparate impact claims, commentators recently have argued that the ECOA should not be interpreted to permit disparate impact claims, particularly in the aftermath of *Smith*.  *See* Cubita & Hartmann, *supra*.

[23]    The arguments above are equally applicable to both FHA § 804 and FHA § 805.  However, as discussed above, Plaintiff has not stated a cognizable claim under Section 804.  If, however, the Court concludes that Plaintiff has stated a cognizable claim under Section 804, Accredited asks the Court to dismiss Plaintiff's disparate impact claims under Section 804 for the same reasons given for dismissal of Plaintiff's Section 805 claims.

[24]    A detailed history of cases permitting disparate impact claims under the FHA is contained in Peter E. Mahoney, *The End(s) of Disparate Impact:  Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 EMORY L.J. 409, 425-39 (1998).  While Mahoney "expressly leaves to one side the question of whether any disparate impact standard is appropriately applied under the FHA," *id.* at 425 n.54, he notes that "the Title VII explanation of the disparate impact standard does not fully unravel the reasons for its use in the FHA area or the tangled state of the standard in FHA/ECOA jurisprudence."  *Id.* at 425.

[25]    We note that while some courts have held that the FHA permits disparate impact claims, the Supreme Court has yet to rule on the issue, and the D.C. Circuit recently clarified that it has not addressed this issue.  *See Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006).

33

*Jack*"), the court engaged in no substantive analysis of the FHA or Title VII. Instead, the *Black Jack* court adopted a disparate impact standard derived wholly from constitutional cases. *See id.* 1184-85; *see also* Mahoney, *supra*, at 428-29. Less than two years after *Black Jack*, the Supreme Court overruled the entire line of equal protection cases relied on by the *Black Jack* court and held that equal protection claims require a showing of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 265 (1976); *see also* Mahoney, *supra*, at 429-30. Thus, the foundation of the *Black Jack* line of cases was undermined, and *Black Jack* itself "must be regarded as having no vitality." *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 360-61 (1984).

The next stage in the evolution of FHA disparate impact jurisprudence was based on a misunderstanding of the Supreme Court's Title VII jurisprudence. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Supreme Court reaffirmed its holding that equal protection claims require a showing of discriminatory intent. *Id.* at 264-65. In a case brought under both the Equal Protection Clause and the FHA, the Seventh Circuit held that "discriminatory effects" were sufficient to support an equal protection claim. *Id.* at 259. The Supreme Court reversed, but noted that "[t]he Court of Appeals, however, proceeding in a somewhat unorthodox fashion, did not decide the statutory question." *Id.* at 271. The Supreme Court therefore remanded for consideration of the FHA claim. *Id.* On remand, the Seventh Circuit held that the FHA permits disparate impact claims. This holding was based both on a reliance on *Black Jack* and on a misreading of the Supreme Court's opinion in *Griggs*:

> The important point to be derived from *Griggs* is that the Court did not find the "because of race" language to be an obstacle to its ultimate holding that intent was not required under Title VII. It looked to the broad purposes underlying the Act rather than attempting to discern the meaning of this provision from its plain language.

*Metro. Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289-90 (7th Cir. 1977) ("*Arlington Heights II*").  Thus, the *Arlington Heights II* court concluded that *Griggs* permitted Title VII disparate impact claims based on "the broad purposes" of the Act and in spite of the plain meaning of the statute.  The *Arlington Heights II* court extended this reading of *Griggs* to the FHA to find that the FHA permitted disparate impact claims.  However, the Supreme Court has now made clear that this reading of *Griggs* is incorrect.  *See Smith*, 544 U.S. at 235-37.  Disparate impact claims under Title VII are permitted by the "effects" language of Section 703(a)(2)—by the plain language of the statutory text—not by a broad interpretation of the purpose of the statute.  *Id.*  Thus, *Smith* not only undermines the foundation of *Arlington Heights II* and all cases based thereon, but it also strongly suggests that statutes lacking this "effects" language—including the FHA—do not permit disparate impact claims.[26]

The next and final stage in the evolution of FHA disparate impact cases continued the misreading of *Griggs* and, therefore, has been undermined by *Smith*.  The Third Circuit in *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) grounded FHA disparate impact liability on Title VII jurisprudence in three flawed and now discredited arguments:  First, it made much of the Supreme Court's remand to the Seventh Circuit in *Arlington Heights*.  *See* 564 F.2d at 147.  The Supreme Court's remand was based, however, on the fact that the Seventh Circuit had not previously considered the FHA claim.  *Arlington Heights*, 429 U.S. at 271.  *Rizzo*'s reliance on the remand ignores the fact that the Supreme Court takes quite seriously its duty to

---

[26]    Additionally, the Seventh Circuit clarified in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990) that evidence of discriminatory effects is relevant only in the sense that it is probative of discriminatory intent, and that liability under the FHA is "permissible only upon a finding of an intent to discriminate." *Id.* at 1533; *see also Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 714-16 (7th Cir. 1998) (questioning the applicability of Title VII disparate impact jurisprudence to credit discrimination cases).

address only issues properly before it.  *See, e.g.*, *Taylor v. Freeland & Kronz*, 503 U.S. 638, 645-46 (1992); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815-16 (1985).  Second, *Rizzo* relied on Title VII disparate impact cases and reasoned (wrongly) that the statutory language of Title VII and the FHA related to disparate impact are comparable.  *Rizzo*, 564 F.2d at 147.  This conclusion has been undercut by *Smith*.  Finally, it noted that other courts of appeal had held that FHA permits disparate impact claims, relying largely on *Black Jack* and *Arlington Heights II*.  As discussed above, these cases were based either on overruled precedent or on a misreading of the Supreme Court's Title VII precedent.  Thus, *Rizzo* and its progeny are based on a faulty foundation—a foundation *Smith* has shown to be unsound.[27]

While some other courts later followed these cases and their progeny—including their misreading of *Griggs* and misinterpretation of the statutory text of Title VII—in finding that the FHA permits disparate impact claims, the Supreme Court's holding in *Smith* now strongly suggests a reconsideration of the legal analysis of these cases is necessary.  For example, when this Court considered the issue of whether the FHA permits disparate impact claims, the Court relied heavily on previous decisions from other circuit courts because the D.C. Circuit had not (and still has not) addressed the issue.  *See Nat'l Fair Housing Alliance*, 208 F. Supp. 2d at 58 & n.6.  Each of these cases is either discussed above (and, as discussed, is now seriously in doubt) or relies on one or more of these cases and their progeny.  This can best be seen by reviewing these cases in chronological order:

---

[27]     Not all cases were built upon this flawed foundation, however.  In *Brown v. Artery Organization, Inc.*, 654 F. Supp. 1106 (D.D.C. 1987), Judge Greene held that discriminatory effect alone is insufficient to sustain a claim under the FHA.  *See also Village of Bellwood*, 895 F.2d at 1533.

| Court | Case Cited | Authority Upon Which the Court Relies |
|---|---|---|
| 8th Circuit | *Black Jack* | equal protection cases overruled by *Washington v. Davis* |
| 7th Circuit | *Arlington Heights II* | *Black Jack* and *Griggs* |
| 3d Circuit | *Rizzo* | *Black Jack*, *Arlington Heights II*, and *Griggs* |
| 4th Circuit | *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982) | *Black Jack*, *Arlington Heights II*, *Rizzo*, and *Griggs* |
| 6th Circuit | *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986) | *Black Jack*, *Arlington Heights II*, *Rizzo*, and *Town of Clarkton* |
| 2d Circuit | *United States v. Starrett City Assoc.*, 840 F.2d 1096, 1100 (2d Cir. 1988) | *Town of Clarkton*, *Arthur*, and *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036-37 (2d Cir.1979), which in turn relied on *Black Jack*, *Arlington Heights II*, and *Rizzo* |
| 9th Circuit | *Keith v. Volpe*, 858 F.2d 467, 482-84 (9th Cir. 1988) | *Black Jack*, *Arlington Heights II*, *Rizzo*, and *Town of Clarkton* |
| 1st Circuit | *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252, 269 n.20 (1st Cir. 1993) | *Black Jack*, *Arlington Heights II*, *City of Clarkton*, *Starrett City Assoc.*, and *Robinson* |
| 11th Circuit | *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir. 1994) | *City of Clarkton*, *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978) (which in turn relies on *Arlington Heights II*), and *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1558, n. 20 (11th Cir.1984) (which in turn relies on *Black Jack, Arlington Heights II*, *Rizzo*, *City of Clarkton*, *Mitchell*, and *Griggs*) |
| 10th Circuit | *Mountain Side Mobile Home Estates Partnership v. HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995) | *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.1995) (which in turn relies on *Black Jack*, *Arlington Heights II*, and *Rizzo*) |
| 5th Circuit | *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996) | *Hanson v. Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir.1986) (which in turn relies on *Mitchell*) |

Thus, each of cases relied upon by the Court in *National Fair Housing Alliance* ultimately derives from *Black Jack*, *Arlington Heights II*, and/or *Rizzo*.  The Supreme Court's decision in *Smith*—by clarifying its holding in *Griggs*, reemphasizing the primacy of the statutory text, and explaining that disparate impact claims are only permitted by statutes that contain "effects"

language—seriously undermines all of these decisions. *Cf. Limbach*, 466 U.S. at 360-61

(holding that the progeny of overruled cases "must be regarded as retaining no vitality").[28]

The Supreme Court's clarification of its Title VII jurisprudence in *Smith*, its reemphasis

of the primacy of the statutory text, and its clarification of the meaning of Title VII's statutory

text show that past FHA disparate impact jurisprudence is without a solid foundation.  In the

aftermath of *Smith*, the lower courts' FHA disparate impact jurisprudence should be rejected.

Because the text of the FHA does not contain the language that authorizes disparate impact

claims, the FHA cannot be read to permit disparate impact claims.

**B.    Even if the Fair Housing Act Permitted Disparate Impact Claims, Plaintiff Fails to State a Cognizable Disparate Impact Claim.**

Finally, even if the FHA could be interpreted to permit disparate impact claims, Plaintiff

has failed to state a cognizable disparate impact claim.  A cognizable disparate impact claim

requires two components:  an allegation that a practice has an adverse impact on a protected

class, and an allegation that the impact is disparate.  To establish that an adverse impact is

disparate, a plaintiff "must show that the unfavorable consequences are borne disproportionately

by the members of the class in comparison to non-members who are similarly situated."

*Donnelly v. R.I. Bd. of Govs. for Higher Educ.*, 929 F. Supp. 583, 590 (D.R.I. 1996), *aff'd* 110

---

[28]    Accredited notes that a number of agencies issued a Policy Statement on Discrimination in Lending ("Policy Statement").  *See* 59 Fed. Reg. 18266 (Apr. 15, 1994).  The Policy Statement's discussion of disparate impact claims under the FHA is not an authoritative interpretation of the FHA.  *See id.* at 18266.  Instead, it is a summary of FHA jurisprudence.  *See id.* at 18268 ("The courts have recognized three methods of proof of lending discrimination under the ECOA and the FH Act . . . .").  Because the Policy Statement is based on decisions that the Supreme Court's decision in *Smith* has undermined, and is unsupported by the plain language of the FHA, it is not entitled to deference.  Moreover, we note that the Policy Statement is not the result of "notice and comment" rulemaking but rather "a statement of the Agencies' general position on the Equal Credit Opportunity Act and the Fair Housing Act for purposes of administrative enforcement of those statutes."  *Id.* at 18266.

F.3d 2 (1st Cir. 1997); *see also*; *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir.

1984) (holding that to state a cognizable disparate impact claim, plaintiffs must allege that the

policy in question "had a disparate impact on the minorities in the *total group to which the policy

was applied*" (emphasis added)).  In other words, to state a cognizable disparate impact claim, a

plaintiff must allege that the total impact of a policy is disparate when compared to the total

group to which the policy is applied.  Plaintiff has failed to do so.

     Plaintiff's meritless allegations of discrimination are based on highly selective

descriptions of and references to Accredited's loan programs that artificially narrow both the

group of borrowers affected by these loan programs and the geographic area to which these

programs apply.[29]  As a result, Plaintiff has failed to state a cognizable disparate impact claim.

     Plaintiff fails to state a cognizable disparate impact claim for at least two reasons.  First,

Plaintiff has artificially and inappropriately narrowed the group of individuals that is affected by

Accredited's alleged lending policies.  Plaintiff's allegations address only individuals affected by

Accredited's limitations on row houses, and only those owning or purchasing a row house in one

of six metropolitan areas.  However, Plaintiff omits significant limitations on property type in

Accredited's loan programs, making it appear (wrongly) that row houses are the only types of

property excluded.  For example, Plaintiff incorrectly claims that Accredited's policies "deny[]

loans *only* for row houses that fall under a high minimum threshold of $100,000 . . . ."  Compl. ¶

54 (emphasis added).  Plaintiff's convenient use of ellipses—"'Not allowed: Rowhomes ....'", *Id.*

¶ 60 (ellipses in Complaint)—is indicative of Plaintiff's highly selective and misleading

discussion of the loan programs.  Plaintiff focuses exclusively on limitations placed on row

---

[29]    Because Plaintiff attached excerpts of Accredited's loan programs to the Complaint, it is appropriate for the Court to consider them in ruling on this motion to dismiss.  *See, e.g.*, *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006).

houses while simultaneously omitting any discussion of the limitations placed on other property types—many of which are owned or purchased primarily by non-minority borrowers.  Even a cursory review of the excerpts of Accredited's Loan Program Guide attached to Plaintiff's Complaint dispels the impression that only row houses are excluded.[30]  Thus, Plaintiff's allegations are based not on Accredited's policies, but on a small portion of those policies to the exclusion of the rest.  Plaintiff's inappropriate narrowing of the affected group not only distorts the effect of Accredited's lending policies, it fatally flaws Plaintiff's Complaint.[31]  By failing to allege facts regarding the total impact of Accredited's lending policies, Plaintiff has failed to state a claim upon which relief may be granted.

Second, Plaintiff has failed to state a cognizable disparate impact claim because Plaintiff fails to compare the affected group to the total group to which the policy applied.  The loan programs attached to Plaintiff's Complaint are excerpts of the loan programs Accredited offers nationwide.  *See* Compl. Ex. G, at 4.  Yet, when Plaintiff discusses the alleged impact of those loan programs, it discusses only a mere six metropolitan areas—a small fraction of the areas in which Accredited makes loans under these programs.  *See* Compl. ¶¶ 21-58.  Only once does Plaintiff acknowledge that the loan programs Plaintiff discusses apply "in any of the states where

---

[30]    For the Court's convenience, a summary of property type limitations in Accredited's loan programs (excerpts of which are attached to the Complaint) is attached hereto as Exhibit C. Plaintiff also omits a discussion of the general limitations on other property types contained in Accredited's Loan Program Guide.  In addition to limitations on row houses, Accredited imposes limitations on numerous other property types—including property types primarily owned or purchased by non-minorities—including condominiums, factory-built houses, modular homes, rural properties, etc.  *See* Compl. Ex. I.

[31]    In the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to [FRCP] 10(c), the exhibit prevails.  *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (citing 2A *Moore's Federal Practice*, ¶ 10.06, p. 10-24).

Accredited does business." *Id.* ¶ 64.  The excerpts of Accredited's Loan Program Guide show that these loan programs are offered nationwide in those states where it makes loans, and not just in the six metropolitan areas on which Plaintiff focuses.   *See* Compl. Ex. G, at 4 (identifying existence of state-specific guidelines for states across the nation).  Therefore, the appropriate group for comparison would be all potential borrowers nationwide, not simply potential borrowers in a mere six metropolitan areas.  By failing to allege that the impact of Accredited's lending practices is disparate in comparison to all potential borrowers nationwide, Plaintiff has failed to state a claim upon which relief may be granted.

By comparing an improperly narrowed group of borrowers affected by Accredited's alleged policies to an improperly narrowed group of borrowers and potential borrowers, Plaintiff has failed to state a cognizable disparate impact claim.  For these reasons, Accredited requests that the Court dismiss Plaintiff's disparate impact claims.

## CONCLUSION

For the reasons discussed above, Defendants request that Plaintiff's Complaint, or, in the alternative, portions of Plaintiff's Complaint, be dismissed.

Respectfully submitted,

_____/s/_____
Matthew P. Previn

Matthew P. Previn (DC Bar No. 460228)
Kirk D. Jensen (DC Bar No. 477629)
   (federal court application pending)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
202-349-8000 (telephone)
202-349-8080 (fax)

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 21, 2007, a copy of the above and foregoing was electronically filed in this case and was duly served upon counsel of record by operation of the Court's ECF system

<div align="right">

_____/s/_____

Matthew P. Previn

</div>

**EXHIBIT A**

**STATUTES CONTAINING "EFFECTS" LANGUAGE THAT PERMITS DISPARATE IMPACT CLAIMS**

| Statute | Text of Statute Permitting Disparate Impact Claims | Cases Finding Disparate Impact Claims Permitted |
|---|---|---|
| Title VII | "It shall be an unlawful employment practice for an employer: . . . (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ***or otherwise adversely affect*** his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). | *Griggs*, 401 U.S. at 429-31. |
| ADEA | "It shall be unlawful for an employer: . . . (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities ***or otherwise adversely affect*** his status as an employee, because of such individual's age…." 29 U.S.C. § 623 (emphasis added). | *Smith*, 544 U.S. at 232-35. |
| Americans with Disabilities Act ("ADA") | "No covered entity shall discriminate against a qualified individual with a disability because of he disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).<br><br>"As used in subsection (a) of this section, the term 'discriminate' includes: (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; (2) participating in a[n]… arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited in this subchapter; (3) utilizing standards, criteria, or methods of administration: (A) ***that have the effect of discrimination*** on the basis of disability; or (B) that perpetuate the discrimination of others who are subject to common administrative control…." 42 U.S.C. § 12112(b) (emphasis added). | *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). |

| Statute | Text of Statute Permitting Disparate Impact Claims | Cases Finding Disparate Impact Claims Permitted |
|---|---|---|
| Rehabilitation Act | "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990…." 29 U.S.C. § 791(g). | *Alexander v. Choate*, 469 U.S. 287, 299 (1985). |
| Voting Rights Act | "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by an State or political subdivision in a manner which ***results*** in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color…." 42 U.S.C. § 1973(a) (emphasis added). | *Chisom v. Roemer*, 501 U.S. 380, 404 (1991) |

**EXHIBIT B**

**STATUTES OMITTING "EFFECTS" LANGUAGE AND THAT DO NOT PERMIT DISPARATE IMPACT CLAIMS**

| Statute | Text of Statute Not Permitting Disparate Impact Claims | Cases Finding Disparate Impact Claims Not Permitted |
|---|---|---|
| Title IX | "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…." 20 U.S.C. § 1681. | *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). |
| Title VI | "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000-d. | *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). |
| Equal Education Opportunities Act | "No State shall deny equal educational opportunity to any individual on account of his or her race, color, sex or national origin…." 20 U.S.C. § 1703. | *Castenada v. Pickard*, 648 F.2d 989, 1001 (5th Cir. 1981). |
| Title II | "All persons shall be entitled to the full and equal enjoyment of the goods, services ,facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a. | *Robinson v. Paragon Foods, Inc.*, 2006 WL 2661110, at *6 (N.D. Ga. Sept. 15, 2006) (Title II). |

**EXHIBIT C**

**PROPERTY TYPE LIMITATIONS IN ACCREDITED'S LOAN PROGRAMS**
(taken from the Exhibits attached to Plaintiff's Complaint)

| Loan Program | Property Type Limitations (excerpts) | Source |
|---|---|---|
| > 100% CLTV 2nd Mortgage Program | "Not allowed:  Rural, units, modular, manufactured homes." "Minimum Property Value:  $100,000." | Compl. Ex. H, at II-19. |
| > 90% LTV 1st Mortgage Program – Full Doc, Alt2, Alt1 | "Not allowed:  Rowhomes; flats; commercial / industrial zoning." "Rural properties may be considered as an exception up to a 5-acre maximum." | Compl. Ex. K, at II-2. |
| > 90% LTV 1st Mortgage Program – Stated | "Not allowed:  Rowhomes; rural properties; 3-4 units; properties zoned commercial / industrial; lease options; land contracts; manufactured homes; construction-to-perm transactions." | Compl. Ex. L, at II-6. |
| 95% LTV 1st Mortgage – Full Doc | "Not allowed:  3-4 units, rural, rowhomes, flats, commercial / industrial zoning." | Compl. Ex. M, at II-4. |
| High CLTV Stand-Alone 2nd Mortgage Program – Full Doc, Alt2, Alt1 | "Not allowed:  Rowhomes; flats; manufactured homes; commercial / industrial zoning." "Rural properties may be considered as an exception up to a 5 acre maximum." | Compl. Ex. N, at II-14. |
| High CLTV Stand-Alone 2nd Mortgage Program – Stated | "Rural, 3-4 units, rowhomes, flats, manufactured homes, modular homes, or commercial / industrial zoned properties are not allowed." | Compl. Ex. O, at II-17. |
| High CLTV Combo Program – Full Doc, Alt2, Alt1 | "Not allowed:  Rowhomes; flats; manufactured homes; commercial / industrial zoning." | Compl. Ex. P, at II-22. |
| High CLTV Combo Program – Stated | "Rural, 3-4 units, rowhomes, flats, manufactured homes, modular homes, or commercial / industrial zoned properties are not allowed." | Compl. Ex. Q, at II-25. |
| Score More Program – Full Doc, Alt2, Alt1 | "Not allowed:  Manufactured homes; Unimproved land; Cooperative and Time Share units; Properties in Trust; Agricultural; Leaseholds; Escrow Holdbacks; Commercial; Mixed use; Industrial; Mobile home zoning." | Compl. Ex. R, at II-28. |
| Score More Program – Stated, Lite | "Not allowed:  Manufactured homes; Unimproved land; Cooperative and Time Share units; Properties in Trust; Agricultural; Leaseholds; Escrow Holdbacks; Commercial; Mixed use; Industrial; Mobile home zoning." | Compl. Ex. S, at II-31. |
| Second Home Program | "Not allowed:  Properties zoned commercial / industrial; lease options; land contracts." "Properties allowed in Florida or Hawaii only." | Compl. Ex. T, at II-11. |

| Loan Program | Property Type Limitations (excerpts) | Source |
|---|---|---|
| Super Jumbo 1st Mortgage Program – Full Doc, Alt2 | "Not allowed:  4 Units, manufactured homes, rural, properties zoned commercial / industrial, properties with agricultural zoning or use." | Compl. Ex. U, at II-33. |
| Super Jumbo 1st Mortgage Program – Stated, Lite | "Not allowed:  3-4 Units." | Compl. Ex. V, at II-34. |
| MOP Program | "Rural properties may be considered with a 10% LTV reduction." "Rowhomes:  Follow standard guidelines in Collateral – Section VII.  Rowhomes in Baltimore, MD are not allowed." "Manufactured homes are not allowed." | Compl. Ex. W, at II-9. |
| Interest Only Criteria | "Property types [not allowed]:  3-4 units; rural; rowhomes; or other unacceptable property types shown in Collateral – Section VII." | Compl. Ex. X, at VI-13. |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY REINVESTMENT
COALITION,

                Plaintiff,

       v.                                    Case No. 1:07-cv-01357-EGS

ACCREDITED HOME LENDERS HOLDING
COMPANY, ACCREDITED HOME LENDERS,
INC., and ACCREDITED MORTGAGE LOAN
REIT TRUST,

                Defendants.

## DECLARATION OF JOHN C. REDDING

John C. Redding declares as follows:

1.     My name is John C. Redding. I am over the age of 21 and am competent to make

this declaration. I make this declaration based on personal knowledge of the matters set forth

herein. I am currently the Associate General Counsel – Operations of Accredited Home Lenders,

Inc. ("Accredited") and have held that position or similar positions since January 2005. In

addition, I am an Assistant Vice-President and Assistant Secretary of both Accredited and

Accredited Home Lenders Holding Company (the "Holding Company"). As part of my duties, I

oversee the licensing group, litigation, and general operations of Accredited from a legal and

regulatory perspective. While I do not regularly perform any duties for the Accredited Mortgage

Loan REIT Trust (the "REIT"), I have reviewed documents and correspondence as well as

consulted with other individuals to sufficiently inform myself to provide this declaration.

2.     The Holding Company is a corporation registered in Delaware, with its principal

place of business in San Diego, California. The Holding Company has never been registered or

licensed to do business in the District of Columbia, nor has it ever maintained an office, employee, telephone, mailing address, or registered agent for service of process in the District of Columbia. The Holding Company has never originated or serviced a loan in the District of Columbia. The Holding Company has never maintained any business records in the District of Columbia or owned or leased any real property in the District of Columbia. The Holding Company has never engaged in any marketing to residents of the District of Columbia. The Holding Company's only contacts with the District of Columbia have involved filings and communications with the Securities and Exchange Commission in connection with its status as a public company. Plaintiff in this case served the Holding Company in Delaware.

3.      The REIT, a Maryland real estate investment trust, was formed in May 2004. The REIT has never been registered or licensed to do business in the District of Columbia, nor has it ever maintained an office, employee, telephone, mailing address, or registered agent for service of process in the District of Columbia. The REIT has never originated or serviced a loan in the District of Columbia. The REIT has never maintained any business records in the District of Columbia, or owned or leased any real property in the District of Columbia. The REIT has never engaged in any marketing to residents of the District of Columbia. The REIT is a passive investment vehicle. Accredited sells the REIT loans made by Accredited, which the REIT holds for a very short time (no longer than 30 days) until the loans are placed into a securitization vehicle (typically a trust). None of the sales of loans to the REIT takes place in the District of Columbia. The REIT holds an ownership interest in the securitization trusts that hold the loans for each securitization. None of the securitization trusts is organized in the District of Columbia. Only a very small fraction of the loans included in these securitization trusts have borrowers who are District of Columbia residents or are secured by property located in the District of Columbia.

The REIT has played no role in the development or implementation of Accredited's lending policies and underwriting criteria. Nor has the REIT participated in the decisions regarding whether to originate any loan in the District of Columbia, originated any loans in the District of Columbia, or serviced any loans in the District of Columbia. Plaintiff in this case served the REIT in Maryland.

4.       Accredited is a California corporation and a wholly-owned subsidiary of the Holding Company. Of the three defendants named in the instant case, only Accredited is involved in developing and implementing lending policies, making lending decisions, originating loans, or servicing loans.

5.       The Holding Company represents in its filings with the SEC that the Accredited group of companies, and not the Holding Company individually, originates mortgage loans in all fifty states and the District of Columbia. The Holding Company, the REIT, and Accredited maintain separate corporate existences, and observe corporate formalities. The Holding Company, Accredited, and the REIT do not (i) present a common marketing image to the public, (ii) have an integrated sales system, or (iii) grant exclusive distributorships to each other. The Holding Company, Accredited, and the REIT each keep separate books.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 21, 2007

John C. Redding

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY REINVESTMENT
COALITION,

<div style="text-align:center">Plaintiff,</div>

<div style="text-align:center">v.</div>

ACCREDITED HOME LENDERS HOLDING
COMPANY, ACCREDITED HOME LENDERS,
INC., and ACCREDITED MORTGAGE LOAN
REIT TRUST,

<div style="text-align:center">Defendants.</div>

Case No. 1:07-cv-01357-EGS

## [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

On consideration of the Motion to Dismiss filed by Defendants Accredited Home Lenders Holding Company ("Holding Company"), Accredited Home Lenders, Inc. ("Accredited"), and Accredited Mortgage Loan REIT Trust ("REIT"), the Memorandum of Points and Authorities in support thereof, the opposition thereto, the reply, arguments made at the hearing, the facts, the law and the entire record herein, and finding that good cause exists that (1) this Court lacks jurisdiction over the Holding Company and the REIT, (2) Plaintiff lacks standing to pursue its claims, and (3) Plaintiff's Complaint fails to state a claim upon which relief can be granted under the Fair Housing Act ("FHA"), it is hereby

**ORDERED** that the Motion to Dismiss be and it hereby is GRANTED; and it is hereby

**FURTHER ORDERED** that Plaintiff's Complaint and the claims made therein be dismissed in entirety, with prejudice.

Dated: _____, 2007     _____

<div style="margin-left:40%">Hon. Emmet G. Sullivan<br>United States District Judge</div>

**<u>Serve:</u>**

Matthew P. Previn, Esq.
Kirk D. Jensen, Esq.
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC  20037

John Peter Relman, Esq.
Bradley Howard Blower, Esq.
Elena Grigera, Esq.
RELMAN & DANE
1225 19th Street, NW, Suite 600
Washington, DC  20036