# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
NATIONAL COMMUNITY )
REINVESTMENT COALITION, )
)
            Plaintiff, )
)
      v. )      Case No. 1:07-cv-01357-EGS
)
ACCREDITED HOME LENDERS )
HOLDING COMPANY, *et al.*, )
)
          Defendants. )
_____)


**PLAINTIFF NATIONAL COMMUNITY REINVESTMENT
COALITION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

John P. Relman (Bar No. 405500)
Bradley H. Blower (Bar No. 421112)
Glenn Schlactus (Bar No. 475950)
Elena Grigera (Bar No. 491678)
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

THE ALLEGATIONS OF THE COMPLAINT .................................... 5

STANDARD OF REVIEW ................................................................ 7

ARGUMENT .................................................................................... 7

I.    ACCREDITED HOLDING AND ACCREDITED REIT ARE SUBJECT
TO PERSONAL JURISDICTION IN THIS COURT .................................... 7

    A.  NCRC Has Established That This Court Has Personal Jurisdiction Over
Accredited Holding And Accredited REIT ............................................ 8

    B.  NCRC Is Entitled To Jurisdictional Discovery If The Court Finds That It
Has Not Yet Made A Sufficient Showing To Establish Personal Jurisdiction ...... 11

II.   NCRC HAS STANDING ........................................................................ 13

    A.  NCRC Has Been Injured By Defendants' Actions ................................ 14

    B.  NCRC's Allegations Regarding Its Injuries Are Sufficiently Specific
At This Early Stage Of The Litigation .................................................. 17

    C.  NCRC's Allegations That It Has Expended Resources To Counteract
The Effects Of Defendants' Discriminatory Policies Are Not Illogical .............. 18

III.  NCRC PROPERLY STATES A CLAIM UNDER 42 U.S.C. § 3604 ........................ 20

    A.  Section 3604 Applies To Mortgage Lending .......................................... 20

        1.  The Text's Plain And Unambiguous Language and Substantial
Precedent Demonstrate That Section 3604 Applies To Lending .................... 21

        2.  HUD Regulations Demonstrate That Section 3604 Applies To Lending ........ 24

        3.  Application Of Section 3604 To Lending Does Not Render Section
3605 Superfluous ............................................................................ 26

        4.  The Equal Credit Opportunity Act Supports The Application Of
Section 3604 To Lending .................................................................. 27

B.  NCRC Properly Alleges Violation Of Section 3604 .............................................28

IV. DISPARATE IMPACT CLAIMS ARE COGNIZABLE UNDER THE
FAIR HOUSING ACT .........................................................................................30

A.  The Legislative History Of The Fair Housing Act Demonstrates That It
Applies To Disparate Impact Claims...................................................................31

B.  This Court And All Eleven Circuits To Address The Issue Have Held
That The Fair Housing Act Applies To Disparate Impact Claims........................33

C.  Congress Endorsed The Application Of The Act To Disparate Impact
Claims In The Fair Housing Amendments Act Of 1988 .......................................37

D.  The Text Of The Fair Housing Act Compels The Conclusion That
The Act Applies To Disparate Impact Claims......................................................39

E.  Administrative Implementation Of The Fair Housing Act Supports
A Disparate Impact Standard................................................................................41

F.  *Smith* Does Not Undermine The Judicial Consensus That The Fair
Housing Act Applies To Disparate Impact Claims, But Instead Supports It.........43

1.  *Smith* Does Not Undermine The Bases For The First Through
Eleventh Circuits' Holdings That The FHA Permits A Disparate
Impact Claim................................................................................................44

2.  *Smith* Demonstrates That The Circuit Courts Have Properly
Analyzed The FHA's Application To Disparate Impact Claims ....................46

3.  Post-*Smith* Cases Continue To Hold That The FHA Applies To
Disparate Impact Claims..............................................................................50

V.  NCRC PROPERLY STATES A DISPARATE IMPACT CLAIM UNDER
THE FAIR HOUSING ACT.................................................................................51

A.  NCRC Satisfies The Low Pleading Standard For Discrimination Claims
By Alleging That Accredited's Policies Have A Disparate Impact On
African-Americans And Latinos...........................................................................51

B.  Even If The Pleading Standard Were Higher, NCRC Would Satisfy It ...............52

CONCLUSION......................................................................................................................55

# TABLE OF AUTHORITIES

## CASES:

*2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673
(D.C. Cir. 2006) ..................................................................................................2, 34

*Affordable Housing Dev. Corp. v. City of Fresno*, 433 F.3d 1182 (9th Cir. 2006) ......................50

*Alexander v. Choate*, 469 U.S. 287 (1985) ..................................................................48

*Alexander v. Riga*, 208 F.3d 419 (3d Cir. 2000)..........................................................16

*\* Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986) ..............................................33

*Beard v. Worldwide Mortgage Corp.*, 354 F. Supp. 2d 789 (W.D. Tenn. 2005) ..........................23

*Beaulialice v. Federal Home Loan Mortgage Corp.*,
No. 8:04-CV-2316-T-24-EAJ, 2007 WL 744646, at *4 (M.D. Fla. Mar. 6, 2007) ......................50

*Bergholm v. Peoria Life Ins. Co.*, 284 U.S. 489 (1932)..................................................27

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984)..................................53, 54

*Byrd v. Brandeburg*, 922 F. Supp. 60 (N.D. Ohio 1996)..................................................24

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080
(D.C. Cir. 1998) ....................................................................................................12

*Central Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629
(11th Cir. 2000)..................................................................................................16

*Charleston Housing Auth. v. U.S. Dep't of Agriculture*, 419 F.3d 729
(8th Cir. 2005)......................................................................................................50

*Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)....................................*passim*

*Chisom v. Roemer*, 501 U.S. 380 (1991) ..................................................................48

*\* Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714 (D.C. Cir. 1991)...............22

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995)................................20, 34

*Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005)........................................................50

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987) .......................................................11, 13

*Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454 (D.C. Cir. 1990) .................................7, 8

*Darst-Webbe Tenant Ass'n v. St. Louis Housing Auth.*, 417 F.3d 898 (8th Cir. 2005) ................50

*Dews v. Town of Sunnyvale, Texas*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) ................................16

*Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1 (D.D.C. 2003)..........................12

*Dothard v. Rawlinson*, 433 U.S. 321 (1977)................................................................................52

*Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415 (D.C. Cir. 1991)................................12

*Edwards v. Johnston County Health Dep't*, 885 F.2d 1215 (4th Cir. 1989) ..............................53

* *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996)................................11, 12, 13

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ........................................................................................16, 17, 19

*Fuller v. Teachers Ins. Co.*, No. 5:06-cv-438, 2007 WL 2746861
(E.D.N.C. Sept. 19, 2007)................................................................................................23

*General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982) ................30, 35, 48

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) ......................................24, 26, 35

* *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ............................................................ *passim*

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000).................12, 13

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ......................................................................20

*Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276 (11th Cir. 2006)............................50

* *Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986)................................................24, 33

*Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) ......................22, 26

* *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................................... *passim*

*Hispanics United of DuPage County v. Village of Addison*, 988 F. Supp. 1130
(N.D. Ill. 1997)................................................................................................................52

*Honorable v. Easy Life Real Estate System*, 100 F. Supp. 2d 885 (N.D. Ill. 2000)......................23

\* *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926
(2d Cir. 1988) ................................................................................................ *passim*

\* *Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994) .................................... 34

\* *Johnson v. Long Beach Mortgage Trust 2001-4*, 451 F. Supp. 2d 16 (D.D.C. 2006) ...... 9, 10, 11

*Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970) ..................... 45

*Landmark Legal Found. v. IRS*, 267 F.3d 1132 (D.C. Cir. 2001) ................................. 22

\* *Langlois v. Abington Housing Auth.*, 207 F.3d 43 (1st Cir. 2000) ................................ 33, 37, 41

*Laufman v. Oakley Building & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976) ..................... 23, 25

*Lorillard v. Pons*, 434 U.S. 575 (1978) ................................................................. 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................... 7, 18

*Mackey v. Nationwide Insurance Cos.*, 724 F.2d 419 (4th Cir. 1984) ............................ 23

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13
(D.D.C. 1999) ............................................................................... 7, 8, 10, 11, 13

*Mayers v. Ridley*, 465 F.2d 630 (D.C. Cir. 1972) ............................................... 23, 29, 35

*McDiarmid v. Economy Fire & Cas. Co.*, 604 F. Supp. 105 (S.D. Ohio 1984) ................... 24

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) ..................................... 51

\* *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283
(7th Cir. 1977) ............................................................................................ *passim*

*Meyer v. Holley*, 537 U.S. 280 (2003) ............................................................. 10, 24

\* *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243
(10th Cir. 1995) ................................................................ 2, 33, 36, 42, 43, 52

*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ...................... 24, 25

\*National Fair Housing Alliance, Inc. v. Prudential Ins. Co.*, 208 F.
Supp. 2d 46 (D.D.C. 2002) ........................................................................ *passim*

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995) ........................ 24, 25

\* *Pfaff v. HUD*, 88 F.3d 739 (9th Cir. 1996) ....................................................33, 42, 43

*Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993) ..........................16

*Rahmaan v. Federal Nat'l Mortgage Ass'n*, No. Civ. A. 02-1822, 2003 WL 21940044
(D.D.C. May 19, 2003) ...............................................................................................51

*Reese Bros., Inc. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31 (D.D.C. 2007) .....................8

*Reinhart v. Lincoln County*, 482 F.3d 1225 (10th Cir. 2007) ........................................50

\* *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977)..........................33, 34, 36

*Rusello v. United States*, 464 U.S. 16 (1983)...............................................................28

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................42, 43

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)......................................................51

\* *Smith v. City of Jackson*, 544 U.S. 228 (2005) ................................................. *passim*

\* *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) .............................33, 35, 36

*Southend Neighborhood Improvement Assoc. v. St. Clair County*, 743 F.2d 1207
(7th Cir. 1984).............................................................................................................29

\* *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990)................................15, 16, 17, 19

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000).........................7, 51

*Steptoe v. Savings of America*, 800 F. Supp. 1542 (N.D. Ohio 1992) ...........................24

\* *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972)  ......................... *passim*

*United States v. American Inst. of Real Estate Appraisers*, 442 F. Supp. 1072
(N.D. Ill 1977)..............................................................................................................24

\* *United States v. City of Black Jack*, 508 F.2d 1179 ......................36, 37, 43, 44, 45, 49

*United States v. Massachusetts Indus. Fin. Agency*, 910 F. Supp. 21
(D. Mass. 1996)............................................................................................................24

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ......................................................42

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987)............................24

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990)....................................................16

*Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) ....................................................21, 23, 26

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................................................7

*Washington v. Davis*, 426 U.S. 229 (1976)..............................................................................30

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) .........................................................2

*Williams v. Matthews Co.*, 499 F.2d 819 (8th Cir. 1974) ....................................................33, 45

*Williams v. Poretsky Mgm't, Inc.*, 955 F. Supp. 490 (D. Md. 1996) ...........................................24

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ...............................................10

## STATUTES AND REGULATIONS:

15 U.S.C. § 1691e...............................................................................................21, 27, 28

24 C.F.R. § 100.50..............................................................................................................25

24 C.F.R. § 100.70(b) ...................................................................................................25, 26

29 U.S.C. § 621..................................................................................................................41

29 U.S.C. § 623............................................................................................................40, 47

Civil Rights Act, Title VII, 42 U.S.C. § 2000e *et seq.* ......................................................... *passim*

D.C. Code § 13-423 ........................................................................................................9, 11

* Fair Housing Act, 42 U.S.C. § 3601 *et seq.*....................................................................... *passim*

* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988) ....... 37-39

## OTHER AUTHORITIES:

114 Cong. Rec. 2526 ....................................................................................................31, 32

114 Cong. Rec. 3422...........................................................................................................36

114 Cong. Rec. 5214...........................................................................................................32, 33

134 Cong. Rec. 23711-12 ...................................................................................39

59 Fed. Reg. 18266 (Apr. 15, 1994) ..................................................................43

*Fair Housing Amendments Act of 1987: Hearings on S. 558 Before the Subcomm.
on the Constitution of the Sen. Comm. on the Judiciary*, 100th Cong. (1987) .............................38

*Homeowners Ins. Discrimination: Hearing Before the Sen. Comm. on Banking,
Housing, & Urban Affairs*, 103d Cong. 52 (1994) ....................................................42

H.R. Rep. No. 100-711 (1988).........................................................................37, 38

*HUD v. Mountain Side Mobile Estates*, 2 Fair Hous.-Fair Lend. Rptr. (P-H)
¶ 25,053, 1993 WL 307069 (HUD Sec'y 1993) ...........................................................42

HUD, No. 8024.01, *Title VIII Complaint Intake, Investigation & Conciliation
Handbook* (REV-2 1995).................................................................................42

Jean Eberhart Dubofsky, *Fair Housing: A Legislative History and a Perspective*, 8
Washburn L.J. 149 (1969) ..............................................................................26

*Report of the Nat'l Advisory Comm'n on Civil Disorders* (1968) .................................31

*United States v. Blackpipe State Bank*, No. 93-5115 (D.S.D. consent decree filed 1993) ............26

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| NATIONAL COMMUNITY ) | |
| REINVESTMENT COALITION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:07-cv-01357-EGS |
| ) | |
| ACCREDITED HOME LENDERS ) | |
| HOLDING COMPANY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**PLAINTIFF NATIONAL COMMUNITY REINVESTMENT
COALITION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The National Community Reinvestment Coalition ("NCRC") brings this action under the

Fair Housing Act, 42 U.S.C. §§ 3601-3631, as amended ("FHA" or "Act"), against lender

Accredited Home Lenders, Inc., its parent company Accredited Home Lenders Holding

Company, and its subsidiary Accredited Mortgage Loan REIT Trust (collectively, "Accredited").

*See* Compl. ¶¶ 1, 13-16. NCRC seeks relief from Accredited's refusal to make mortgage loans

secured by row houses under most of its fourteen loan programs. *See id.* ¶¶ 5, 59-64. NCRC

also seeks relief from Accredited's imposition of minimum property value requirements in all

fourteen of these programs. *See id.* ¶¶ 5, 48-51. These policies violate the Fair Housing Act

because they have an unnecessary and unjustified disproportionate adverse impact on African

Americans and Latinos in major metropolitan areas including Baltimore, Philadelphia, Detroit,

St. Louis, Cleveland, and Washington, D.C. *See id.* ¶¶ 6-8, 19-20, 46, 52-56, 64. They also

violate the Act because Accredited knew or should have known of the policies' discriminatory

impact, and maintains the policies with discriminatory intent.  *See id.* ¶¶ 6-8, 56, 71.

Accredited now moves to dismiss the Complaint, raising six arguments.  Two are especially novel, without precedent under the Act at issue here, and sweeping in scope:  that the FHA applies only to intentional discrimination and does not apply to disparate impact claims,[1] and that 42 U.S.C § 3604 of the FHA does not apply to lending.  Both would require this Court to reverse its own opinion addressing the FHA in *National Fair Housing Alliance, Inc. v. Prudential Insurance Co.*, 208 F. Supp. 2d 46 (D.D.C. 2002) ("*Prudential*") (Sullivan, J.), and reject the opinions of federal appellate and district courts throughout the country.

With respect to the application of the FHA to disparate impact claims, Accredited asks this Court not only to reverse its holding in *Prudential*, but also to be the first court in the country to hold that the Act does not reach disparate impact.  This would require the Court to reject the uniform holdings of the First through Eleventh Circuits (the D.C. Circuit recently "assume[d] without deciding" that the eleven circuits are correct, *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006)).  These decisions have been reaffirmed and applied consistently for more than thirty years and are well grounded on the Act's legislative history, purpose, text, administrative construction, and more.  Defendants nevertheless ask the Court to sweep them aside in their entirety.

Defendants' extraordinary assertion that every court has gotten the issue wrong rests on a deeply flawed reading of the Supreme Court's decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005).  Notably, *Smith* did not mention the FHA.  Rather, it addressed the Age Discrimination in Employment Act ("ADEA") and held that the ADEA *does apply* to disparate impact claims.

---

[1]  "A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination.  Indeed, 'the necessary premise of the disparate impact approach is that some [housing] practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.'"  *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)) (alteration in original).

2

The approach of the Court in *Smith*, analyzing the ADEA's text, legislative history, purpose, and administrative construction, refutes Defendants' contention that *Smith* replaced the familiar, multifaceted approach to statutory construction with a narrow, formalistic search for specific words in a statute's text.  *Smith* did no such thing, and there is no basis for rejecting what this Court has called the "overwhelming" precedent holding that the FHA applies to disparate impact claims.  *Prudential*, 208 F. Supp. 2d at 59.  Consideration of the text of the FHA in the context of its legislative history, purpose, and administrative construction, as *Smith* did with the ADEA, makes clear that the Circuit Courts and this Court have analyzed the issue correctly under the FHA and that the FHA is properly applied to disparate impact claims.

Defendants likewise err by asserting that *Smith* analyzed language identical to the FHA's and held it inapplicable to disparate impact claims.  In truth, the *Smith* Court did not address the relevant FHA language because *Smith* considered ADEA language that differs significantly from the FHA.  In the footnote in *Smith* that is the basis of Defendants' argument, the Supreme Court focused on the ADEA's words "*any individual*" and "*such individual's*," 544 U.S. at 236 n.6 (emphases in original), but these words do not appear in the FHA.  Moreover, the text of the FHA, unlike the ADEA, requires the FHA to be construed such that it promotes fair housing as broadly as possible "within constitutional limitations."  42 U.S.C. § 3601.  Defendants ignore these textual differences and thereby misconstrue the relevance of *Smith* to an analysis of the text of the FHA.

Defendants' contention that section 3604 of the FHA does not apply to lending is equally flawed and at odds with substantial precedent.  Section 3604 contains broad language barring, *inter alia*, acts that "otherwise make unavailable or deny, a dwelling to any person because of race . . . ."  42 U.S.C. § 3604(a).  This Court held in *Prudential* that this and other language in

3

section 3604 is broad enough to apply to homeowner's insurance.  *See* 208 F. Supp. 2d at 55-57.

Because mortgage lending is even more directly tied to the availability of housing than

insurance, *Prudential* compels the conclusion that section 3604 applies to lending as well.  The

breadth of section 3604's reach, including its specific application to lending, is likewise

supported by a wealth of other decisions from this Court, the D.C. Circuit, and federal courts

throughout the country, as well as the construction of the Act by the United States Department of

Housing and Urban Development, which is entitled to *Chevron* deference.  Contrary to

Accredited's assertion, applying section 3604 to lending does not render section 3605 of the Act

superfluous because many homes are exempted from section 3604, but not section 3605.  Nor is

it contrary to a provision of the Equal Credit Opportunity Act ("ECOA") relied on by

Accredited, as shown by another provision of ECOA that Defendants do not address.

Defendants also argue that this Court may not exercise personal jurisdiction over two of

the Defendants, Accredited Home Lenders Holding Company and Accredited Mortgage Loan

REIT Trust; that NCRC lacks standing; that even if section 3604 does apply to lending, NCRC

does not properly state a claim under it; and that even if the FHA does apply to disparate impact

claims, NCRC does not properly state a claim based on disparate impact.  Personal jurisdiction is

properly exercised here because the Complaint, supplemented here by Defendants' own filings

with the Securities and Exchange Commission ("SEC"), demonstrates specific contacts by these

companies with the District of Columbia from which NCRC's claims arise.  Similarly, the

allegations of the Complaint demonstrate that NCRC has suffered the types of injuries that the

Supreme Court has held are sufficient to establish organizational standing under the FHA.

Finally, Accredited's assertions that NCRC does not properly state a claim are based on its

mistaken understandings of the text of 42 U.S.C § 3604 (a), (b), and (c) and of the pleading

requirements for disparate impact claims.  The latter error reflects Accredited's flawed understanding of the manner in which a disparate impact analysis is conducted.

For these reasons, and as shown in greater detail below, NCRC respectfully submits that Accredited's motion to dismiss should be denied in its entirety.

## THE ALLEGATIONS OF THE COMPLAINT

The National Community Reinvestment Coalition is a national non-profit organization with the mission and purpose of increasing fair and equal access to credit, capital, and banking services and products for all Americans, regardless of race.  *See* Compl. ¶ 2.  Its members include community development corporations, civil rights groups, community reinvestment advocates, local and state government agencies, and churches.  *See id.* ¶ 12.  One of NCRC's primary missions is to increase the flow of private capital into underserved communities.  *See id.* ¶¶ 2, 12.

Defendant Accredited Home Lenders Holding Company ("Accredited Holding") is a public company that originated over $16 billion in residential mortgage loans in 2005 in its own right and/or through its subsidiaries.  *See id.* ¶ 13.  Accredited Holding represents in one or more filings with the SEC that it originates mortgage loans in the District of Columbia.  *See id.*

Defendant Accredited Home Lenders, Inc. ("Accredited, Inc.") is a nationwide mortgage banking company and wholly-owned subsidiary of Accredited Holding.  *See id.* ¶ 14. Accredited, Inc. is a subprime lender.  *See id.*

Defendant Accredited Mortgage Loan REIT Trust ("Accredited REIT") is a wholly-owned subsidiary of Accredited, Inc.  *See id.* ¶ 16.  Its principal purpose is to acquire, hold, manage, and service Accredited, Inc.'s mortgage assets, including assets connected to the District of Columbia.  *See id.*

5

Despite any corporate formalities, Accredited Holding, Accredited, Inc., and Accredited REIT serve as each other's agents, employees, and representatives.  *See id.* ¶ 17.

Accredited offers fourteen lending programs.  *See id.* ¶ 46; *id.* Ex. G at 1 (listing programs).  Each of these programs incorporates one or more of six lending policies that discriminate against African Americans and Latinos in major metropolitan areas including, but not limited to, Baltimore, Philadelphia, Detroit, St. Louis, Cleveland, and Washington, D.C.  *See, e.g.*, *id.* ¶¶ 7-8, 19-20, 46.  These six policies fall into two groups.  Three of the policies restrict the availability of loans by requiring applicants to satisfy minimum property values.  *See id.* ¶¶ 5, 48-51.  The other three policies deny loans to owners and purchasers of row houses.  *See id.* ¶¶ 5, 59-64.  These policies determine whether a prospective borrower is eligible for a mortgage loan under Accredited's fourteen loan programs.  *See id.* ¶ 4.

These six policies have the purpose and effect of discriminating against African Americans and Latinos and of favoring whites.  *See id.* ¶¶ 6, 8, 52-56 (minimum property value policies); *id.* ¶¶ 7-8, 64 (no row house policies).  The policies have a discriminatory effect because row houses and houses that do not satisfy Accredited's minimum property value requirements are more heavily concentrated in African-American and Latino neighborhoods in metropolitan areas.  *See, e.g.*, *id.* ¶¶ 6-7.  Accredited knew or should have known about the disparate impact of these policies on African Americans and Latinos in these areas.  *See id.* ¶¶ 56, 71.  There is no legitimate business justification for the six policies.  *See id.* ¶¶ 10, 57-58, 65.  Even if there were a legitimate justification, the use of traditional underwriting criteria such as credit score, steady income, and amount of debt would provide a less discriminatory alternative to Accredited's no row house and minimum property value policies.  *See id.* ¶¶ 11, 58, 65.

NCRC alleges that Accredited's acts, policies, and practices violate the Fair Housing Act.

Specifically, NCRC alleges violations of 42 U.S.C. §§ 3604(a), (b), (c) and 3605.  *See id.* ¶ 73.

**STANDARD OF REVIEW**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12 for lack of standing, lack of personal jurisdiction, or failure to state claim, the complaint's factual allegations must be accepted as true and viewed "in the light most favorable to the plaintiff." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (standing); *see Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (failure to state a claim); *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 19 (D.D.C. 1999) (personal jurisdiction).  The plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged."  *See Sparrow*, 216 F.3d at 1113 (quotation marks and citation omitted).  The Court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted; alteration in original).

**ARGUMENT**

**I.    ACCREDITED HOLDING AND ACCREDITED REIT ARE SUBJECT TO PERSONAL JURISDICTION IN THIS COURT**

Two of the Defendants, Accredited Holding and Accredited REIT, claim that their contacts with the District of Columbia are too insubstantial to support this Court's exercise of personal jurisdiction over them.  *See* Mem. at 3-10.  Their argument rests largely on a self-serving declaration from an individual who states that he holds jobs at both Accredited, Inc. and Accredited Holding.  *See* Decl. of John C. Redding ¶ 1 ("Redding Decl."); Mem. at 5-9 (repeatedly citing declaration).  Although a defendant may submit evidence in support of a Rule 12(b)(2) motion based on personal jurisdiction, it should be disregarded if it is inconsistent with the complaint's allegations because "factual discrepancies appearing in the record must be

7

resolved in favor of the plaintiff." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990) (reversing district court's dismissal under Rule 12(b)(2)); *see Reese Bros., Inc. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31, 36 (D.D.C. 2007) ("To determine if a basis for personal jurisdiction exists, the court should resolve factual discrepancies in the complaint and affidavits in favor of the plaintiff.") (citing *Crane*).  Mr. Redding's key points contradict the allegations of the Complaint, as shown below, and therefore do not provide a valid basis for dismissing Accredited Holding or Accredited REIT.

NCRC nonetheless submits herewith Accredited's SEC filings upon which the allegations supporting jurisdiction are based.  *See* Decl. of Glenn Schlactus, Exs. 1 & 2 (attached hereto as Attach. A) ("Schlactus Decl.").  They demonstrate that Accredited Holding and Accredited REIT have engaged in substantial lending-related transactions in the District of Columbia which give rise to the Complaint.  NCRC also alleges that these two Defendants are alter egos of Defendant Accredited Home, which does not contest personal jurisdiction.  These facts are sufficient to subject Accredited Holding and Accredited REIT to personal jurisdiction in this Court.  Even if the Court finds that they are not sufficient, NCRC is entitled to jurisdictional discovery before the Court issues any ruling to the contrary.  Accordingly, the motion to dismiss for lack of personal jurisdiction should be denied.

### A.    NCRC Has Established That This Court Has Personal Jurisdiction Over Accredited Holding And Accredited REIT

NCRC need only make out a *prima facie* case that this Court has personal jurisdiction over Accredited Holding and Accredited REIT to defeat their motion to dismiss.  *See, e.g.*, *Material Supply Int'l*, 62 F. Supp. 2d at 19.  The Complaint, even viewed in conjunction with Accredited's declaration, plainly does so by demonstrating that the exercise of personal jurisdiction satisfies both the District of Columbia's long-arm statute and due process.

8

The District's long-arm statute reaches, *inter alia*, a company that:

(1) transact[s] any business in the District of Columbia; . . .

(4) caus[es] tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; [or]

(5) ha[s] an interest in, us[es], or possess[es] real property in the District of Columbia . . . .

D.C. Code § 13-423(a). The statute "permits the exercise of personal jurisdiction to the fullest extent permissible under the due process clause." *Johnson v. Long Beach Mortgage Trust 2001-4*, 451 F. Supp. 2d 16, 28 (D.D.C. 2006) (citation and quotation marks omitted).

NCRC's allegations satisfy the long-arm statute. NCRC alleges that "AHL Holding represents in one or more documents filed with the Securities and Exchange Commission that it originates mortgage loans in . . . the District of Columbia."[2] Compl. ¶ 13; *See* Schlactus Decl., Ex. 1 at 1-3, Ex. 2 at 2-4. The statement in Defendants' supporting declaration that "[t]he Holding Company has never originated or serviced a loan in the District of Columbia," Redding Decl. ¶ 2, should be disregarded because it contradicts the Complaint's allegation and the supporting SEC filings. NCRC further alleges that the "principal business objective of Accredited REIT is to acquire, hold, manage, and service the mortgage assets of AHL, Inc. throughout the United States, including the District of Columbia." Compl. ¶ 16; *see* Schlactus Decl., Ex. 1 at 1-2, 1-4. Defendants have confirmed that Accredited REIT holds in trust loans of D.C. borrowers and loans secured by property in the District. *See* Redding Decl. ¶ 3. These facts satisfy subsections (1) and (5) of the long-arm statute.

NCRC further alleges that, by maintaining discriminatory lending policies in conjunction

---

[2]    The allegations in the Complaint are supported by Accredited's most recent 10-K and 10-Q filings with the SEC. Excerpts supporting the allegations that Mr. Redding tries to contradict are attached, with the most relevant portions highlighted for the Court's convenience. *See* Schlactus Decl., Exs. 1 & 2.

with these mortgage loans and mortgage assets, Accredited Holding and Accredited REIT have injured and continue to injure Plaintiff by violating its rights under the Fair Housing Act. *See, e.g.*, Compl. ¶¶ 67-71. A FHA claim is "in effect, a tort action." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Subsection (4) is, accordingly, also satisfied.

Defendants' contacts also satisfy due process. Due process requires only minimum contacts such that the defendant may "reasonably anticipate being haled into court" in the District. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "A defendant establishes minimum contacts by purposefully availing himself of the privilege of conducting activities within the forum jurisdiction, thus invoking the benefits and protections of its laws." *Material Supply Int'l*, 62 F. Supp. 2d at 19 (citation omitted). The Complaint alleges that Accredited Holding admits as much by representing to the SEC that, because of its lending activities in the District, it is "subject to the laws and regulations of the District of Columbia."[3] Compl. ¶ 13; *See* Schlactus Decl., Ex. 1 at 1-3, Ex. 2 at 2-5.

*Johnson* demonstrates that the minimal requirements of due process and the long-arm statute are satisfied here. In *Johnson*, a non-D.C. trust company took "assignment of a mortgage note secured by real property in" the District, although it did not originate the loan. 451 F. Supp. 2d at 27. The trust thus held a security interest in property located in the District and "dr[ew] a revenue stream from [the] mortgage payments." *Id.* at 29-30. This Court held "these contacts sufficient to satisfy both the D.C. long-arm statute and due process requirements." *Id.* at 30.

In addition, the lending activities that give rise to these Defendants' contacts with the District of Columbia are the same ones from which this lawsuit arises because Accredited's discriminatory lending policies are an essential component of its lending activities. Thus, as in

---

[3] NCRC does not contend, contrary to Defendants' characterization, that the act of filing documents with an agency located in the District is a sufficient contact. *See* Mem. at 6. Rather, it is the content of those filings that demonstrates that the exercise of personal jurisdiction by this Court is proper.

*Johnson*, personal jurisdiction with respect to this case is also proper under D.C. Code § 13-423(b)'s "arising from" requirement. *See* 451 F. Supp. 2d at 30.

NCRC also sufficiently alleges that Accredited Holding and Accredited REIT are subject to personal jurisdiction because they are alter egos of Accredited Home, which does not contest personal jurisdiction. On this basis, "the affiliated corporation's jurisdictional contacts may be imputed to" Accredited Holding and Accredited REIT. *Material Supply Int'l*, 62 F. Supp. 2d at 19; *see El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675-76 (D.C. Cir. 1996) ("local subsidiary's contacts can be imputed to the foreign parent"); Schlactus Decl., Ex. 1 at 1-5 (describing subsidiary relationships among Defendants). NCRC alleges that the alter ego requirements are satisfied with respect to each Defendant, and Accredited's most recent SEC 10-Q filing even confirms that Accredited REIT is "economically and operationally dependent on" Accredited, Inc. *See* Schlactus Decl., Ex. 2 at 2-2; Compl. ¶¶ 13-14, 16-17. Defendants' supporting declaration, in which Mr. Redding admits to simultaneously holding positions at both Accredited, Inc. and Accredited Holding, supports these allegations. *See* Redding Decl. ¶ 1.

Accordingly, the exercise of personal jurisdiction over all three Defendants is proper.

### B.    NCRC Is Entitled To Jurisdictional Discovery If The Court Finds That It Has Not Yet Made A Sufficient Showing To Establish Personal Jurisdiction

Even if the allegations of the Complaint, supported by the SEC filings attached hereto and admissions contained in Mr. Redding's declaration, were not sufficient to establish personal jurisdiction – which they are – they entitle NCRC to discovery of jurisdictional facts.

"A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *El-Fadl*, 75 F.3d at 676; *see Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (vacating dismissal; plaintiff identified several links between

defendant and forum "sufficient at least to permit further inquiry regarding personal jurisdiction"); *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991) ("As a general matter, discovery . . . should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction."). Thus, the D.C. Circuit's standard for permitting jurisdictional discovery is "quite liberal." *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003). The plaintiff need only "demonstrate[] that it can supplement its jurisdictional allegations through discovery," *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352-53 (D.C. Cir. 2000), or "have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant," *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).

NCRC does not have to establish a *prima facie* case of personal jurisdiction to obtain jurisdictional discovery; indeed, the discovery would serve no purpose under such a rule. In *El-Fadl*, for example, the plaintiff alleged that the defendant bank issued an unrelated loan in Washington, pursued legal claims related to that loan, and was the alter ego of its Washington subsidiary. *See* 75 F.3d at 675. The D.C. Circuit held that, although these allegations alone did not establish personal jurisdiction, they warranted discovery because they were "not conclusory," "alleged specific transactions," and suggested theoretical connections between the defendant and the forum that were "not implausible." *Id.* at 676; *see also GTE New Media Servs.*, 199 F.3d at 1352 ("We cannot tell whether jurisdictional discovery will assist [the plaintiff] on this score, but it is entitled to pursue precisely focused discovery aimed at addressing matters relating to personal jurisdiction."); *Diamond Chem.*, 268 F. Supp. 2d at 16 (allowing jurisdictional discovery even though plaintiff had made only a "paltry showing" of jurisdiction). Thus, granting a motion to dismiss is improper without affording the plaintiff "a fair opportunity to

inquire into [the defendant]'s affiliations with the District." *Carr*, 814 F.2d at 764.

NCRC plainly satisfies the D.C. Circuit's low threshold for obtaining jurisdictional discovery. As in *El-Fadl*, NCRC does not make merely conclusory statements but instead puts forth specific allegations of contacts by both Accredited Holding and Accredited REIT with the District of Columbia. *See* Compl. ¶¶ 13, 16; *see also* Redding Decl. ¶ 3. Plaintiff is entitled to discover information regarding the D.C.-related loans originated by Accredited Holding or held or serviced by Accredited REIT and any role either company has played with respect to the lending policies at issue[4], as well as other contacts they may have with this forum as a result of their mortgage-related activities. Plaintiff is also entitled to discovery of jurisdictional facts regarding the alter ego relationship among Defendants. *See GTE New Media Services*, 199 F.3d at 1352; *Material Supply Int'l*, 62 F. Supp. 2d at 21-22 (practice in the D.C. Circuit is to "order[] discovery to illuminate alter ego disputes before deciding dispositive motions which assert[] lack of jurisdiction over the alleged alter ego").

Thus, even if the Court finds that NCRC has not yet demonstrated that the exercise of personal jurisdiction over Accredited Holding and Accredited REIT is warranted, clear precedent in this Circuit requires the Court to deny the motion to dismiss so that NCRC may conduct jurisdictional discovery.

## II.  NCRC HAS STANDING

Accredited asserts that NCRC lacks standing because it has not alleged a cognizable injury to itself. *See* Mem. at 12. To the contrary, NCRC alleges that Accredited's discriminatory

---

[4]    The Redding Declaration claims that these two Defendants are not involved in "developing" or "implementing" the lending policies, Redding Decl. ¶ 4, but the Complaint alleges the contrary and therefore controls. *See* Compl. ¶¶ 4, 13, 16-17. Moreover, the declaration does not address any role these Defendants have had in approving the policies and speaks only in the present tense with respect to Accredited Holding's role regarding them. Redding Decl. ¶¶ 3-4. These omissions suggest important jurisdictional contacts that NCRC can only adduce through discovery.

policies have frustrated its mission by causing it to devote scarce resources to education and outreach programs to counteract those policies. *See* Compl. ¶¶ 2, 67-68. Decisions of the Supreme Court, the D.C. Circuit, and this Court in other cases brought by organizational plaintiffs under the Fair Housing Act establish that these allegations confer standing. Moreover, despite Accredited's contention, *see* Mem. at 11, 18, there is no need for the Court to conduct a preliminary evidentiary hearing on standing or require NCRC to file an amended complaint with more specific allegations.

### A.    NCRC Has Been Injured By Defendants' Actions

The Supreme Court has made clear that fair housing organizations like NCRC can suffer injuries that establish standing. The Court considered the issue at the pleading stage, as here, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). The defendants in *Havens* turned prospective African-American renters away from an apartment complex by falsely telling them that no apartments were available. *See* 455 U.S. at 368. The plaintiff organization, HOME, alleged that it had "been frustrated by defendant's racial steering practices in its efforts to assist equal access to housing through counseling and other referral services . . . [and] had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices." *Id.* at 379 (citation and quotation marks omitted). The Court concluded that:

> [i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* (citation omitted).

The D.C. Circuit and this Court have reiterated and relied on *Havens*. *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990), challenged the exclusive use of white models in real

estate advertisements.  *See* 899 F.2d at 25.  The organizational plaintiff alleged that defendants'

discriminatory advertising required it to devote "scarce resources" to counteract "the ads'

adverse impact" and educate people about the illegality of defendants' conduct.  *Id.* at 27-29.

*Prudential* challenged an insurer's policies regarding its underwriting of homeowner's insurance

on disparate impact and intentional discrimination grounds.  The plaintiff fair housing groups

"allege[d] that they have expended resources on counteracting Prudential's discrimination

through their educational, counseling and referral programs."  208 F. Supp. 2d at 54.  In both

cases, the court held that the injuries alleged established standing because they were comparable

to the ones alleged in *Havens*.  *See Spann*, 899 F.2d at 27, 28; *Prudential*, 208 F. Supp. 2d at 52-

54.

        Under these precedents, it is clear that NCRC has standing.  Defendants' discriminatory

policies and practices have frustrated NCRC's mission by causing it to divert its resources from

its other testing, education, counseling, and capacity-building services – thus "perceptibly

impair[ing]" these activities, *Havens*, 455 U.S. at 379 – to conduct education and outreach

programs to counteract Accredited's policies.  The Complaint states:

> Accredited's racially discriminatory policies and practices have frustrated NCRC's
> mission of increasing the flow of private capital into underserved communities and have
> caused NCRC to expend its scarce resources on educational programs, investigations, and
> litigation to identify and combat such practices. . . .
>
> Accredited's discriminatory lending policies and practices have required the NCRC to
> engage in an education and outreach campaign, and to develop educational materials to
> identify and counteract the unlawful actions of Accredited, thus diverting the NCRC's
> resources from other testing, education, counseling, and capacity-building services.  . . .
> Defendants' discriminatory lending policies and practices have required the NCRC, and
> will require the NCRC in the future, to spend additional resources to counteract
> Accredited's discriminatory conduct.
>
> [T]he NCRC has made substantial efforts and expended considerable resources to
> investigate the existence and effects of Accredited's lending policies and to ensure equal
> lending opportunities for potential borrowers.

Compl. ¶¶ 2, 67-68.  These allegations are comparable to the ones held adequate in *Havens*,

*Spann*, and *Prudential*, and because the question of standing is "answered chiefly by comparing

the allegations of the particular complaint to those made in prior standing cases," *Spann*, 899

F.2d at 29 (internal quotation marks and citation omitted), they establish NCRC's standing here.[5]

NCRC's allegations are also comparable to the organizational plaintiff's in *Fair*

*Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C.

Cir. 1994) ("*FEC*"), and Accredited's reliance on that case (which considered and upheld

standing under Title VII, not the FHA) is misplaced.  *See* Mem. at 15.  The plaintiff alleged that

an employment agency's policy of turning away or refusing to provide referrals to African-

Americans caused it to expend resources to counteract that policy and diminished the efficacy of

the various programs it used to achieve its goal of promoting equal opportunity.  *See id.* at 1270,

1276.  Relying on *Havens*, the court found "'no question'" but that the organization had

standing.  *Id.* at 1276.

In seeming recognition of the controlling law establishing that the very same allegations

made by NCRC establish standing, *see* Mem. at 16, Accredited attempts to misrepresent NCRC's

allegations in two ways.

First, Defendants assert that NCRC rests standing on what they alternately term "a

setback to [NCRC's] abstract social interests" and "frustration of mission."  Mem. at 12-13.

---

[5]      There is no shortage of additional FHA cases finding that an organization establishes standing based on
allegations like those made by NCRC here.  *See, e.g.*, *Central Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co.,
Inc.*, 236 F.3d 629, 639-42 (11th Cir. 2000) (organization claiming diversion of resources had standing); *Alexander
v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir.
1993) (organization "forced to devote significant resources to identify and counteract the defendants'
[discriminatory] practices" had standing); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("only
injury which need be shown to confer standing on a fair-housing agency is a deflection of the agency's time and
money to . . . efforts directed against discrimination"); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 559-62
(N.D. Tex. 2000) (organization had standing to allege disparate impact).

There is nothing abstract about NCRC's injuries, however.  NCRC clearly alleges that it has

been forced to expend scarce resources on a variety of activities to repair the damage done by

Accredited to its efforts to "increas[e] the flow of private capital into underserved communities."

Compl. ¶ 2; *see id.* ¶¶ 67-68.  By discriminating against members of underserved minority

communities, Accredited has rendered less effective NCRC's efforts to bring more capital to

those communities, and has "impelled [NCRC] to devote resources to checking or neutralizing

the [] adverse impact" of that discrimination.  *Spann*, 899 F.2d at 27.  This "perceptibl[e]

impair[ment]" of NCRC's programs and the "consequent drain on [NCRC's] resources" are the

very injuries that *Havens* holds leave "no question that the organization has suffered injury in

fact."  455 U.S. at 379; *see also FEC*, 28 F.3d at 1276 (organization has standing where its

programs are "perceptibly impaired," making its "overall task more difficult") (citing *Havens*).

Second, Defendants assert that NCRC rests standing on expenses that are related to

bringing this lawsuit.  *See* Mem. at 13-14.  That is not the case, as the Complaint details other

categories of costs spent to counteract Accredited's illegal practices and does not rely on

litigation-related costs.

Accredited makes two additional assertions in an attempt to evade *Havens* and its

progeny – that NCRC's allegations are not specific enough to support standing and that they are

illogical.  Both assertions fail.

**B.    NCRC's Allegations Regarding Its Injuries Are Sufficiently
Specific At This Early Stage Of The Litigation**

Accredited contends that NCRC's allegations "are not specific enough" because the

Complaint "never identifies what programs, campaign or materials it developed, when it

developed them, or how those programs were directly attributable to Accredited's alleged

conduct or could have counteracted it."  Mem. at 15.  This contention is directly refuted by

17

*Havens*, which held that more rudimentary allegations of injury than those made by NCRC here were sufficient to establish standing at the pleading stage. 455 U.S. at 378-79. The Supreme Court required no more specificity. *See id.*; *see also Prudential*, 208 F. Supp. 2d at 52-54 (allegations in complaint established standing at pleading stage).

Accredited's error reflects it failure to distinguish between assessing standing at the pleading stage and after factual development: "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation and internal quotation marks omitted). Accredited's demand at the pleading stage for a more detailed auditing of NCRC's injuries, supported by evidence, is premature. Plaintiff need only *plead* injury now, not *prove* it. Only at later stages of this case, *i.e.*, at summary judgment or trial, may NCRC be required to present specific evidence regarding such details. *See id.*

## C.  NCRC's Allegations That It Has Expended Resources To Counteract The Effects Of Defendants' Discriminatory Policies Are Not Illogical

Defendants further object that NCRC's allegations "cannot – as a matter of logic – be true." Mem. at 16. The linchpin of Defendants' "logic" is their assertion that NCRC cannot "force Accredited to make certain types of loans." *Id.* at 18. From this, Accredited concludes NCRC can do nothing that "could *plausibly* counteract what Plaintiff is alleging." *Id.* at 17 (emphasis in original). This understanding of "counteract," however, would suggest that the only organization with standing to sue Accredited is its own board of directors. But Accredited's board, or any other organization with the authority to "force" Accredited to change its lending policies, would have no need to bring a lawsuit. The implication of Accredited's novel view of organizational standing, then, is that no organization interested in bringing a lawsuit would have

standing to do so.  This is, of course, contrary to the many cases under the Fair Housing Act holding "that organizations are entitled to sue on their own behalf for injuries they have sustained."  *Havens*, 455 U.S. 363, 379 n.19 (citation omitted).

The facts of the many cases upholding organizational standing under the FHA further demonstrate the fallacy of Accredited's "logic."  In *Havens*, for example, the fair housing organization could not, apart from bringing the lawsuit, literally "force" the apartment complex to end its policy of refusing to accept African-American tenants.  The organizational plaintiffs in *Spann* could not, other than through litigation, force an end to the advertisers' exclusive use of white models.  The same is true in *Prudential*, where the plaintiffs could not independently force the defendant to change its underwriting practices, and *FEC*, where the plaintiff could not force the employment agency to end its policy of refusing to take applications from and make referrals to African Americans.  In each case, however, the courts upheld standing.  In the only two to address explicitly the potential efficacy of the organization's efforts to counteract the challenged policies, the D.C. Circuit found that those efforts could have an impact.  *See Spann*, 899 F.2d at 28-29; *FEC*, 28 F.3d at 1268.  *Spann* reasoned, in part, that increased efforts to educate the public about their rights and the unlawfulness of a company's policies – educational efforts that are encompassed in NCRC's allegations – "might . . . be necessary," even though public education does not compel a company to change its policies.  *See* 899 F.2d at 28-29.

Moreover, Accredited's novel theory appears to presuppose that an organization, to have standing, must *succeed* in counteracting a defendant's discriminatory acts.  There is no basis for such a requirement.  Accredited may believe that NCRC will fail in any non-litigation efforts to counteract its policies, but this does not mean that NCRC is not injured by diverting and devoting its scarce resources to trying.

19

Accordingly, the allegations in NCRC's Complaint are sufficient to establish standing and no more is required at this point in the litigation.[6]

## III.    NCRC PROPERLY STATES A CLAIM UNDER 42 U.S.C. § 3604

### A.    Section 3604 Applies To Mortgage Lending[7]

Accredited asserts that NCRC fails to state a claim under 42 U.S.C. § 3604 of the Fair Housing Act because, *inter alia*, "Congress did not intend Section [3604] to apply to mortgage lending." Mem. at 20. Under the Act's plain language, however, which is "broad and inclusive" and must be given a "generous construction," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972); *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995), Accredited's view of section 3604 should be rejected. Accredited's view is also contrary to substantial case law and the interpretation of section 3604 by the United States Department of Housing and Urban Development ("HUD"), which is entitled to *Chevron* deference.

Accredited offers little objection to any of this. Instead, it argues that section 3604 must not apply to lending because this would render section 3605 (at least as originally enacted) superfluous. *See* Mem. at 23. This argument fails to account for another provision of the FHA, section 3603, which demonstrates the independent purpose of section 3605. Accredited also

---

[6]    At the end of its standing argument, Accredited briefly adds that the Court could require NCRC to provide evidence or an amended complaint to support its allegations of injury as an alternative to dismissing the Complaint. *See* Mem. at 18-19 & n.8. The premise of Accredited's discussion, however, is that its prior arguments about standing are correct. For the reasons already stated, those arguments are not correct. The Complaint, on its own, already satisfies the legal standard applicable to a motion to dismiss for want of standing under the FHA. The many cases Accredited cites are therefore inapposite; their premise is that the complaint does not establish standing. One of them makes this especially clear. *Haase v. Sessions*, 835 F.2d 902, 903 (D.C. Cir. 1987), holds that on a motion to dismiss, "[i]f the pleadings meet the requirements of Article III standing, the court has proper jurisdiction." The court distinguished this from the situation where "the district court is uncertain as to the sufficiency of the pleadings. . . ." *Id.* Only in the latter case "can [the district court] order evidentiary hearings on its own motion and then rule on the standing question." *Id.* Here, NCRC's Complaint falls into the former category and there is, accordingly, no basis for requiring evidence or an amended complaint.

[7]    The application of section 3604 to mortgage lending is the sole issue in a motion to dismiss pending before Judge Lamberth in another case brought by NCRC. *See NCRC v. NovaStar Fin., Inc.*, No. 1:07-cv-00861 (filed May 9, 2007). NCRC's brief in that case (Docket No. 7, filed June 13, 2007) addresses the issue in much greater detail than page limitations permit here.

argues that 15 U.S.C. § 1691e(i) of ECOA reveals Congress's belief that section 3605 is the only

FHA provision applicable to lending.  This, however, fails to account for 15 U.S.C. § 1691e(k),

which reveals Congressional understanding that other provisions of the FHA likewise apply to

lending.

### 1.    The Text's Plain And Unambiguous Language and Substantial Precedent Demonstrate That Section 3604 Applies To Lending

Section 804 of the Fair Housing Act, codified at 42 U.S.C. § 3604, makes it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, <u>or otherwise make unavailable or deny,</u> a dwelling to any person because of race . . . .

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, <u>or in the provision of services or facilities in connection therewith,</u> because of race. . . .

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, <u>with respect to</u> the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race . . . .

42 U.S.C. § 3604 (emphases added).  Nothing in the these provisions evinces any intention to

exclude their application to discrimination in lending.  To the contrary, the Act contains no

limitation whatsoever on the categories of persons who may be liable for violating the Act's

prohibitions and places no limit on the types of activities that may give rise to liability.

Beginning with subsection (a), Accredited's policy of limiting or denying access to

certain of its loan products to minority would-be borrowers makes housing "unavailable" to

those borrowers and "den[ies]" them dwellings.  The reason is simple.  "Without mortgage

financing, homes cannot be purchased."  *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 6 (D.D.C.

1999) (Kennedy, J.) (construing subsection (f)(1), which parallels subsection (a)) (citation

omitted).  The plain language of subsection (b) likewise applies because mortgage lending

constitutes "services" provided "in connection with" the "sale . . . of a dwelling."  Subsection (c)

also unambiguously applies to lending.  Notably, Congress used the words "*with respect to* the sale or rental" in subsection (c), even though it used the words "*for* the sale or rental" in subsection (a).  42 U.S.C. § 3604(a), (c) (emphases added).  Use of the narrow word "for" to modify "the sale of rental" in subsection (c) would have been meaningful and coherent, but Congress chose instead to use "with respect to."  As the D.C. Circuit has observed, "with respect to" is an "extremely general" phrase.  *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001).  At the very least, Accredited's purchase mortgage loans are made "with respect to" home sales because the sale of a home is the very purpose of such loans.

The D.C. Circuit, this Court, and other courts that have considered the issue have concluded that section 3604 applies to lending.  The D.C. Circuit described the activities reached by section 3604 in *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 718-20 (D.C. Cir. 1991).  It stated that "the denial of certain essential services relating to a dwelling, such as mortgage financing . . . might result in the denial of housing . . . ."  *Id.* at 719-20.  *Clifton Terrace* thus demonstrates that subsections (a) and (b) both apply to lending because its denial can make housing unavailable and it is a "service."

This Court confirmed that section 3604 applies to lending more recently in *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).  *Hargraves* involved allegations of reverse redlining in loans secured by real property.  *See id.* at 19.  Judge Green held that section 3604(a) applied because the "predatory practices alleged can make housing unavailable by putting borrowers at risk of losing the property which secures their loans."  *Hargraves* strongly supports the application of section 3604 here because Accredited's policies are more closely linked to the availability and sale of homes than reverse redlining.  The failure to provide mortgage services always makes housing unavailable and always respects the sale of a home,

while predatory lending only creates the risk of losing a property.  *See also Laufman v. Oakley Bldg. & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976) (holding that section 3604(a) applies to lending; "The cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively 'make unavailable or deny' a 'dwelling.'").  Courts have likewise held that section 3604(b) applies to lending.  *See Beard v. Worldwide Mortgage Corp.*, 354 F. Supp. 2d 789, 808-09 (W.D. Tenn. 2005); *Honorable v. Easy Life Real Estate Sys.*, 100 F. Supp. 2d 885 (N.D. Ill. 2000).

Demonstrating the broad reach of section 3604, courts also widely agree that it applies to many other activities that are important to housing.  This Court, for example, explicitly noted section 3604's "broad, general language" in holding it applicable to the sale of homeowner's insurance.  *See Prudential*, 208 F. Supp. 2d at 56-57.  The Court reasoned that insurance is a practical necessity when a person buys a home, *see id.* at 57; *see also Wai*, 75 F. Supp. 2d at 5-8 (reasoning similarly in applying section 3604 to insurance), which is even more true of a mortgage.  Moreover, *Prudential* explicitly rejected defendants' reliance on *Mackey v. Nationwide Insurance Cos.*, 724 F.2d 419 (4th Cir. 1984), as support for a narrow construction of section 3604.  *See* 208 F. Supp. 2d at 55 ("The 'split' of authority on this issue . . . is not as divided as the defendants portray it to be.").  Accredited likewise places great emphasis on *Mackey*, *see* Mem. at 22 & n.11, even though a district court within the Fourth Circuit recently concluded that *Mackey* is no longer good law.  *See Fuller v. Teachers Ins. Co.*, No. 5:06-cv-438, 2007 WL 2746861, at *3-*7 (E.D.N.C. Sept. 19, 2007).

Likewise, in *Mayers v. Ridley*, 465 F.2d 630 (D.C. Cir. 1972) (*en banc*), the court held 3604(c) applicable to the District of Columbia's filing of deeds containing racial covenants because this function is central to real estate transactions.  *See id.* at 634, 649.  Many other courts

have agreed that section 3604 reaches diverse activities that, like lending, directly affect housing. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir. 1995) (insurance); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 299 (7th Cir. 1992) (same); *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996) (same); *McDiarmid v. Econ. Fire & Cas. Co.*, 604 F. Supp. 105, 107 (S.D. Ohio 1984) (same); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (appraisals); *Steptoe v. Sav. of Am.*, 800 F. Supp. 1542, 1545-47 (N.D. Ohio 1992) (same); *United States v. Am. Inst. of Real Estate Appraisers*, 442 F. Supp. 1072, 1079 (N.D. Ill 1977) (same); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987) (zoning); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (same); *Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490 (D. Md. 1996) (tenant sexually harassed by apartment employee); *Byrd v. Brandeburg*, 922 F. Supp. 60 (N.D. Ohio 1996) (Molotov cocktail thrown onto porch).

The Fair Housing Act's plain language and substantial precedent thus demonstrate that 42 U.S.C. § 3604 unambiguously applies to lending.  The motion to dismiss therefore should be denied based on the plain language of the Fair Housing Act.

<strong>2.    HUD Regulations Demonstrate That Section 3604 Applies To Lending</strong>

Even if the Court were to find that the Fair Housing Act is ambiguous as to lending, Accredited's motion must nevertheless still be denied in deference to HUD's clear and controlling interpretation.  HUD has primary responsibility for implementing and administering the Act, and the Court therefore must uphold HUD's construction of the Act so long as it is "reasonable."  *See, e.g.*, *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 107 (1979) (HUD has primary responsibility); *Meyer v. Holley*, 537 U.S. 280, 287-88 (2003) (applying *Chevron* deference to HUD's FHA regulations).  HUD's regulations establish that Accredited's actions

are covered by section 3604.

HUD regulations found at 24 C.F.R. § 100.70(b) and 24 C.F.R. § 100.50(b) state, respectively:

> It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

> It shall be unlawful to: . . . (3) Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

Both regulations were promulgated under section 3604. *See* 24 C.F.R. § 100.50(a). These regulations make plain that the Fair Housing Act applies to "any conduct" that discriminates in the context of housing. They cannot plausibly be read to exclude discriminatory lending. Lenders undoubtedly "engage in [] conduct relating to the provision of housing," and the "services" they provide likewise relate to the provision of housing.

Furthermore, HUD's General Counsel affirmed that section 3604 applies to lending in a 1978 memorandum to the Assistant Secretary for Equal Opportunity. *See* Mem. from Ruth T. Prokop to Chester C. McGuire (Aug. 25, 1978) (copy attached as Attach. B). The memorandum explicitly endorses the *Laufman* court's statement, quoted above, that "'a denial of financial assistance in connection with a sale of a home would effectively 'make unavailable or deny' a dwelling.'" *Id.* at 2 (quoting *Laufman*, 408 F. Supp. at 493). Decisions of the Sixth and Seventh Circuit relied on the General Counsel's memorandum and make clear that HUD has maintained the memorandum's construction of the Act ever since issuing it. *See Nationwide Mut. Ins. Co.*, 52 F.3d at 1354; *Am. Family Mut. Ins. Co.*, 978 F.2d at 300.

Particularly in light of the Fair Housing Act's broad language and the Supreme Court's directive to give the law a "generous construction," HUD's interpretation is reasonable and must

be upheld. *See, e.g., Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-45 (1984); *Wai*, 75 F. Supp. 2d at 7 (24 C.F.R. § 100.70(b) is reasonable). It does not matter that this interpretation has, in part, been articulated outside of HUD's formal regulations. In a case that did not involve any HUD regulations, the Supreme Court held that HUD's "consistent administrative construction of the [Fair Housing] Act" "is entitled to great weight." *Trafficante*, 409 U.S. at 210. Accordingly, even if section 3604 were ambiguous in the context of lending, the Court must uphold HUD's interpretation of the statute and deny Accredited's motion to dismiss.[8]

### 3.    Application Of Section 3604 To Lending Does Not Render Section 3605 Superfluous

Accredited nonetheless asserts that, because 42 U.S.C. § 3605 as originally enacted applied only to lending, the application of section 3604 to lending must be avoided because it would render the original section 3605 superfluous. *See* Mem. at 20-22. Accredited misconstrues the reach of section 3604 by failing to consider section 3603.

Section 3603 exempts activities concerning certain dwellings from the prohibitions of subsections 3604(a), (b), (d), (e), and (f), but not from the prohibitions of section 3605. *See* 42 U.S.C. § 3603(b). When the FHA was passed in 1968, these exemptions applied to 5.5 million dwellings. *See* Jean Eberhart Dubofsky, *Fair Housing: A Legislative History and a Perspective*, 8 Washburn L.J. 149, 152, 159, 161 & n.55 (1969).[9] Section 3605 alone therefore prohibited discrimination in lending with respect to many homes in 1968 and continues to do so now.

---

[8]    It is also significant that the Department of Justice, charged with enforcing the Fair Housing Act through civil litigation, *see* 42 U.S.C. § 3614, has appeared before this Court as *amicus curiae* to express the position of the United States that section 3604 applies to lending. *See* Brief of the United States as *Amicus Curiae* In Supp. of Pls.' Opp. to Defs.' Mot. for J. on the Pleadings or, in the Alternative, for Summ. J. at 15-27, *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) (No. 98-1021). The Department of Justice also expressed this position by bringing suit under sections 3604(a) and (b), as well as 3605, against a bank for refusing to make loans secured by real property on Indian reservations. *See United States v. Blackpipe State Bank*, No. 93-5115 (D.S.D. consent decree filed 1993) (copy attached as Attach. C).

[9]    This article has been cited favorably by the Supreme Court, *see Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 105 n.13 (1979), and by other courts.

Furthermore, even if all activity covered by section 3605 was in fact also covered by section 3604, the canon of construction against rendering statutory language superfluous may not be invoked to "forc[e] from plain words unusual and unnatural meanings." *Bergholm v. Peoria Life Ins. Co.*, 284 U.S. 489, 492 (1932). Yet that is precisely what Accredited would have this Court do. Accredited asks the Court to hold that it does not "make unavailable or deny" dwellings by refusing to make certain loans (such as loans secured by row houses), 42 U.S.C. § 3604(a); that lending is not a "service," *id.* § 3604(b); and that statements of its discriminatory policies are not made "with respect to" the sale of dwellings, *id.* § 3604(c). Because this would strip Congress's words of their plain meaning, a canon of construction that would otherwise lead to this result is inapplicable. *See Bergholm*, 284 U.S. at 492 (refusing to apply well-established canon of construction where it would "vary the plain terms").

### 4. The Equal Credit Opportunity Act Supports The Application Of Section 3604 To Lending

Accredited further contends that a provision in ECOA demonstrates Congressional intent that section 3605 is the only FHA provision applicable to lending. This argument fails because it ignores another provision of ECOA which demonstrates the opposite.

Accredited relies on 15 U.S.C. § 1691e(i), which states that "No person aggrieved by a violation of this subchapter and by a violation of section 3605 of Title 42 shall recover under" both ECOA and the FHA. From this, Accredited concludes that Congress believed that the only FHA provision that concerns the type of activity addressed in ECOA, *i.e.*, lending, is section 3605. However, section 1691e also requires an agency investigating a possible ECOA violation to refer the matter to HUD in some situations if the agency "has reason to believe that the alleged violation would be a violation of the *Fair Housing Act*." 15 U.S.C. § 1691e(k) (emphasis added). The lack of any limitation in subsection (k) to section 3605 of the FHA, especially since

27

this requirement is found almost immediately after the subsection Defendants rely on, shows that Congress contemplated that lending covered by ECOA would also be covered by FHA provisions other than section 3605. *See Rusello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.").

      **B.**      **NCRC Properly Alleges Violation Of Section 3604**

Defendants contend that, even if section 3604 applies to lending, NCRC fails to state a claim under subsections (a), (b), or (c). *See* Mem. at 24-27. Each of its three arguments fail.

With respect to subsections (b) and (c), Accredited merely recasts its contention that these subsections do not apply to lending. It contends that NCRC does not allege that Accredited offers "services" in connection with the sale of a dwelling by asserting that lending is not such a service. Mem. at 26. It likewise contends that NCRC does not allege that Accredited makes any statements "with respect to the sale . . . of a dwelling" by asserting that statements about loans do not "respect" such sales. *Id*. Accredited's contentions fail for the reasons stated in the immediately preceding section – they are contrary to the plain language of section 3604; substantial case law from the D.C. Circuit, this Court, and other courts; and HUD's regulations promulgated under section 3604. As paragraphs 3 to 9, 46 to 65, and 73 of the Complaint demonstrate, NCRC has more than adequately plead facts establishing that Accredited's activities are covered by 42 U.S.C. § 3604(b) and (c).

With respect to subsection (a), Accredited offers an argument that effectively reads out of the statute the words "otherwise make unavailable or deny." *See* Mem. at 24-26. Accredited claims that it does not have a large enough market share in the metropolitan areas at issue "to affect the availability of housing in any way," and that its market share prevents it from

"hav[ing] any impact on the availability of housing in those areas." Mem. at 25. Accredited's market share, however, is irrelevant. In a free market system, rarely if ever does a single entity have such a monopoly on housing that it can force a person to live on the street, and Congress therefore did not direct the Fair Housing Act to alleviating any such problem. Rather, Congress was concerned with discrimination in housing-related transactions and their cumulative effect. *See Mayers*, 465 F.2d at 653 (Wilkey, McGowan, & Leventhal, JJ., concurring) ("[i]t is the total sense and purpose of the Fair Housing Act that no discrimination shall affect . . . real estate transactions"). Thus, it used "broad, general . . . phrases such as 'otherwise make unavailable or deny' . . . to be flexible enough to cover multiple types of housing-related transactions." *Prudential*, 208 F. Supp. 2d at 56. Yet Accredited would have this Court adopt an interpretation of the phrase that would prevent it from applying to *any* transactions because nobody has a monopoly market share. Not surprisingly, Accredited fails to cite any case taking this view of "otherwise make unavailable deny."

FHA case law demonstrates, contrary to Accredited's assertion, that monopoly market share is not a precondition to liability under this language. In *Prudential*, this Court held this language applicable to a single provider of homeowner's insurance without any indication that the insurer dominated the market for that product. Collecting cases from five other Circuits, the Seventh Circuit explained that "courts have construed the phrase 'otherwise make unavailable or deny' in subsection (a) to encompass mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities." *Southend Neighborhood Improvement Ass'n v. St. Clair County*, 743 F.2d 1207, 1210 (7th Cir. 1984). None of the cases it cited give any indication that a defendant had the kind of monopoly Accredited suggests is a predicate for

liability under the "otherwise make unavailable or deny" clause. *See id.* n.3. A company need not be massive to transgress that prohibition.

For these reasons, NCRC has properly stated a claim under 42 U.S.C. § 3604.

## IV. DISPARATE IMPACT CLAIMS ARE COGNIZABLE UNDER THE FAIR HOUSING ACT

Accredited asserts that the Fair Housing Act does not apply to disparate impact claims. *See* Mem. at 27-38. To rule in Defendants' favor, this Court would have to reject its own holding in *Prudential* and more than three decades of consistent decisions from the eleven United States Courts of Appeals that have addressed the issue. No other court in the country has done so, and there is no reason to.

Defendants' novel and extraordinary request rests on their unique interpretation of *Smith v. City of Jackson*, 544 U.S. 228 (2005) – which holds that the Age Discrimination in Employment Act *does apply* to disparate impact claims and makes no mention of the Fair Housing Act – and the thirty-one year old holding in *Washington v. Davis*, 426 U.S. 229 (1976), that the Equal Protection Clause does not reach disparate impact. Accredited contends that these two cases expose the uniform case law finding the FHA applicable to disparate impact claims as nothing more than "a house built upon sand." Mem. at 33. The heart of Accredited's argument is its assertion that *Smith* reduced the proper analysis of whether a civil rights statute reaches disparate impact to no more than a mechanical, formalistic search for specific statutory language to the exclusion of all else.

For more than thirty years, however, the Supreme Court has demonstrated that the purpose of a civil rights statute is central to determining whether it applies to disparate impact claims. *See, e.g.*, *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 386-391 (1982) ("*General Bldg.*") (42 U.S.C. § 1981); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30

(1971) (Title VII).  The Court did not abandon this approach in *Smith*.  To the contrary, *Smith* strongly reaffirms the importance of Congress's purpose in addressing this issue.

While, as shown below, the text of the Fair Housing Act fully supports the Act's application to disparate impact claims, we therefore begin with its purpose, as expressed in legislative history.  We then demonstrate that the federal appellate courts' uniform holdings that the FHA applies to disparate impact claims are based on a myriad of additional compelling factors that *Smith* also considered, and that Congress endorsed this judicial construction when it amended the Act in 1988.  We then show that the text of the Act compels its application to disparate impact claims and that administrative interpretation of the Act, entitled to great deference, is in accord.  Finally, we explain how Defendants misrepresent the analysis and significance of *Smith*, which actually confirms that disparate impact is a valid basis for imposing liability under the FHA.

A.    **The Legislative History Of The Fair Housing Act Demonstrates That It Applies To Disparate Impact Claims**

Congress adopted the FHA in the wake of the highly publicized report by the National Advisory Commission on Civil Disorders, which warned that the "Nation is moving toward two societies, one black, one white – separate and unequal."  *See Report of the Nat'l Advisory Comm'n on Civil Disorders* 1, 13 (1968).  Proponents of the FHA emphasized that the facially neutral practices of private and public actors were a principal cause of residential segregation, which the Act aimed to eliminate.  One of the Act's leading supporters, Senator Brooke, noted that African Americans could not move to better neighborhoods because they were "surrounded by a pattern of discrimination based on individual prejudice, often *institutionalized* by business and industry, and Government *practices*."  114 Cong. Rec. 2526 (1968) (emphases added).  Senator Mondale, the Act's principal sponsor, explained that after the Supreme Court prohibited

31

explicitly racial zoning laws in 1917, "[l]ocal ordinances *with the same effect*, although operating more deviously in an attempt to avoid the Court's prohibition, were still being enacted." *Id.* at 2669 (emphasis added).

Proponents of the FHA plainly intended to eliminate these causes of residential segregation. Senator Mondale stated that it "seems only fair, and is constitutional, that Congress should now pass a fair housing act to undo *the effects*" of past discriminatory governmental actions. *Id.* Because Congress was undoubtedly empowered to proscribe intentional governmental discrimination, Senator Mondale would have had no reason to comment on the Act's constitutionality unless it aimed at the discriminatory effects of facially neutral laws and practices. While this statement focused on public actors, there is no indication in the Act's text or history that Congress intended to treat facially neutral private and public acts differently. *See Prudential*, 208 F. Supp. 2d at 59 n.7.

The Act's legislative history also demonstrates that Congress was aware of the difficulty of proving discriminatory intent and, because of that difficulty, allowed other forms of proof. Senator Baker introduced an amendment that would have exempted from liability any homeowner who engaged a real estate agent "without indicating any preference, limitation or discrimination based on race . . . ., or an intention to make any such preference, limitation or discrimination." 114 Cong. Rec. at 5214. That is, it would have made those homeowners liable only if they intentionally discriminated. A number of the bill's supporters objected that the amendment would undermine Congress's purpose by making proof of discrimination difficult in all but the most blatant cases. Senator Dominick argued that the amendment would "increase[] the opportunity for discrimination," *id.* at 5220, and Senator Percy stated that the amendment "would require proof that the single homeowner had specified racial preference. I maintain that

proof would be impossible to produce." *Id.* at 5216; *see also id.* at 5218, 5220-21 (remarks of

Senators Mondale and Hart regarding the difficulty of proving discriminatory intent). Because

of these concerns, the Baker amendment was defeated. *See id.* at 5221-22.

In short, the FHA's sponsors clearly recognized that residential segregation stemmed in

part from ostensibly neutral private and public practices and they sought to undo the effects of

those practices. Together with the widespread recognition that evidence of overt discrimination

would often be difficult to uncover, this confirms that Congress intended to provide a disparate

impact cause of action under the FHA. The contrary conclusion would effectively condemn

Congress as having adopted a measure manifestly incapable of achieving its intended aims.

### B.    This Court And All Eleven Circuits To Address The Issue Have Held That The Fair Housing Act Applies To Disparate Impact Claims

There is unanimity among the eleven United States Circuit Courts of Appeals to address

the issue that the FHA does, in fact, provide for a disparate impact cause of action. *See, e.g.*,

*Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Huntington Branch, NAACP*

*v. Town of Huntington*, 844 F.2d 926, 934-35 (2d Cir.) ("*Huntington*"), *aff'd per curiam*, 488

U.S. 15 (1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146-48 (3d Cir. 1977); *Smith v.*

*Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.*, 800 F.2d

1381, 1386 (5th Cir.1986); *Arthur v. City of Toledo*, 782 F.2d 565, 574-75 (6th Cir. 1986);

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288-90 (7th Cir. 1977)

("*Arlington Heights II*"); *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974); *Pfaff v.*

*HUD*, 88 F.3d 739, 745-46 (9th Cir. 1996); *Mountain Side Mobile Estates P'ship v. Sec'y of*

*HUD*, 56 F.3d 1243, 1250-52 (10th Cir. 1995) ("*Mountain Side*"); *Jackson v. Okaloosa County*,

21 F.3d 1531, 1543 (11th Cir. 1994).[10]  As this Court put it in *Prudential*, the federal appellate precedents are "overwhelming."  208 F. Supp. 2d at 59.  The Court would now have to reject every one of these precedents to rule in Defendants' favor.  The Court refused to do so in *Prudential*, where it held that a fair housing organization stated a claim based on the racially disparate impact of the defendant's ostensibly neutral underwriting policies regarding the sale of homeowner's insurance, *see* 208 F. Supp. 2d at 58-61, and there is no reason for it to change course now.

The Circuit Courts' grounds for finding the FHA applicable to disparate impact claims are broad.  Their decisions reflect and often rely on the Supreme Court's instruction that the Act must be given a "generous construction" in light of its "broad and inclusive language." *Trafficante*, 409 U.S. at 209, 212; *City of Edmonds*, 514 U.S. at 731; *see also Havens*, 455 U.S. at 380 (rejecting an interpretation that would "undermine[] the broad remedial intent of Congress embodied in the Act").  These requirements would be contradicted by failing to apply the FHA to disparate impact claims.  *See, e.g.*, *Huntington*, 844 F.2d at 935 (relying in part on *Trafficante* in holding disparate impact actionable); *Arlington Heights II*, 558 F.2d at 1289-90 (same).

The Circuit Courts also emphasize that the legislative history discussed above demonstrates that Congress's purpose is advanced by recognizing disparate impact claims.  The Second Circuit, for example, explained that Congress's rejection of the Baker amendment "underscore[s] congressional willingness to broaden Title VIII to encompass segregation resulting from the application of facially neutral rules, even in the absence of discriminatory intent."  *Huntington*, 844 F.2d at 934-35.  The Third Circuit agreed.  *See Rizzo*, 564 F.2d at 147.

---

[10]      The D.C. Circuit recently "assume[d] without deciding that [plaintiffs] may bring a disparate impact claim under the FHA."  *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006). The court recognized that the First through Eleventh Circuits have "held that the FHA . . . prohibits not only intentional housing discrimination, but also housing actions having a disparate impact."  *Id.* (citation omitted).

Citing leading proponents Senators Mondale and Brooke, the Third Circuit also emphasized that "several Congressmen spoke of the importance of [the FHA] in eliminating the adverse discriminatory effects of past and present prejudice in housing." *Id.* at 147 & n.30. These analyses parallel the Supreme Court's analysis of the FHA in *Gladstone, Realtors*, which demonstrated by example that the Act's legislative history is important to its construction. *See* 441 U.S. at 105 (support offered by Act's legislative history is "substantial").

The Circuit Courts have also looked to Title VII jurisprudence because, as the Fourth Circuit put it, "the anti-discrimination objectives of [the FHA] are parallel to the goals of Title VII . . . ." *Town of Clarkton*, 682 F.2d at 1065; *see also Huntington*, 844 F.2d at 935 ("[t]he two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination"). This plainly is correct. "The objective of Congress in the enactment of Title VII . . . was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees," *Griggs*, 401 U.S. at 429-30, and the FHA's objective was just as far-reaching: "Congress was aware that the measure would have a very broad reach, and indeed the legislation was seen as an attempt to alter the whole character of the housing market." *Mayers*, 465 F.2d at 652 (Wilkey, McGowan, & Leventhal, JJ., concurring). In light of the statutes' close relationship, the Supreme Court has looked to its interpretation of Title VII to give meaning to provisions of the FHA. For example, in *Trafficante*, the Court interpreted the phrase "person aggrieved" in the FHA by citing a case that construed a similar phrase in Title VII. 409 U.S. at 208-09; *cf. General Bldg.*, 458 U.S. at 389-90 (14th Amendment's discriminatory purpose standard controls claims under the 1866 Civil Rights Act because the laws are "legislative cousins" and it would be "incongruous to construe" them in a "markedly different" manner). Following the Supreme

35

Court's example, many courts have relied in part on the availability of a disparate impact claim under Title VII and *Griggs* in holding that one is also permitted under the FHA. *See, e.g.*, *Huntington*, 844 F.2d at 934-36; *Rizzo*, 564 F.2d at 146; *Town of Clarkton*, 682 F.2d at 1065; *Mountain Side*, 56 F.3d at 1250-51 & n.7.

Setting their holdings on still another foundation, the Circuit Courts have also found that the FHA reaches disparate impact claims because of the difficulty of proving intent in many cases, and the invidiousness of the effects of many practices even where that proof cannot be made. This was precisely the rationale offered by the Act's supporters in opposition to the Baker amendment – requiring proof of intent would eviscerate the Act. The Seventh Circuit explained:

> Conduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment "to replace the ghettos by 'truly integrated and balanced living patterns.'" Moreover, a requirement that the plaintiff prove discriminatory intent before relief can be granted under the statute is often a burden that is impossible to satisfy.

*Arlington Heights II*, 558 F.2d at 1289-90 (quoting *Trafficante*, 409 U.S. at 211 (quoting 114 Cong. Rec. 3422 (Sen. Mondale))). The Second Circuit similarly explained that "clever men may easily conceal their motivations," and that "[o]ften, [facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied." *Huntington*, 844 F.2d at 935; *see also id.* at 934 ("an intent requirement would strip the statute of all impact on de facto segregation"); *City of Black Jack*, 508 F.2d at 1185.

Finally, the nation's courts have of course also relied on the text of the FHA to support their conclusion that the Act permits disparate impact claims. Notably, courts emphasize two different components of the Act. First is the Act's own statement of its exceptional breadth: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601. *See Huntington*, 844 F.2d at 928, 934 (relying

in part on § 3601 in holding disparate impact actionable); *Arlington Heights II*, 558 F.2d at 1289-90 (same); *City of Black Jack*, 508 F.2d at 1184 (same).  Second, courts have considered the language of 42 U.S.C. § 3604, which enumerates some of the particular practices prohibited by the Act.  They have found that this language is ambiguous as to whether it reaches disparate impact claims because, as the Seventh Circuit put it, it is subject to both a "narrow view" and a "broad view."  *Arlington Heights II*, 558 F.2d at 1288; *see also, e.g.*, *Langlois*, 207 F.3d at 49 (text "*could* be thought to refer simply to intentional discrimination") (emphasis added).  In light of the many factors that courts have found to favor applying the FHA to disparate treatment claims, they have adopted the broad view.  *See, e.g.*, *Arlington Heights II*, 558 F.2d at 1289 ("we decline to take a narrow view of the phrase 'because of race'").

In sum, the First through the Eleventh Circuits and this Court are in unanimous agreement that the FHA applies to disparate impact claims.  These courts' analyses, grounded on Supreme Court rules of FHA construction, legislative history, purpose, analogy to Title VII, issues of proof, and the Act's text, are multifaceted and consistent.  As this Court aptly stated, the precedent is "overwhelming."  *Prudential*, 208 F. Supp. 2d at 59.

### C.  Congress Endorsed The Application Of The Act To Disparate Impact Claims In The Fair Housing Amendments Act Of 1988

When it passed the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988) ("FHAA"), Congress used the same language the FHA already applied to race, color, religion, sex, and national origin to add new prohibitions against discrimination because of familial status or handicap.  *See id.* § 6(a), (b).  *Compare* 42 U.S.C. § 3604(a), (b) *with id.* § 3604(f)(1), (2).  Prior to the FHAA, all eight of the Circuit Courts to address the issue had concluded that the FHA includes a disparate impact cause of action.  The legislative history of the FHAA shows that Congress agreed with the courts.

37

Congress's actual knowledge of the Circuit Courts' decisions is evident from the House Report on the FHAA and Senate hearings. The House Report explicitly discusses some of these decisions: "[b]ecause minority households tend to be larger and exclusion of children often has a racially discriminatory *effect*, two federal courts of appeal have held that adults-only housing may state a claim of racial discrimination under title VIII." H.R. Rep. No. 100-711, at 21 (1988) (citing Fourth and Ninth Circuit cases; emphasis added). The Report also discusses the Second Circuit's *Huntington* decision permitting disparate impact claims. *See id.* at 90; *see also Fair Housing Amendments Act of 1987: Hearings on S. 558 Before the Subcomm. on the Constitution of the Sen. Comm. on the Judiciary*, 100th Cong. 529-557 (1987) (testimony and statement of Robert Schwemm) (discussing "strong consensus" in Circuit Courts).

Congressional approval of these decisions is demonstrated by the House's rejection of an amendment mandating that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the *intent* to discriminate on the basis of race or other prohibited criteria under the Act." H.R. Rep. No. 100-711, at 89 (emphasis added). The explicit purpose of the amendment was to eliminate the disparate impact standard approved by the courts in favor of an intent requirement. *See id.* 89-93. The House Judiciary Committee rejected it. *See id.* at 89.

The House likewise made clear that it intended disparate impact analysis to apply to the new protected class of handicap:

> The Committee understands that housing discrimination against handicapped persons is not limited to blatant, intentional acts of discrimination. *Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination.* A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed."

*Id.* at 25 (1988) (emphasis added). By using the FHA's original language to accomplish its goal of reaching acts with a disparate impact based on handicap, the Committee demonstrated its

agreement with the Circuit Courts' holdings that the original language reaches disparate impact.

In addition, the day after the FHAA was signed into law, its principal sponsor, Senator Kennedy, made clear that "Congress accepted th[e] consistent judicial interpretation" "of the [] Federal courts of appeals" that the FHA "prohibit[s] acts that have discriminatory effects, and that there is no need to prove discriminatory intent."  134 Cong. Rec. 23711-12 (1988).

Accordingly, the presumption that Congress "adopt[s prior judicial] interpretation when it re-enacts a statute without change" is especially strong with respect to the disparate impact decisions that preceded the FHAA.  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (citations omitted).  With the FHAA, Congress's awareness of the prior consistent judicial interpretation was explicit, as was its intent to continue to give that interpretation the force of law.

### D.    The Text Of The Fair Housing Act Compels The Conclusion That The Act Applies To Disparate Impact Claims

NCRC brings this action under four FHA provisions, 42 U.S.C. §§ 3604(a), (b), (c) and 3605.  The text of each may properly be interpreted as applying to disparate impact causes of action.  Another provision, § 3601, mandates that this is therefore the only permissible interpretation because it is the broader one.  There are key textual differences between these FHA provisions and the ADEA provisions considered in *Smith*.  Defendants ignore these differences, but they demonstrate that *Smith*'s understanding of the ADEA's text is consistent with holding Accredited liable under the FHA based on the disparate impact of its policies.

Under 42 U.S.C. § 3604, it is unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

39

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

Under 42 U.S.C. § 3605:

It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

The "any person," "because of," and "based on" constructions fit with a disparate impact claim because they do not focus on a particular individual.

The Supreme Court explained in *Smith* that an explicit focus on a particular individual is the reason why one part of the ADEA, 29 U.S.C. § 623(a)(1), is inconsistent with disparate impact liability. *See* 544 U.S. at 236 n.6. Contrary to Accredited's claim that the language of the FHA "mirrors" the language of that part of the ADEA, Mem. at 30, it does not. The key words in the ADEA emphasized by the *Smith* Court – "*any individual*" and "because of *such individual's*" – are not found in the FHA. 544 U.S. at 236 n.6 (emphases in original). The FHA uses "any person" instead of the ADEA's "any individual," and defines "person" to include, *inter alia*, "one or more individuals." 42 U.S.C. § 3602(d). Similarly, the FHA has no parallel to the ADEA's "such individual's" phrase. The FHA's use of the plural makes it more akin to the section of the ADEA that *Smith* found does apply to disparate impact claims, 29 U.S.C. § (a)(2), because that section of the ADEA uses the plural term "employees."

The FHA thus reflects a general concern with all people, not just a particular individual. Accordingly, even if the language of sections 3604 and 3605 does not unambiguously apply to disparate impact claims, that interpretation is at least a reasonable one. *See, e.g., Arlington*

40

*Heights II*, 558 F.2d at 1288 (explaining the "broad" and "narrow" views of the Act); *Langlois*,

207 F.3d at 49.  Another key textual component of the FHA that Accredited fails to acknowledge

requires that this is, therefore, the interpretation mandated by the text.  42 U.S.C. § 3601, which

has no parallel in the ADEA, states that "[i]t is the policy of the United States to provide, *within

constitutional limitations*, for fair housing throughout the United States."[11] *Id.* (emphasis added).

This requires that, if there are two constitutional constructions of the FHA and one applies the

Act to more conduct than the other, the broader is the correct construction.  This is precisely why

the Supreme Court has interpreted the FHA to eliminate the usual prudential requirements for

standing.  *See Havens*, 455 U.S. at 372 ("prudential barriers to standing" do not apply to FHA

claims).  Here, section 3601 requires the Act's application to disparate impact claims because

this construction is permitted by sections 3604 and 3605 and, in light of the Supreme Court's

unanimous approval of disparate impact claims under Title VII more than thirty-five years ago in

*Griggs*, is plainly constitutional.

Furthermore, even if sections 3601, 3604, and 3605 did not, taken alone, dictate that the

FHA applies to disparate impact claims, the many other factors enumerated by the appellate

courts all support that result.  The "generous construction" required by the Supreme Court, the

legislative history and purpose of the original Act and the FHAA, the analogous purpose of Title

VII, the difficulty of proving intent, and the great harm of practices that have a disparate impact

though not motivated by discriminatory intent all buttress the text's application to disparate

impact causes of action.

      **E.**     **Administrative Implementation Of The Fair Housing Act**
                **Supports A Disparate Impact Standard**

The various agencies charged with implementing and administering the FHA have

---

[11]     *Compare* 42 U.S.C. § 3601 *with* 29 U.S.C. § 621(b) (ADEA statement of purpose).

embraced the use of disparate impact analysis. Most significantly, the Secretary of HUD, who has "[t]he authority and responsibility for administering th[e] Act," 42 U.S.C. § 3608(a), has endorsed disparate impact. *See HUD v. Mountain Side Mobile Estates*, 2 Fair Hous.-Fair Lend. (P-H) ¶ 25,053, 1993 WL 307069, at *5 (HUD Sec'y 1993). Even if the statute itself did not resolve the issue of whether disparate impact is a valid basis of liability, the Secretary's administrative construction adopted through adjudication is entitled to the highest degree of *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 230-31 & n.12 (2001).[12] HUD has also asserted in litigation that the FHA permits a disparate impact cause of action. *See Pfaff*, 88 F.3d at 745 (describing HUD's position); *Mountain Side*, 56 F.3d at 1250 (same). This expression of HUD's position is also entitled to great deference. *See Smith*, 544 U.S. at 244-45 (Scalia, J., concurring).

In addition, HUD's Assistant Secretary for Fair Housing and Equal Opportunity has told Congress that "[t]he standards to determine discrimination [in home insurance under the FHA] – as in all other covered areas – will be based on the principles of overt discrimination, disparate treatment, and disparate impact." *See Homeowners Ins. Discrimination: Hearing Before the Sen. Comm. on Banking, Housing, & Urban Affairs*, 103d Cong. 52 (1994) (statement of Roberta Achtenberg). Similarly, HUD's handbook for its FHA enforcement staff endorses disparate impact theory.[13] Thus, even if *Chevron* deference did not apply to the Secretary's interpretation, the view of the FHA reflected in these various HUD pronouncements is firmly rooted in the

---

[12]    This conclusion is not altered by the Tenth Circuit's reversal of this decision on other grounds in *Mountain Side*. In fact, the Tenth Circuit expressly endorsed the Secretary's view that the FHA includes a disparate impact cause of action. *Mountain Side*, 56 F.3d at 1250-51.

[13]    *See* HUD, No. 8024.01, *Title VIII Complaint Intake, Investigation & Conciliation Handbook*, 2-27 (REV-2 2005) (available at http://www.hudclips.org/sub_nonhud/cgi/selecthbk.cgi (select "search" and 8024.01)) ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2-28 ("even in cases where there is absolutely no evidence of discriminatory intent, a discriminatory impact claim may result in a finding of liability").

statutory framework and entitled to *Skidmore* deference, *i.e.*, deference based on HUD's

"specialized experience" and "the value of uniformity."  *See Mead*, 533 U.S. at 234-35 (citing

*Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 140 (1944)) (internal quotation marks omitted).

Other agencies have also interpreted the FHA to include a disparate impact cause of

action.  As part of its enforcement responsibilities under the Act, *see, e.g.*, 42 U.S.C. §§

3610(g)(2)(C), 3614, the Department of Justice ("DOJ") has successfully urged the courts to

adopt an impact standard.  It has done so both on behalf of HUD, *see Pfaff* and *Mountain Side*,

and on behalf of the United States, *see City of Black Jack*, 508 F.2d at 1184-85.  In 1994, HUD,

DOJ, the Federal Reserve Board, and seven other federal agencies that regulate financial

institutions adopted a joint "Policy Statement on Discrimination in Lending" recognizing that

proof of disparate impact is sufficient to establish a violation of the FHA.  *See* 59 Fed. Reg.

18266, 18269-70 (Apr. 15, 1994).  Contrary to Defendants' assertion, *see* Mem. at 38 n.28, these

agencies were stating their position, not merely "summar[izing]" FHA cases.  Although these

other agencies lack the interstitial lawmaking power delegated to the Secretary of HUD, their

consistent views are also entitled to *Skidmore* deference, and confirm the propriety of the

Secretary's determination that the FHA provides a disparate impact cause of action.

     **F.**    ***Smith* Does Not Undermine The Judicial Consensus That The Fair Housing Act Applies To Disparate Impact Claims, But Instead Supports It**

In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court held that the Age

Discrimination in Employment Act *does apply* to disparate impact claims.  Defendants

nonetheless contend that, because of *Smith*, this Court should ignore its own holding in

*Prudential* that the FHA applies to disparate impact claims and the parallel holdings of the First

through Eleventh Circuits.

Defendants assert that *Smith* somehow changed the rationale supporting *Griggs*, in which

43

the Supreme Court in 1971 held that Title VII applies to disparate impact claims.  Despite the

clear reliance on Congressional purpose in *Griggs*, *see* 401 U.S. at 429-30, that decision now

rests, on Defendants' view, solely on the presence of particular words in the text of Title VII, and

not to any degree on the purpose of Title VII or anything else.  This means, Defendants continue,

that *Griggs* provides no support for applying the FHA to disparate impact claims because the

language of Title VII and the FHA is not identical.  Defendants contend that this undermines

*every* opinion applying the FHA to disparate impact claims.  They assert that every such opinion

traces back exclusively to *Griggs* and/or the belief, rejected by the Supreme Court thirty-one

years ago in *Washington*, that the Equal Protection Clause applies to disparate impact claims.

Defendants' theory is wrong for two reasons.  First, the Circuit Courts rest their holdings

that the FHA encompasses disparate impact on many foundations, as shown above.  They do not

rely exclusively, or even primarily, on *Washington* and *Griggs*.  Second, *Smith* reinforces the

analytical approach taken by the Circuit Courts in these cases, including their use of *Griggs*,

Supreme Court rules of FHA construction, the Act's legislative history, its purpose, issues of

proof, and the Act's text as compelling reasons for applying the FHA to disparate impact claims.

> **1.** ***Smith* Does Not Undermine The Bases For The First**
> **Through Eleventh Circuits' Holdings That The FHA**
> **Permits A Disparate Impact Claim**

Defendants' claim that *Washington* and *Griggs* are the sole basis of every opinion

holding that the FHA applies to disparate impact claims begins with a flawed analysis of the

Eighth Circuit's 1974 opinion in *City of Black Jack*.  *See* Mem. at 33-34.  Defendants assert that

*City of Black Jack* "adopted a disparate impact standard derived wholly from constitutional

cases."  *Id.* at 34.  This is simply wrong.  In addition to Equal Protection cases, the Eighth Circuit

relied heavily on:

- 42 U.S.C. § 3601, which requires that between multiple reasonable, constitutional interpretations of the FHA, the one with the broadest reach is the proper one;

- its own decision in *Williams*, 499 F.2d at 826, a FHA case holding that "[t]he courts will . . . proscribe practices which actually or predictively result in racial discrimination, irrespective of defendant's motivation;" and

- *Griggs*, which remains a strong precedent in favor of applying disparate impact analysis under the FHA, as shown below.[14]

*See* 508 F.2d at 1184-85.  The *Washington* decision thus did no harm to the bulk of *City of Black Jack*'s foundation.

Defendants then misread the Seventh Circuit's 1977 opinion in *Arlington Heights II*, which they assert is based solely on *City of Black Jack* and *Griggs*.  *See* Mem. at 34-35.  Like *City of Black Jack*, however, *Arlington Heights II* rests on many sound footings.  The Seventh Circuit emphasized the possible "broad" and "narrow" interpretations of 42 U.S.C. § 3604 (which, as shown above, differs significantly from the ADEA's text that Defendants claim it "mirrors"); 42 U.S.C. § 3601; the Supreme Court's requirement in *Trafficante* "that the Act must be interpreted broadly;" the difficulty of proving intent; and the great harm that can result from ostensibly neutral practices.  558 F.2d at 1288-89.  The court concluded:  "In light of the declaration of congressional intent provided by section 3601 and the need to construe the Act expansively in order to implement that goal, we decline to take a narrow view of the phrase 'because of race' contained in section 3604(a)."  *Id.* at 1289.  *Griggs*, though it properly could have been, was not even mentioned in this conclusion.

Having misunderstood the analyses of the Seventh and Eighth Circuits, Defendants then assert that every subsequent case applying the FHA to disparate impact claims rests squarely on *City of Black Jack* and *Arlington Heights II* and is irrevocably infected by their purported

---

[14]     To a lesser extent, the Eighth Circuit also relied on a Second Circuit case authored by retired Supreme Court Justice Clark that involved both Fourteenth Amendment and FHA claims.  *See Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108, 109 (2d Cir. 1970), *cited in City of Black Jack*, 508 F.2d at 1185.

errors.[15]  *See* Mem. at 35-38.  To the contrary, *City of Black Jack* and *Arlington Heights II*

remain sound and the plethora of additional consistent opinions from throughout the country and

this Court properly cite to them, while simultaneously relying on several additional sound

rationales.  *See* § IV.B, *supra*.

## 2.  *Smith* Demonstrates That The Circuit Courts Have Properly Analyzed The FHA's Application To Disparate Impact Claims

Defendants assert that *Smith* means that whether a civil rights statute allows for a

disparate impact claim rests only on a formalistic search for the words "otherwise adversely

affect" or nearly identical words.  Mem. at 29-33, Exs. A-B.  They contend that the Supreme

Court in *Smith* repudiated its reliance in *Griggs* on anything but a statute's text, read

mechanically, in addressing this issue.  This, Defendants claim, means that the analogy to Title

VII in considering the issue under the FHA is impermissible after *Smith*.

Defendants entirely misconstrue *Smith*.  Though the Court was sharply divided as to the

result, the analytical approaches of every Justice across three opinions were much broader and

comprehensive than Defendants assert.  Every Justice relied on:

- the legislative history of the ADEA, *see id.* at 232-33 (Majority); *id.* at 238 (Plurality Plus); *id.* at 248, 253-56 (O'Connor, J.)[16];

- the purpose of the ADEA, including its comparison to the purpose of Title VII, *see id.* at 234, 235 n.5 (Plurality Plus); *id.* at 248, 256-57, 258-59, 262 (O'Connor, J.);

---

[15]     Less vehemently, Defendants add an additional criticism of the Third Circuit's opinion in *Rizzo*.  They assert that "*Rizzo*'s reliance on the remand [from the Supreme Court that lead to *Arlington Heights II*] ignores the fact that the Supreme Court takes quite seriously its duty to address only issues properly before it."  Mem. at 36. This contradicts Defendants' fundamental contention that through *Smith* – a case about the ADEA that makes no mention of the FHA – the Supreme Court effectively held that the FHA does not reach disparate impact claims.

[16]     The sections of Justice Stevens's opinion that garnered five votes (sections I, II, and IV) are referred to as "Majority."  The section of Justice Stevens's opinion that garnered four votes (section III) is referred to as "Plurality Plus" because Justice Scalia "agree[d] with all of the Court's reasoning" in that section, though he did not join it. 544 U.S. 243.  Justice Scalia's opinion is referred to as "Scalia, J."  Justice O'Connor's opinion, joined by Justices Kennedy and Thomas, is referred to as "O'Connor, J."  Chief Justice Rehnquist did not take part in the decision of the case.

- the text of the ADEA's provision, § 623(a), assertedly providing a disparate impact cause of action, *see id.* at 233 (Majority); *id.* at 235-36 & n.6, 240 (Plurality Plus); *id.* at 248-51 (O'Connor, J.);

- the text of another provision of the ADEA, § 623(f) (the "RFOA" provision), that influenced how § 623(a) should be construed, *see id.* at 233, 240 (Majority); *id.* at 238-39, 240 (Plurality Plus); *id.* at 245-46 (Scalia, J.); *id.* at 251-53, 261, 265-67 (O'Connor, J.); and

- the nature of discrimination based on age as compared to discrimination based on race and other classes protected under Title VII,[17] *id.* at 240-41 (Majority); *id.* at 236 n.7 (Plurality Plus); *id.* at 254-55, 258-59, 261 (O'Connor, J.).

A majority of the Court also relied on and accorded deference to the administrative construction of the ADEA, which endorsed disparate impact claims. *See id.* at 239-40 (Plurality Plus); *id.* at 243-45 (Scalia, J.). In fact, the only reason Justice Scalia did not join Part III of Justice Stevens's opinion was his belief that, though that part was reasoned correctly, the Court should simply rest its decision on deference to the EEOC under *Chevron*. *See id.* at 243 (Scalia, J.).

The Supreme Court's reliance on the ADEA's purpose is particularly notable because it so clearly demonstrates the fallacy of Accredited's central thesis – that *Smith* signals the Court's own rejection of its reliance in *Griggs* on Title VII's purpose as support for that statute's application to disparate impact claims. To the contrary, the purpose of the ADEA was of central importance even to the Justices who disagreed with applying the ADEA to disparate impact, Justices O'Connor, Kennedy, and Thomas:

> In other words, the Court in *Griggs* reasoned that disparate impact liability was necessary to achieve Title VII's ostensible goal of eliminating the cumulative effects of historical racial discrimination. However, that rationale finds no parallel in the ADEA context, and

---

[17] The majority explained that "age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment. . . . Moreover, intentional discrimination on the basis of age has not occurred at the same levels as discrimination against those protected by Title VII." 544 U.S. at 240-41. Justice O'Connor insisted that these distinctions underlay different Congressional purposes in enacting the ADEA and Title VII, and therefore required the Court to treat them differently with respect to disparate impact claims. *See id.* at 258-59 ("disparate impact liability under the ADEA cannot be justified, and is not necessary, as a means of redressing the cumulative results of past discrimination").

it therefore should not control our decision here.  Even venerable canons of construction must bow, in an appropriate case, to compelling evidence of congressional intent.

*Id.* at 262 (O'Connor, J.) (citation omitted).  Justice Stevens's opinion likewise placed great emphasis on Congressional purpose by discussing at length the purpose of the ADEA as revealed by its legislative history.  *See id.* at 232-33, 235 n.5.  He also made clear that *Griggs* is supported by *both* the purpose and text of Title VII, and that Supreme Court precedent discussing the text complements, without replacing, the emphasis on purpose in *Griggs*.  *See id.* at 235.

The factors considered in *Smith* to determine whether the ADEA permits disparate impact causes of action were, therefore, much broader than Defendants acknowledge.  In addition to the statute's text, they include its legislative history and purpose, the text of related statutory provisions, the type of discrimination at issue (*e.g.*, race, age), and the administrative construction of the statute.[18]  These factors are also the foundation for prior Supreme Court cases considering the question pursuant to other civil rights statutes.  *See Chisom v. Roemer*, 501 U.S. 380, 383, 393 (1991) (examining Voting Rights Act's broad preamble and legislative purpose); *Alexander v. Choate*, 469 U.S. 287, 295-97 (1985) (examining Rehabilitation Act's legislative history and purpose, agency interpretation, and consensus among appellate courts); *General Bldg.*, 458 U.S. at 386-91 (examining 42 U.S.C. § 1981's legislative history and purpose); *Griggs*, 401 U.S. at 429-30 (examining Title VII's purpose).  They are, of course, familiar tools in the exercise of statutory construction generally.

Significantly, these are the same factors upon which the uniform decisions finding a disparate impact cause of action under the FHA are based.  *See* § IV.B, *supra*.  The consistent

---

[18]    Justice O'Connor (joined by Justices Kennedy and Thomas) added in *Smith* that "we could safely assume that Congress had notice (and therefore intended) that the language at issue here would be read to authorize disparate impact claims" if "*Griggs* had been decided *before* the ADEA was enacted."  544 U.S. at 259 (emphasis in original).  Before the FHAA in 1988, as noted above, eight federal appellate courts had held that the FHA applies to disparate impact claims.  Because the FHAA maintained the operative language of 42 U.S.C. §§ 3604 and 3605 and even extended it to handicap and familial status, Justice O'Connor's analysis supports crediting Congress with the intention that the consistent judicial construction of the Act would continue to govern.  *See* § IV.C, *supra*.

use of these tools by the Supreme Court to determine the availability of a disparate impact claim confirms that the Circuit Courts have properly analyzed this question under the FHA. Defendants' narrow search for particular words, on the other hand, is demonstrably inadequate.

As shown by the Circuit Courts and this Court, these factors compel the application of the FHA to disparate impact claims.  This Court in *Prudential* explained that the "Congressional intent underlying the FHA is to promote integrated housing patterns and to discourage discrimination in access to housing."  208 F. Supp. 2d 46 (citing *Trafficante*).  Predicating liability on deliberate discrimination alone, however, would defeat this goal for several reasons. "Conduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating" Congress's purpose. *Arlington Heights II*, 558 F.2d at 1289 (citation omitted).  Similarly, practices commenced for neutral reasons "[o]ften . . . develop into powerful discriminatory mechanisms" that preserve entrenched patterns of segregation.  *Huntington*, 844 F.2d at 935.  In addition, "clever men may easily conceal their motivations."  *City of Black Jack*, 508 F.2d at 1185.  The legislative history of the Act shows that, for these very reasons, Congress intended the FHA to apply based on disparate impact as well.

Consistent with the result mandated by the FHA's purpose and legislative history, the legislative history of the FHAA shows that Congress in 1988 agreed with the eight Circuit Courts to have then held the FHA applicable to disparate impact claims.  Even if sections 3604 and 3605 on their own did not compel the FHA's application to disparate impact liability, another provision, section 3601, instructs that it must be so read.  Any other construction would dramatically diminish the Act's effectiveness in promoting fair, integrated housing throughout the United States, which would be directly at odds with the Act's fundamental purpose.

*Smith* also confirms that *Griggs* is a proper basis for holding the FHA applicable to disparate impact claims, and that the Circuit Courts have properly relied on it. The FHA and Title VII have parallel purposes and address discrimination against the same protected classes. *See, e.g.*, *Huntington*, 844 F.2d at 935 ("[t]he two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination"); 42 U.S.C. § 2000e-2 (Title VII applies to race, color, religion, sex, national origin); 42 U.S.C. §§ 3604, 3605 (FHA applies to same). *Smith* shows that these are important criteria in analyzing the issue. The Supreme Court's conclusion in *Griggs* that Title VII permits disparate impact claims therefore strongly suggests that the FHA does, too.

### 3. Post-*Smith* Cases Continue To Hold That The Fair Housing Act Applies To Disparate Impact Claims

At least one court has explicitly rejected the notion that *Smith* "prohibit[s] disparate impact claims under" the FHA. *Beaulialice v. Fed. Home Loan Mortgage Corp.*, No. 8:04-CV-2316-T-24-EAJ, 2007 WL 744646, at *4 (M.D. Fla. Mar. 6, 2007). Since *Smith* was decided, at least six federal appellate opinions have held yet again, though without citing *Smith*, that the FHA applies to disparate impact claims. *See Cox v. City of Dallas*, 430 F.3d 734, 746 (5th Cir. 2005); *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 740-41 (8th Cir. 2005); *Darst-Webbe Tenant Ass'n v. St. Louis Hous. Auth.*, 417 F.3d 898, 902 (8th Cir. 2005); *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276, 1286 (11th Cir. 2006). These opinions implicitly reject Defendants' notion that decades of consistent case law from eleven Circuits and this Court is "a house built upon sand," Mem. at 33, and that *Smith* brought the house down. To the contrary, these recent decisions reaffirm what is essentially, and with good reason, settled law.

## V.    NCRC PROPERLY STATES A DISPARATE IMPACT CLAIM UNDER THE FAIR HOUSING ACT

### A.    NCRC Satisfies The Low Pleading Standard For Discrimination Claims By Alleging That Accredited's Policies Have A Disparate Impact On African Americans And Latinos

Defendants contend that, even if the FHA applies to disparate impact claims, NCRC fails to state a claim based on disparate impact. *See* Mem. at 38-41. Their argument should be rejected because it ignores the very limited pleading requirements for discrimination claims set forth in *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000), and confirmed in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). The *prima facie* elements of a cause of action for discrimination do not have to be plead in the complaint to state a claim. *See Swierkiewicz*, 534 U.S. at 511; *Sparrow*, 216 F.3d at 1114. The complaint does not even to have identify similarly situated people "who were given preferential treatment over [the plaintiff]." *Sparrow*, 216 F.3d at 1114. Minimal descriptions of discrimination, such as "'I was turned down for a job because of my race'" or "'I was turned down for a loan because of my race'" thus suffice to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 1115; *Rahmaan v. Fed. Nat'l Mortgage Ass'n*, No. Civ. A. 02-1822, 2003 WL 21940044, at *2 (D.D.C. May 19, 2003) (Roberts, J.). This "low" "threshold for pleading discrimination claims" applies to FHA claims. *McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir. 2004).

NCRC easily satisfies this low pleading standard and therefore properly states a claim based on disparate impact.[19] The complaint plainly identifies Accredited's lending policies as the source of discriminatory effects with respect to African-Americans and Latinos. *See, e.g.*, Compl. ¶¶ 4-8. This is equivalent to "'I was turned down for a loan because of my race,'" *Rahmaan*, 2003 WL 21940044, at *2, and this aspect of Accredited's motion should be denied

---

[19]    NCRC also alleges discriminatory treatment. *See, e.g.*, Compl. ¶¶ 4-8, 71. Defendants do not contend that NCRC fails to state a claim on this basis.

based on nothing more.  Defendants' contention that the Complaint does not identify the correct

populations and lending policies that should be studied in a disparate impact analysis speaks not

to any pleading requirement under Rule 12(b)(6), but rather to evidentiary issues that should be

resolved on summary judgment or at trial.

>   **B.**      **Even If The Pleading Standard Were Higher, NCRC Would Satisfy It**

Even if the pleading standard for a discrimination claim were higher and required a

complaint to identify appropriate policies and populations for analysis, NCRC's complaint would

satisfy that standard.  With respect to the appropriate populations, NCRC alleges that

Accredited's lending policies have a disparate impact in major metropolitan areas.  *See, e.g.*,

Compl. ¶¶ 51-58.  Defendants assert that instead "the appropriate group for comparison would be

all potential borrowers nationwide" because they make mortgage loans nationwide.  Mem. at 41.

Ample precedent refutes this assertion.  As the Tenth Circuit explained in *Mountain Side*, "[i]n

some cases national statistics may be the appropriate comparable population.  . . . However,

those cases are the rare exception . . . ."  56 F.3d at 1253; *see Hispanics United of DuPage*

*County v. Vill. of Addison*, 988 F. Supp. 1130, 1154 (N.D. Ill. 1997) ("[l]ocal, not national,

statistics, are usually most pertinent").  The reason is that disparate impact analysis compares

"similarly situated" people, as Defendants acknowledge, Mem. at 38, and people across the

country are not similarly situated as to most characteristics.  As *Mountain Side* shows, the "rare

exception" applies only to characteristics such as height and weight.  *See* 56 F.3d at 1253 (citing

the explanation in *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977), that "there is no reason to

suppose that physical height and weight characteristics of Alabama men and women differ

markedly from those of the national population").

This case does not qualify for the "rare exception" because people across the country are

not similarly situated with respect to real estate. It is common knowledge that real estate markets differ dramatically as one looks across the country. Accredited implicitly recognizes this by applying different lending policies in different cities. *See* Compl. ¶¶ 44 n.1, 51, 59, 62 (describing policies unique to Baltimore and Washington, D.C.). It is plainly wrong to suggest that someone trying to buy a house and borrow the money to do so in Washington, D.C. is similarly situated to someone trying to do the same in rural Mississippi. That, however, is what Accredited asks this Court to hold.

Metropolitan areas, on the other hand, provide a sufficiently uniform basis of comparison with respect to real estate here. Indeed, this is the basis of one part of this Court's decision in *Prudential*. The plaintiffs in *Prudential* challenged the disparate impact of a national insurer's policies and practices in particular metropolitan areas. *See* 208 F. Supp. 2d at 50-51. The insurer moved to dismiss on the ground that the statistical basis of the allegations was inadequate. *See id.* at 60. The Court denied the motion, explaining that plaintiffs' statistics based on those particular geographic areas were "more than adequate facts to support their disparate impact claim." *Id.* at 60-61. *See also Edwards v. Johnston County Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989) (in challenge to impact of statewide requirement in one county, complaint need only allege greater adverse impact on minorities in that county).

Even the limited authority relied on by Accredited does not support its contention that the proper population should be as broad as one can conceive it, regardless of obvious differences within that population with respect to the affected activity. In *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 985 (4th Cir. 1984), a three-building apartment complex instituted an adults-only policy in one of the buildings. The owner evicted the residents of that building who had children, and a disparate impact challenge followed. *See id.* at 985-86. The court held that the

proper population for analysis included only the residents of that building; it did not include prospective applicants for an apartment in the building, even though their applications would be considered under the same policy.  *See id.* at 987-88.  People living in the building and facing eviction were not similarly situated to people who would only have their applications denied.  The logic of Accredited's argument, however, would place the tenants and prospective tenants in a single pool, which the Fourth Circuit explicitly rejected.

Accredited's logic would also effectively give large companies an exemption from disparate impact liability under the FHA because of the diversity of real estate markets and demographics across the country.  Surely Congress did not intend that, the bigger a company is, the less it need be concerned with fair housing.[20]

Even under a heightened pleading standard, NCRC also identifies appropriate lending policies for a disparate impact analysis.  NCRC challenges multiple elements of all fourteen of Accredited's loan programs.  *See* Compl. ¶¶ 46-66.[21]  Accredited protests that the only type of disparate impact challenge that a plaintiff could state would be one that addresses every element of each program *collectively*.  *See* Mem. at 40 ("[b]y failing to allege facts regarding the *total impact* of Accredited's lending policies, Plaintiff has failed to state a claim") (emphasis added).  Accredited's explanation of this position appears to be that it is acceptable to engage in activities with a disparate impact on minorities so long as it elsewhere engages in separate activities that might affect more non-minorities than minorities.  *See id.* at 40 & n.30 (asserting that, in some cases, Accredited places limitations on eligible property types where such types "are owned or

---

[20]    Accredited is trying to have it both ways here.  With respect to liability under 42 U.S.C. § 3604(a), it claims to be too small to be held liable.  *See* § III.B, *supra*.  With respect to liability under any FHA provision based on disparate impact, it effectively claims to be too big because it is national.

[21]    Accredited wrongly asserts that Plaintiff challenges only "limitations on row houses."  Mem. at 39.  NCRC actually challenges elements of all fourteen programs that concern minimum property values as well as row houses.  *See, e.g.*, Compl. ¶ 5.

purchased primarily by non-minority borrowers"). This is the equivalent of asserting that it is lawful to place a "No Blacks" sign on the door of one lending office so long as a different office has a "No Whites" sign. Clearly, that would not be an accurate interpretation of the FHA.

Accredited's contention is also refuted by *Prudential*. There, the plaintiffs challenged "*certain* 'redlining' procedures . . . and the use of factors such as credit history to determine eligibility for homeowners insurance." 208 F. Supp. 2d at 48 (emphasis added); *see* Compl. ¶¶ 44-56, *Prudential* (Docket No. 1, filed Oct. 23, 2001) (describing the procedures and factors challenged). This Court held that the allegations adequately supported the disparate impact claim, *see* 208 F. Supp. 2d at 60-61, even though the plaintiff did not challenge the "total impact" of every aspect of the defendant's policies.

Accordingly, NCRC has properly stated a claim based on disparate impact under sections 3604 and 3605 of the Fair Housing Act.

## CONCLUSION

For the reasons stated above, the National Community Reinvestment Coalition respectfully submits that Accredited's motion to dismiss should be denied in its entirety.

Respectfully submitted,

 /s/  John P. Relman
John P. Relman (Bar No. 405500)
Bradley H. Blower (Bar No. 421112)
Glenn Schlactus (Bar No. 475950)
Elena Grigera (Bar No. 491678)
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888

*Attorneys for Plaintiff*

November 16, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Memorandum of Points and

Authorities in Opposition to Defendants' Motion to Dismiss, Attachments A, B and C, and the

Proposed Order were electronically filed on November 16, 2007 using the Court's CM/ECF

system.  Notice of this filing will be sent by operation of the Court's electronic filing system to

all counsel.


/s/_Ben Clark_____
Ben Clark

# ATTACHMENT

# A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                       )

NATIONAL COMMUNITY         )
REINVESTMENT COALITION,   )
                                         )

              Plaintiff,      )
                                       )

     v.                            )
                                       )

ACCREDITED HOME LENDERS    )    Case No. 1:07-cv-01357-EGS
HOLDING COMPANY,         )
                                       )

ACCREDITED HOME LENDERS, INC.  )
                                       )

     and                       )
                                       )

ACCREDITED MORTGAGE LOAN    )
REIT TRUST,              )
                                       )

             Defendants.    )
———————————————————————)

## DECLARATION OF GLENN SCHLACTUS, ESQ.

I, Glenn Schlactus, hereby state as follows:

I am an attorney with the law firm of Relman & Dane P.C. representing Plaintiff National Community Reinvestment Coalition in this matter, and I have knowledge of the facts contained herein. I hereby declare that the following documents are attached to and filed as exhibits to this declaration:

1.       Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Form 10-K filed with the United States Securities and Exchange Commission ("SEC") by Accredited Home Lenders Holding Co. for the fiscal year ended December 31, 2006. This document was obtained from the SEC's website.

2.    Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Form 10-Q filed with the SEC by Accredited Home Lenders Holding Co. for the quarterly period ended June 30, 2007.  This document was obtained from the SEC's website.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED ON:  November 15, 2007          BY:  _____

                                              Glenn Schlactus

Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2006**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from        to

Commission File Number 001-32275

## ACCREDITED HOME LENDERS HOLDING CO.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3669482** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

15253 Avenue of Science
San Diego, California 92128
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: 858-676-2100

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.001 Par Value | NASDAQ |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  or  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  or  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☐  or  No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  or  No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2007 was $343,447,677.

The number of outstanding shares of the registrant's common stock as of July 26, 2007 was 25,124,190.

Source: ACCREDITED HOME LEND, 10-K, August 02, 2007

those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from those generally applicable to stockholders or may have been used for purposes of allocating risk among us, Parent and Purchaser rather than establishing matters as facts.

A copy of the Merger Agreement is attached as Exhibit 2.1 to our Current Report on Form 8−K filed on June 4, 2007. The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement.

Effective October 1, 2006, we acquired Aames Investment Corporation ("Aames") pursuant to an Agreement and Plan of Merger dated as of May 24, 2006. Aames was a public REIT that managed a portfolio of non−prime residential mortgage loans and, through its principal subsidiary, originated, sold, and serviced residential mortgage loans through both wholesale and retail channels.

On September 29, 2006, we acquired the common stock of AaRCS, LLC ("AaRCS") an indirect wholly owned subsidiary of Aames. AaRCS, a vendor management services company, was merged with and now operates as our vendor management subsidiary, Vendor Management Services, LLC dba Inzura Settlement Services.

On June 23, 2006, we purchased the wholesale business of Aames for cash. We completed this purchase prior to closing our merger with Aames in an effort to reduce attrition of Aames employees and maximize the potential synergies from the combination of our and Aames's wholesale businesses.

The Aames acquisitions have been accounted for using the purchase method and, accordingly, the consolidated financial statements include the activity of the above companies from their respective dates of acquisition. (See Note 2 in the consolidated financial statements−"Business Combinations" for additional detail.)

In July of 2004, we formed Accredited Home Lenders Canada, Inc. ("AHLC"), as a wholly owned Canadian subsidiary, and funded our first Canadian mortgage loan in November that same year. AHLC is a mortgage banking company that originates and finances mortgage loans for Canadian borrowers who are not normally eligible for traditional prime mortgages from the major Canadian banks. AHLC is currently originating mortgage loans in the provinces of Alberta, British Columbia, Manitoba, Ontario and Quebec and has current plans to expand beyond those five provinces.

In May 2004, we formed Accredited Mortgage Loan REIT Trust (the "REIT"), a Maryland real estate investment trust, as a wholly owned subsidiary for the purpose of acquiring, holding and managing real estate mortgages. The REIT elected to be taxed as a real estate investment trust and to comply with the provisions of the Internal Revenue Code with respect thereto. Accordingly, the REIT will generally not be subject to federal or state income tax to the extent that it timely distributes its taxable income to its shareholders and satisfies the real estate investment trust requirements and certain asset, income and share ownership tests are met. In August 2004, the REIT completed a public offering of 3,400,000 9.75% Series A Perpetual Cumulative Preferred Shares ("Series A Preferred Shares"), and in September and October 2004 sold an additional 693,678 Series A Preferred Shares pursuant to the exercise of the underwriters' over−allotment option and a reopening of the public offering.

**Description of Our Business**

We are a mortgage company, operating throughout the United States and in Canada, that originates, finances, securitizes, services and sells non−prime mortgage loans secured by residential real estate. We focus on borrowers who may not meet conforming underwriting guidelines because of higher mortgage loan−to−value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties. We originate mortgage loans primarily based upon the borrowers' willingness and ability to repay the mortgage loan and the adequacy of the collateral. Our experienced management team has developed incentive programs, technology tools and business processes that focus our employees on originating non−prime mortgage loans with the financial and other characteristics that should provide a target profit for us.

7

Source: ACCREDITED HOME LEND, 10−K, August 02, 2007

1-2

*We are exposed to environmental liabilities, with respect to properties that we take title to upon foreclosure, that could increase our costs of doing business and harm our results of operations.*

In the course of our servicing activities, we may foreclose and take title to residential properties and become subject to environmental liabilities with respect to those properties. We may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation and clean–up costs incurred by these parties in connection with environmental contamination, or may be required to investigate or clean up hazardous or toxic substances or chemical releases at a property. The costs associated with investigation or remediation activities could be substantial. Moreover, as the owner or former owner of a contaminated site, we may be subject to common law claims by third parties based upon damages and costs resulting from environmental contamination emanating from the property. If we ever become subject to significant environmental liabilities, our business, financial condition, liquidity and results of operations would be significantly harmed.

### Statutory and Regulatory Risks

*The scope of our operations exposes us to risks of noncompliance with an increasing and inconsistent body of complex laws and regulations at the federal, state and local levels.*

Because we originate mortgage loans in all 50 states, in the District of Columbia and Canada, we must comply with the laws and regulations, as well as judicial and administrative decisions, of all of these jurisdictions, as well as an extensive body of federal and international laws and regulations. The volume of new or modified laws and regulations has increased in recent years, and, in addition, individual cities and counties have begun to enact laws that restrict non–prime mortgage loan origination activities in those cities and counties. The laws and regulations of each of these jurisdictions are different, complex and, in some cases, in direct conflict with each other. As our operations continue to grow, it may be more difficult to comprehensively identify, to accurately interpret and to properly program our technology systems and effectively train our personnel with respect to all of these laws and regulations, thereby potentially increasing our exposure to the risks of noncompliance with these laws and regulations.

In light of the recent challenges in the mortgage industry, numerous legislative and regulatory proposals have been offered or enacted at the federal, state, and local government levels to address perceived market failures, address abusive lending practices, and restrict loan products, terms and conditions. For example at the federal level, the federal banking agencies published *Interagency Guidance on Nontraditional Product Risks* on October 4, 2006 and a *Statement on Subprime Lending* on June 29, 2007. At the state level, the Conference of State Bank Supervisors (CSBS) and the American Association of Residential Mortgage Regulators (AARMR) issued *Guidance on Nontraditional Mortgage Product Risks* on November 14, 2006 and, on July 17, 2007, the CSBS, AAMR and the National Association of Consumer Credit Administrators issued a *Statement on Subprime Mortgage Lending*, each of which guidance documents are intended to substantially mirror the federal guidance. More than three dozen states have adopted in some fashion the *Guidance on Nontraditional Mortgage Product Risks* and the CSBS has asserted that 26 states are prepared to adopt on an expedited basis the *Statement on Subprime Mortgage Lending.*

In addition, government enforcement actions and private litigation may increase given the current scrutiny of the industry. These developments could, among other things, limit our ability to offer loan products, reduce the pool of applicants who are eligible to obtain loans and restrict the volume and profitability of our loan origination, investment and servicing activities, in addition to increasing our exposure to risks of noncompliance with governing law and regulations. As a result, these developments could have a material adverse impact on our results of operations, financial condition and business prospects.

In addition, recently enacted and changed laws, regulations and standards relating to corporate governance and public disclosure, including the Sarbanes–Oxley Act of 2002, new Securities and Exchange Commission regulations and stock exchange rules, are creating uncertainties for companies like ours. These new or changed laws, regulations and standards are subject to varying interpretations due, in many cases, to their lack of

53

Source: ACCREDITED HOME LEND, 10–K, August 02, 2007

In July 2004, we formed Accredited Home Lenders Canada, Inc. ("AHLC"), as a wholly owned Canadian subsidiary and funded our first Canadian mortgage loan in November 2004. AHLC is a mortgage banking company that originates and finances mortgage loans for Canadian borrowers who are not normally eligible for traditional prime mortgages from the major Canadian banks. AHLC is currently originating mortgage loans in the provinces of Alberta, British Columbia, Manitoba, Ontario and Quebec and has current plans to expand beyond those five provinces.

In May 2004, we formed a Maryland real estate investment trust, Accredited Mortgage Loan REIT Trust (the "REIT"), for the purpose of acquiring, holding and managing real estate assets. All of the outstanding common shares of the REIT are held by Accredited Home Lenders, Inc., which in turn is a wholly owned subsidiary of Accredited Home Lenders Holding Co. The REIT has elected to be taxed as a real estate investment trust and to comply with the provisions of the Internal Revenue Code with respect thereto. Accordingly, the REIT will generally not be subject to federal or state income tax to the extent that it timely distributes its taxable income to its shareholders and satisfies the real estate investment trust requirements and meets certain asset, income and share ownership tests.

**Recent Developments**

In the third quarter of 2006, the non−prime mortgage market in which the Company operates was characterized by increased competition for loans and customers which simultaneously lowered profit margins on loans and caused lenders to be more aggressive in making loans to relatively less qualified customers. By the end of 2006, the non−prime mortgage industry was clearly being negatively impacted. The sustained pricing competition and higher risk portfolios of loans reduced the appetite for loans among whole loan buyers, who offered increasingly lower prices for loans, thereby shrinking profit margins for non−prime lenders. In addition, the higher levels of credit risk taken on by non−prime lenders resulted in higher rates of delinquency in the loans held for investment and in increasing frequency of early payment defaults and repurchase demands on loans that had been sold. These trends accelerated during the first quarter of 2007, and the industry experienced a period of turmoil which has continued into the second and third quarter of 2007. As of mid−June 2007, more than 50 mortgage companies operating in the non−prime mortgage industry had failed and many others faced serious operating and financial challenges. The most notable of these failures is New Century Mortgage Corporation ("New Century"), one of the largest non−prime originators in recent years, which filed for bankruptcy protection in April 2007.

It now appears that an underlying reason for the deterioration of industry conditions was the relatively poor performance of loans originated in 2006 in comparison to loans originated in 2004 and 2005. While real estate markets were booming during 2004 and 2005, and some areas experienced significant home price appreciation, many originators extended credit and underwriting standards to meet market demands. When home price appreciation leveled off, or in some areas declined, many of the loans originated in 2006 did not perform up to expectations. This decline in performance led to increases in the cost of securitizing non−prime loans as the rating agencies which rate non−prime securitizations increased loss coverage levels, requiring higher credit support for non−prime securitizations.

During the first seven months of 2007, a number of significant industry events occurred, including the following:

- New Century announced that it would restate results for the nine months ended September 30, 2006 to account for losses on defaulted loans that it was obligated to repurchase (February 7th);

- HSBC Holdings PLC, one of the world's largest banks and non−prime lenders, announced an increase in its bad debt charge for 2006, which it attributed to problems in its U.S. non−prime mortgage lending division (February 8th);

- Credit−Based Asset Servicing and Securitization LLC ("C−BASS") and Fieldstone Investment

69

## A CCREDITED HOME LENDERS HOLDING CO. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### Basis of Presentation

The consolidated financial statements include the accounts of Accredited Home Lenders Holding Co. ("Accredited" or "AHLHC"), a Delaware corporation, and its wholly owned subsidiaries Accredited Home Lenders, Inc. ("AHL"), Accredited Home Lenders Canada, Inc., Vendor Management Services, LLC d/b/a Inzura Settlement Services, AHL's wholly owned subsidiaries Accredited Mortgage Loan REIT Trust herein reported separately (the "REIT"), and Inzura Insurance Services, (collectively referred to as "Accredited"). The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. All intercompany balances and transactions are eliminated in consolidation.

AHLHC operates in the highly volatile non–prime mortgage sector. Subsequent to December 31, 2006, the non–prime mortgage sector has been characterized by turmoil and deteriorating conditions including the withdrawal of credit by warehouse credit lenders, bankruptcy of multiple industry participants, tightening of underwriting standards, increased mortgage delinquencies and defaults by borrowers, reduced origination of non–prime mortgages, downgrades by credit rating agencies, and reductions in personnel, among others. In response to these challenging conditions and to preserve liquidity, during 2007, AHLHC completed the sale of substantially all of its mortgage loans held for sale totaling approximately $2.7 billion, borrowed $230 million under a five year term note facility, restructured or terminated many credit facilities, terminated its asset backed commercial paper program, acquired new warehouse credit facilities and long–term debt financing, executed significant reductions in personnel and stabilized its operations.

In addition, during the first half of 2007, AHLHC engaged financial advisors to evaluate strategic options to enhance liquidity, including raising additional capital. In June 2007, AHLHC entered into a merger agreement with an affiliate of Lone Star Fund V (U.S.), L.P. The merger is expected to be completed in the third quarter of 2007 and to provide access to additional capital. If the merger agreement is not consummated or if AHLHC is unable to obtain adequate capital resources to fund future operations in the event of further non–prime mortgage sector volatility and deterioration, AHLHC's financial and operational viability becomes increasingly uncertain. In such event, AHLHC may be required to delay, scale back or eliminate some of its operations. The ultimate outcome of the merger is not presently determinable. The accompanying consolidated financial statements do not include any adjustments related to the effects of this uncertainty.

Accredited engages in the business of originating, financing, securitizing, selling and servicing non–prime mortgage loans secured by residential real estate. Accredited focuses on borrowers who may not meet conforming underwriting guidelines because of higher mortgage loan–to–value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties. Accredited originates mortgage loans primarily based upon the borrower's willingness and ability to repay the mortgage loan and the adequacy of the collateral.

Through its REIT subsidiary, Accredited securitizes non–prime mortgage loans originated by AHL. Generally, the REIT acquires mortgage assets and assumes funding obligations from AHL, which are accounted for at AHL's carrying value, as contributions from AHL.

AHL also provides operating facilities, administration and mortgage loan servicing for the REIT. The REIT is, therefore, economically and operationally dependent on AHL, and, as such, the REIT's results of operation or financial condition would not be indicative of the conditions that would have existed for its results of operations or financial condition if it had operated as an unaffiliated entity.

F–9

Source: ACCREDITED HOME LEND, 10–K, August 02, 2007

Exhibit 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-Q

---

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2007**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

### Commission File Number 001-32275

---

# ACCREDITED HOME LENDERS HOLDING CO.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **04-3669482** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

### 15253 Avenue of Science
### San Diego, California 92128
#### (Address of principal executive offices) (Zip Code)

### Registrant's telephone number, including area code: 858-676-2100

---

### Securities registered pursuant to Section 12(b) of the Act:

2-1

**ACCREDITED HOME LENDERS HOLDING CO. AND SUBSIDIARIES**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Securitizations of non-prime mortgage loans originated by AHL have generally been executed through AHL's subsidiary, the REIT. In such securitizations, AHL contributes the mortgage loans to the REIT as capital and assumes AHL's related financing obligations, and the loans are accounted for at AHL's carrying value.

AHL also provides operating facilities, administration and mortgage loan servicing for the REIT. The REIT is, therefore, economically and operationally dependent on AHL, and, as such, the REIT's results of operation or financial condition would not be indicative of the conditions that would have existed for its results of operations or financial condition if it had operated as an unaffiliated entity.

## Use of Estimates

The preparation of our financial statements requires us to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Although we base our estimates and assumptions on historical experience and on various other factors that we believe to be reasonable under the circumstances, our management exercises significant judgment in the final determination of our estimates. Actual results may differ from these estimates. The following areas require significant judgments by management:

- lower of cost or market valuation allowance ("LOCOM")
- provisions for losses, reserves and repurchase reserves
- interest rate risk, derivatives and hedging strategies
- income taxes
- mortgage loan sales

## Cash and Cash Equivalents

For purposes of financial statement presentation, Accredited considers all liquid investments with an original maturity of three months or less to be cash equivalents. All liquid assets with an original maturity of three months or less which are not readily available for use, including cash deposits, are classified as restricted cash.

## Mortgage Banking Activities

Accredited is in the business of originating, financing, securitizing, servicing and selling mortgage loans secured by residential real estate. Accredited recognizes interest income on mortgage loans held for sale and investment from the time that it originates the mortgage loan until the time the mortgage loans are sold. Interest income is also recognized over the life of the mortgage loans that Accredited has securitized in structures that require financing treatment. These securitizations are structured legally as sales, but for accounting purposes are treated as financings under Statement of Financial Accounting Standards ("SFAS") No. 140, *Accounting for Transfer and Servicing of Financial Assets and Extinguishment of Liabilities—a replacement of FASB Statement No. 125* ("SFAS 140"). Gains on sale of mortgage loans are recognized upon the sale of mortgage loans for a premium to various third-party investors under purchase and sale agreements. Mortgage loan sales may be either on a servicing retained or released basis. Mortgage loan servicing income represents fees from interim servicing for

2-2

| | | | |
|---|---|---|---|
| Total | $3,635 | $ 20,825 | $ 24,460 |
| **2006:** | | | |
| Net unrealized gain (loss) | $1,977 | $(15,190) | $(13,213) |
| Net realized gain | — | 32,227 | 32,227 |
| Total | $1,977 | $ 17,037 | $ 19,014 |

## 5. CREDIT FACILITIES

AHL and the REIT have entered into aggregate warehouse facilities to permit the securitization of mortgage loans. AHL is the primary obligor under these facilities until the loans are contributed to the REIT for securitization. The REIT then becomes the primary obligor until the loans are securitized, a period of 30 days or less. Each of the facility agreements has cross-default and cross-collateralization provisions and AHL provides a guarantee of the REIT's obligations under the facilities during the time that the REIT owns the mortgage loans. At June 30, 2007 the REIT had no obligations outstanding under these facilities.

40

2-3

*Decreasing home prices or increasing interest rates may impair future earnings from cash-out refinancings.*

During the quarter ended June 30, 2007, approximately 77% of our mortgage loan production volume consisted of cash-out refinancings. A substantial and sustained increase in interest rates could significantly reduce the number of borrowers who would qualify or elect to pursue a cash-out refinancing and result in a decline in that origination source. Similarly, decreasing home prices reduce the amount of equity available to be borrowed against in cash-out refinancings and could result in a decrease in mortgage loan production volume from that origination source. Therefore, reliance on cash-out refinancings as a significant source of origination volume would subject us to risks that could harm our results of operations, financial condition and business prospects.

*If many of our borrowers become subject to the Servicemembers Civil Relief Act of 2003, our cash flows from our residual securities and our securitizations structured as financings may be harmed.*

Under the Servicemembers Civil Relief Act, which in 2003 re-enacted the Soldiers' and Sailors' Civil Relief Act of 1940 (the "Act"), a borrower who enters military service after the origination of the borrower's mortgage loan generally may not be charged interest above an annual rate of 6% during the period of the borrower's active duty status. The Act also applies to a borrower who was on reserve status and is called to active duty after origination of the mortgage loan. A prolonged, significant military mobilization as part of the war on terrorism or the war in Iraq could increase the number of the borrowers in our securitized pools who are subject to the Act and thereby reduce the interest payments collected from those borrowers. To the extent the number of borrowers subject to the Act is significant, the cash flows we receive from mortgage loans underlying the securitizations in which we have retained economic residual interests would be reduced, which could cause us to reduce the carrying value of our residual interests and could decrease our earnings. In addition, the Act imposes limitations that would impair the ability of the servicer to foreclose on an affected mortgage loan during the borrower's period of active duty status, and, under certain circumstances, during an additional three month period thereafter. Any such reduction in our cash flows or impairment of our ability to exercise our rights that would otherwise be available could harm our results of operations, financial condition and business prospects.

*We are exposed to environmental liabilities, with respect to properties that we take title to upon foreclosure, that could increase our costs of doing business and harm our results of operations.*

In the course of our servicing activities, we may foreclose and take title to residential properties and become subject to environmental liabilities with respect to those properties. We may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation and clean-up costs incurred by these parties in connection with environmental contamination, or may be required to investigate or clean up hazardous or toxic substances or chemical releases at a property. The costs associated with investigation or remediation activities could be substantial. Moreover, as the owner or former owner of a contaminated site, we may be subject to common law claims by third parties based upon damages and costs resulting from environmental contamination emanating from the property. If we ever become subject to significant environmental liabilities, our business, financial condition, liquidity and results of operations would be significantly harmed.

**Statutory and Regulatory Risks**

*The scope of our operations exposes us to risks of noncompliance with an increasing and inconsistent body of complex laws and regulations at the federal, state and local levels.*

Because our business is set up to originate mortgage loans in all 50 states, in the District of Columbia and

2-4

Canada, when we originate mortgage loans, we must comply with the laws and regulations, as well as judicial and administrative decisions, of all of these jurisdictions, as well as an extensive body of federal and international laws and regulations. The volume of new or modified laws and regulations has increased in recent years, and, in addition, individual cities and counties have begun to enact laws that restrict non-prime mortgage loan origination activities in those cities and counties. The laws and regulations of each of these jurisdictions are different, complex and, in some cases, in direct conflict with each other. As this proliferation of laws and regulations continues, it may be more difficult to comprehensively identify, to accurately interpret and to properly program our technology systems and effectively train our personnel with respect to all of these laws and regulations, thereby potentially increasing our exposure to the risks of noncompliance with these laws and regulations.

In light of the recent challenges in the mortgage industry, numerous legislative and regulatory proposals have been offered or enacted at the federal, state, and local government levels to address perceived market failures, address abusive lending practices, and restrict loan products, terms and conditions. For example at the federal level, the federal banking agencies published *Interagency Guidance on Nontraditional Product Risks* on October 4, 2006 and a *Statement on Subprime*

86

# ATTACHMENT

# B

THE GENERAL COUNSEL OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

August 25, 1978

MEMORANDUM TO:  Chester C. McGuire
Assistant Secretary for
Equal Opportunity, E

SUBJECT:    Title VIII of the Civil Rights Act of 1968

In connection with Departmental consideration of the issuance of
substantive regulations interpreting Title VIII you have requested our
views on the applicability of the Federal Fair Housing Act to property
insurance activities.

Specifically, you asked for advice on whether a failure or refusal to
provide property insurance on dwellings based upon race, color, sex,
religion or national origin violates Title VIII.

Section 804(a) of Title VIII of the Civil Rights Act of 1968, 42 U.S.C.
Section 3604(a), makes it unlawful to refuse to negotiate for the sale
or rental of, or otherwise make unavailable or deny, a dwelling to any
person because of race, color, religion, sex or national origin.

The question whether insurance redlining is covered by Section 804(a)
has not been addressed by the courts. The provisions of the Fair
Housing Act of 1968 have, however, been construed broadly by the courts.
The Act has been described as a "detailed housing law, applicable to a
broad range of discriminatory practices," Jones v. Mayer Co., 392 U.S.
490, 417 (1968), and is to be accorded a "generous" construction so that
it can accomplish the "enormous" task which Congress contemplated for it.
Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211-212 (1972).

Further, coverage under the Fair Housing Act is not limited to those who
sell, rent, or finance real estate. "The Act has been applied not only
to persons selling or renting dwellings, but also to newspapers carrying
advertisements, to registrars of deeds containing racially restrictive
covenants, and to municipalities engaging in zoning or discriminatory
land use practices." United States v. Hughes Memorial Home, 396 F. Supp
544 (W.D. Va. 1975) (citations omitted).

"Section 804(a) not only makes it unlawful to 'refuse to sell or rent...' a dwelling for racial reasons, but also makes it unlawful to 'otherwise make unavailable or deny a dwelling to any person because of race, color, religion, [sex] or national origin.' (Emphasis in decision.) This catch-all phraseology may not be easily discounted or de-emphasized. Indeed it 'appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful." United States v. Youritan Constr. Co., 370 F. Supp. 643. (United States v. City of Parma, P.H.E.O.H. Reptr. para 13,616, at p. 14013 (Ohio 1973))

Indeed, Section 804(a) has been construed to prohibit conduct much broader than that constituting a refusal to sell or rent. The statutory language proscribing conduct that "otherwise make[s] [dwellings] unavailable" has been applied to a variety of discriminatory conduct distinguishable from refusals to sell or rent, including refusal to make a mortgage loan because of the race of persons living in the area where the home was located, Laufman v. Oakley Bldg. and Loan Co., supra; Harrison v. Weinseroth, 414 F. Supp 67 (N.D. Ohio 1976); racial steering by real estate agents, Zuch v. Hussy, 366 F. Sup 553 (E.D. Mich 1976); adoption of exclusionary ordinances by a municipality, United States v. Parma, supra; and discriminatory rejection by an orphanage of minority orphans, United States v. Hughes Memorial Home, 396 F. Supp. 544 (W.D. Va. 1975).

The rationale of these decisions indicates that any discriminatory action which, as a practical matter, makes a dwelling "unavailable," is violative of Section 3604(a). This rationale was best articulated by the Laufman court in the context of lender redlining:

The cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively "make unavailable or deny" a dwelling. When such denial occurs as a result of racial considerations, Section 3604(a) is transgressed. Laufman v. Oakley Building & Loan Co., 408 F. Supp. 489 (S.D. Ohio 1976).

Adequate insurance coverage is often a prerequisite to obtaining financing. Insurance redlining, by denying or impeding coverage makes mortgage money unavailable, rendering dwellings "unavailable" as effectively as the denial of financial assistance on other grounds:

cornerstone is essential to revitalize our cities. ... is a
cornerstone of ... Without insurance...
financial institutions will not — and cannot — make loans."

(Report by the President's National Advisory Panel on Insurance, Meeting
the Insurance Crisis of Our Cities 1 (1968).)

In instances where maintenance of appropriate hazard or property insurance
on the premises is required as a condition of financing for the purchase
of the dwelling refusal to issue insurance policies or imposition of pro-
visions which make it more difficult to obtain such insurance, when based
on the racial, religious, sex or ethnic origin of the applicant or similar
concerns about a community, which would result in the denial of the
mortgage makes the dwelling "unavailable" within the meaning of Section
804(a). Since this type of insurance redlining is within the parameters
of Title VIII we are also of the opinion that issuance of Title VIII
regulations is appropriate.

In the McCarran-Ferguson Act, 15 U.S.C. Section 1011-1012, the Congress
declared:

    "that the continued regulation and taxation by the several
    States of the business of insurance is in the public interest
    and that silence on the part of the Congress shall not be
    construed to impose any barrier to the regulation or taxation
    of such business by the several States."

Further, the Act provides that no act of Congress "shall be construed
to invalidate, impair or supersede any law enacted by any state regulating
the business of insurance." (15 U.S.C. 1012(b)).

While the McCarran Act has been held to exempt the business of insurance
from Federal antitrust Acts if such is regulated by the State where the
alleged actions occurred, Commander Leasing Co. v. Transamerica Title
Ins. Co., 447 F. 2d 77, 83 (10th Cir. 1973), the Supreme Court has indi-
cated that "[i]nsurance companies may do many things which are subject
to paramount federal regulations..." SEC v. National Securities, Inc.,
393 U.S. 453 89 S. Ct., 21 L. Ed 2d 668 (1969).

It may be argued that this Congressional mandate exempts insurance
activities from Federal legislation in the area of Civil Rights including
the Fair Housing Act. However, although there is no legislative history
under Title VIII in this area and there have been no judicial decisions
we are of the opinion statutes such as Title VIII which are designed to
protect constitutional rights are not limited by the McCarran-Ferguson
Act.

the only case which has addressed the McCarran-Ferguson Act was held not to bar suit against insurance companies for alleged violations of the Civil Rights Act of 1866 (42 U.S.C. Section 1982). Ben v. General Motors Acceptance Corp., 374 F. Supp. 1199 (D. Colo. 1974). The Ben court stated that:

"There is no indication in the background and history of the McCarran Act or its application that the McCarran Act was intended to deprive a citizen of access to the Federal Courts to obtain redress for violations of his civil rights and require him to report to the state courts as the sole forum for redress. If such were the intent of Congress, it is highly questionable that Congress had the power under the Constitution to do so."

Based upon the above we are of the opinion that the McCarran-Ferguson Act does not exempt insurance companies from the coverage of the Federal Housing Act.

Ruth T. Prokop

# ATTACHMENT

# C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
### WESTERN DIVISION

UNITED STATES OF AMERICA,
   Plaintiff,

v

                                               Civil Action Number 93-5115

BLACKPIPE STATE BANK,
   Defendant.

_____

## AMENDED COMPLAINT

The United States of America alleges:

1. This action is brought by the United States to enforce the provisions of the Equal Credit Opportunity Act, as amended, 15 U.S.C. §§ 1691-1691f, and Title VIII of the of 1966 Civil Rights Act (Fair Housing Act), as amended by the Fair Housing Amendments Act Of 1988, 42 U.S.C. §§ 3601-3619.

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691(h)

3. Defendant, Blackpipe State Bank, is a federally insured bank doing business in the State of South Dakota. Its business includes regularly extending credit, including personal loans and agricultural and commercial loans. The Bank also extends credit for home improvement loans and loans to purchase mobile homes which are "residential real-estate related transactions" as defined in the Fair Housing Act, 42 U.S.C. § 3605(b)(1).

4. As a federally insured lending institution, Blackpipe State Bank is subject to federal laws governing fair lending, including the Equal Credit Opportunity Act, the Fair Housing Act, and the Community Reinvestment Act of 1977 (12 U.S.C. §§ 2901-2906) The Community Reinvestment Act, 12 U.S.C. § 2901 et seq., and its implementing regulations, 12 C.F.R § 354 et seq., require Defendant to meet the credit needs of the entire community in which it operates, including the credit needs of low-and moderate -income areas of the community.

5. As of December 31, 1991, Blackpipe State Bank had approximately $18 million in assets and approximately $9 million in outstanding loans. It is located in the city of Martin, in Bennett County, South Dakota, which is bordered on three sides by American Indian reservations. It is the only major lender in the county.

6. According to the 1950 Census, 46% of the 3206 residents of Bennett County are American Indian; 94% of the 9902 resident of adjacent Shannon County, which is entirely located within the Pine Ridge reservation, are American Indian; and 82% of the 8352 residents of adjacent Todd County, whose boarders are the same as those of the Rosebud reservation, are American Indian.

7. The Bank has adopted a policy of refusing to make any loans secured by collateral that may be subject to tribal court, rather than state or federal court, jurisdiction. This policy precludes all American Indians on the adjacent Indian reservations from obtaining secured loans for such items as motor vehicles or farm equipment from Blackpipe State Bank even if they satisfy all other lending criteria used by the Bank.

8. This policy also precludes all American Indians on the adjacent Indian reservations from obtaining secured loans for residential purposes, including to purchase mobile homes and/or to repair their residences, even if they satisfy all other lending criteria used by the Bank.

9. Both the Rosebud and the Pine Ridge tribal courts have collection provisions and procedures that are used by

creditors to repossess collateral or otherwise obtain remedies in the event of a default on a loan that is subject to tribal jurisdiction. Blackpipe State Bank would also be able to utilize these provisions and procedures to obtain appropriate remedies if it extended secured credit subject to tribal court jurisdiction.

10. More than 18,000 American Indians live in Bennett County and the three surrounding South Dakota counties and constitute more than 75% of the total population in that area. However, based upon information provided to the United States by the Bank, as of April 12, 1993, no more than 171 (33.9%), and no fewer than 114 (22.6%), of the Bank's 504 borrowers are American Indians. The majority of the American Indian borrowers received loans of less than $1000.

11. Blackpipe State Bank has traditionally offered a variety of credit products to its customers, including agricultural, commercial, real estate and personal loans. The majority of the loans made to American Indians were personal loans, and more than four-fifths of the personal loans to American Indians were for less than $1000.

12. The Bank has required American Indian applicants for loans, including those who do not reside on the adjacent reservations, to provide collateral or meet credit requirements which would not be required of white applicants. The Bank has also rejected American Indian applicants for loans under circumstances when white applicants would have been accepted.

13. The Bank has charged American Indian recipients of unsecured personal loans higher interest rates and finance charges than similarly situated white borrowers of such loans.

14. In addition, the Bank has engaged in other practices which contribute to its lending practices and policies towards American Indians. The Bank does not have currently any American Indian employees and has had only one American Indian employee in its history the Bank has delineated its area so it excludes all of the Pine Ridge and Rosebud reservations; the Bank does not and has not marketed its loan products to residents of the Pine Ridge and Rosebud reservations; the Bank is not an approved lender of guaranteed loans from the Farmers Home Administration and the Bureau of Indian Affairs; and the Bank has a policy of refusing to make home mortgage loans due to its reluctance to make such loans to American Indians on the Pine Ridge and Rosebud reservations.

15. Defendant's policies and practices as described above constitute discrimination on the basis of race, color, and/or national origin with respect to credit transactions in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (a)(1).

16. Defendant's policies and practices as described above relating to such activities covered by the Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq., including the extension of credit for the purchase of mobile homes and for the repair of residences constitute:

   a. Discrimination on the basis of race, color, and/or national origin in making available residential real estate-related transactions in violation of Section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a);

   b. Discrimination on the basis of race, color, and/or national origin in the making unavailable or denial of dwellings to persons in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a); and

   c. Discrimination on the basis of race, color, and/or national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of dwellings, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b).

17. Defendant's policies and practices as described above constitute:

   a. A pattern or practice of resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, as amended, U.S.C. §§ 1691-1691f;

   b. A pattern or practice of resistance to the full enjoyment of rights secured by Title VIII of the Civil Rights Act of 1966, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619; and

    c.   A denial to a group of persons of rights granted by Title VIII of the Civil Rights Act of 1966, as amended by the Fair Housing Amendments Act of 1966, 42 U.S.C. §§ 3601-3619, that raises an issue of general public importance.

18.   Persons who have been victims of Defendant's discriminatory policies and practices as described above are aggrieved applicants or persons as referenced or defined under the Equal Credit Opportunity Act and the Fair Housing Act. As a consequence of Defendant's policies and practices, these persons have been denied their rights to equal opportunity in housing, credit, and residential real estate-related transactions. Some victims also may have experienced other actual, compensable injuries.

19.   The discriminatory policies and practices of Defendant as described herein were, and are, intentional and willful, and have been implemented with reckless disregard for the rights of American Indians.

WHEREFORE, the United States prays that the Court enter an ORDER that:

1.   Declares that the policies and practices of Defendant constitute a violation of the Equal Credit opportunity Act, as amended, 15 U.S.C. §§ 1691-1691f, and Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619;

2.   Enjoins Defendant, its agents, employees and successors, and all other persons in active concert or participation with it, from discriminating on account of race, color, or national origin in any aspect of their lending activities;

3.   Requires Defendant to develop and submit to the Court for its approval a detailed plan that: (a) remedies Defendant's discriminatory policies and practices; (b) ensures that future American Indian loan applicants are treated in a nondiscriminatory manner; and (c) ensures that, in the future, Defendant will meet the credit needs of the American Indian population in an appropriately defined Community Reinvestment Act territory;

4.   Awards such damages as would fully compensate the victims of Defendant's discriminatory policies and practices for the injuries caused by the Defendant;

5.   Awards punitive damages to the victims of Defendant's discriminatory policies and practices; and

6.   Assesses a civil penalty against Defendant, in order to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice ray require.

JANET RENO
ATTORNEY GENERAL

JAMES P. TURNER
ACTING ASSISTANT ATTORNEY GENERAL

PAUL F. HANCOCK
Chief, Housing and Civil Enforcement Section

RICHARD J. RITTER
JEFFREY M. SENGER
KENNETH H. ZIMMERMAN
Attorneys, Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 65998
Washington, D.C. 20035-5996
(202)514-4713

KAREN SCHREIER

BOB MALNDEL
Assistant U.S. Attorney
226 Federal Building
515 Ninth Street
Rapid City, SD 57701
(605) 342-7822

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
NATIONAL COMMUNITY                       )
REINVESTMENT COALITION,                   )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )
                                          )
ACCREDITED HOME LENDERS                   )        Case No. 1:07-cv-01357-EGS
HOLDING COMPANY,                          )
                                          )
ACCREDITED HOME LENDERS, INC.             )
                                          )
        and                               )
                                          )
ACCREDITED MORTGAGE LOAN                  )
REIT TRUST,                               )
                                          )
                 Defendants.              )
_____)

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion to Dismiss (Docket No. 9), Defendant's

Memoranda of Law submitted in support, Plaintiff's Memorandum of Points and Authorities

submitted in opposition, and any hearing held on the matter, it is HEREBY ORDERED THAT:

Defendants' Motion to Dismiss is DENIED in its entirety.

SO ORDERED.


_____
EMMET G. SULLIVAN
United States District Judge


Date: _____