## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY
REINSTATEMENT COALITION,

                Plaintiff,

    v.

ACCREDITED HOME LENDERS
HOLDING COMPANY, ACCREDITED
HOME LENDERS, INC., and ACCREDITED
MORTGAGE LOAN REIT TRUST,

             Defendants.

Case No. 1:07-cv-01357-EGS

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Matthew P. Previn (DC Bar No. 460228)
Kirk D. Jensen (DC Bar No. 477629)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
202-349-8000 (telephone)
202-349-8080 (fax)

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

I.    PLAINTIFF HAS NOT SHOWN THAT THIS COURT HAS PERSONAL
      JURISDICTION OVER THE HOLDING COMPANY OR THE REIT. .......................... 1

      A.    Plaintiff's Claims Do Not "Arise From" the Holding Company or the REIT's
            Contacts with the District. ................................................................................... 1

      B.    Plaintiff Has Alleged No Facts That Could Plausibly Show That This Court Has
            General Jurisdiction Over the Holding Company or the REIT ............................. 3

      C.    Plaintiff's "Alter Ego" Theory is Without Merit. ................................................. 3

      D.    Discovery on Personal Jurisdiction is Unnecessary Because All of the Relevant
            Jurisdictional Facts Are Already Before the Court. .............................................. 4

II.   PLAINTIFF LACKS STANDING. .................................................................................. 4

III.  PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM UNDER SECTION 3604 OF
      THE FAIR HOUSING ACT ........................................................................................... 7

      A.    The Structure of the FHA Shows That Section 3604 Does Not Apply to Mortgage
            Lending. ............................................................................................................... 8

      B.    The Equal Credit Opportunity Act Shows That Section 3604 of the Fair Housing
            Act Does Not Apply to Mortgage Lending ........................................................... 9

      C.    The Court Decisions That Apply Section 3604 to Mortgage Lending Address
            Neither the Language of Section 3605 as Enacted Nor the Dual Recovery
            Prohibition in ECOA ......................................................................................... 10

      D.    HUD's Regulations Do Not Indicate Whether Section 3604 Applies to Mortgage
            Lending. ............................................................................................................. 13

      E.    Even if Section 3604 Applied to Mortgage Lending, Plaintiff Has Failed to State a
            Claim Under Section 3604 Upon Which Relief May be Granted. ....................... 14

IV.   DISPARATE IMPACT CLAIMS ARE NOT COGNIZABLE UNDER THE FAIR
      HOUSING ACT ........................................................................................................... 16

      A.    Plaintiff Mischaracterizes the Supreme Court's Opinion in *Smith v. City of
            Jackson* ............................................................................................................. 16

      B.    Plaintiff's Additional Arguments Are Inaccurate and Irrelevant ........................ 19

            1.    The Legislative History of the FHA Shows That Congress Did Not Intend
                  Disparate Impact Claims to be Cognizable ............................................. 21

2.    The General Purpose of the FHA Does Not Support Disparate Impact Claims. .................................................................................................... 28

3.    *Smith* Shows That Court Decisions Finding Disparate Impact Claims Cognizable Under the FHA are No Longer Viable. ................................. 31

4.    HUD Has Not Issued Regulations Regarding Disparate Impact, and its Views Are Not Entitled to Deference. ....................................................... 32

V.    EVEN IF THE FHA PERMITTED DISPARATE IMPACT CLAIMS, PLAINTIFF FAILS TO STATE A COGNIZABLE DISPARATE IMPACT CLAIM. ...................... 34

CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

**Statutes**

Age Discrimination in Employment Act § 4(a), 29 U.S.C. § 623(a)................................. 16-19, 23

Alternative Mortgage Transactions Parity Act, 12 U.S.C. § 3801 ...............................................35

Civil Rights Act, Title VII § 703(a), 42 U.S.C. § 2000e-2(a) .....................................16-19, 22-23

D.C. Code § 13-423(b)..................................................................................................................1

Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1735f-7a .............35

Equal Credit Opportunity Act § 706, 15 U.S.C. § 1691e ........................................................ 9-12

Fair Housing Act § 803, 42 U.S.C. § 3603 ................................................................................ 8-9

Fair Housing Act § 804, 42 U.S.C. § 3604 .............................................................................. 7-16

Fair Housing Act § 805, 42 U.S.C. § 3605 ........................................................................ 7-12, 14

Fair Housing Act § 815, 42 U.S.C. § 3614a ..............................................................................14

Home Owner's Loan Act, 12 U.S.C. § 1461, *et. seq.* ...................................................................35

Pub. L. No. 88-352, § 703(a), 78 Stat. 241 (1964) .......................................................................23

Pub. L. No. 90-202, § 4(a), 81 Stat. 602 (1967) ..........................................................................23

Pub. L. No. 90-284 § 805, 82 Stat. 73 (1968).........................................................................9, 23

Secondary Mortgage Market Enhancement Act, Pub. L. No. 98-440 (1984) ..............................35

**Cases**

*Acker v. Royal Merch. Bank and Fin. Co., Ltd.*, No. Civ.A.98-00392(CK), 1999 WL 1273476 (D.D.C. 1999) ...............................................................................................................................4

*Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004)..............................................................23

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...........................................................16, 20, 30, 33

*American Federation of Gov't Employees, AFL-CIO v. Gates*, 486 F.3d 1316 (D.C. Cir. 2007) ...........................................................................................................................33

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ................................................ 1, 4-7, 15

*Brown v. Artery Org., Inc.*, 654 F. Supp. 1106 (D.D.C. 1987)...............................................27-28

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .....31

*Capital Hill Healthcare Group*, 242 B.R. 199 (Bankr. D.D.C. 1999)............................................4

*Clifton Terrace Assocs., Ltd. v. United Technologies Corp.*, 929 F.2d 714
(D.C. Cir. 1991) ........................................................................................................... 14-15

*City of Moundridge v. Exxon Mobil Corp.*, 244 F.R.D. 10 (D.D.C. 2007)....................................4

*Conley v. Gibson*, 355 U.S. 41 (1957) ......................................................................................5

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)..................................................................16

*Daniel v. Paul*, 395 U.S. 298 (1969).......................................................................................30

*Director v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995)................... 28-29

*Fuller v. Teachers Ins. Co.*, No. 5:06-cv-438, 2007 WL 2746861 (E.D.N.C.
Sept. 19, 2007) ............................................................................................................. 11-12

*Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006)................................................................. 18-19

*Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983) ....................................................33

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ..................................................28, 30

*Johnson v. Long Beach Mortg. Loan Trust*, 451 F.Supp.2d 16 (D.D.C. 2006) ...............................2

*Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) ...........................12

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................4

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F.Supp.2d 174 (D.D.C. 2002).......3

*Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp.2d 34
(D.D.C. 2005) ....................................................................................................................4

*Koons Buick Pontiac GMC, Inc.  v. Nigh*, 543 U.S. 50 (2004) ....................................................21

*Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712 (7th Cir. 1998) .............................................29

*Laufman v. Oakley Building & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976) ...........................13

*Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187
(D.D.C. 2007) ....................................................................................................................7

*Lorillard v. Pons*, 434 U.S. 575 (1978) ...................................................................................27

*Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006) .......................................................................29

*MCI Telecomms Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218 (1994).....................................20

*Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir. 1984).......................................11

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 62 F. Supp. 2d 13
(D.D.C. 1999) ...........................................................................................................3-4

*N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ...........................11

*Nat'l Ass'n of Homebuilders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007) ........................8, 11

*National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46
(D.D.C. 2002) ..........................................................................................................11

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995) ...........................................13

*Neal v. Honeywell Inc.*, 33 F.3d 860 (7th Cir. 1994) ............................................................21, 29

*PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786 (D.C. Cir. 2004)...............14, 33

*Pierce v. Underwood*, 487 U.S. 552 (1988)....................................................................28

*Regan v. Wald*, 468 U.S. 222 (1984) ...........................................................................26

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)..................................................30

*Rudder v. District of Columbia*, 890 F. Supp. 23 (D.D.C. 1995) ....................................34

*Schattner v. Girard, Inc.*, 668 F.2d 1366 (D.C. Cir. 1982).............................................3

*Simms v. First Gibraltar Bank*, 83 F.3d 1546 (5th Cir. 1996).......................................12

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ........................................... 16-18, 23, 29

*Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990).........................................4

*TEVA Pharms. USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) ........................13, 32, 33

*Ulico Cas. Co. v. Fleet Nat'l Bank*, 257 F.Supp.2d 142 (D.D.C. 2003).........................2

*United States v. Bestfoods*, 524 U.S. 51 (1998) ..........................................................3

*United States v. Madigan*, 300 U.S. 500 (1937) .....................................................8, 11

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)......................................27

*Washington v. Davis*, 426 U.S. 229 (1976)..............................................................29

*Weinberger v. Rossi*, 456 U.S. 25 (1982) ................................................................27

*W.Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991)................................................... 21-22, 24

**Other Materials**

24 C.F.R. §§ 100.50(b) ............................................................................................................13

24 C.F.R. §§ 100.70(b) ............................................................................................................13

112 Cong. Rec. 17196 (1966) ..................................................................................................24

112 Cong. Rec. 22618 (1966) ...........................................................................................24-25

112 Cong. Rec. 22670 (1966) ..................................................................................................24

112 Cong. Rec. 22313-14 (1966).............................................................................................24

112 Cong. Rec. 23013-14 (1966).......................................................................................24-25

112 Cong. Rec. 23042-43 (1966).............................................................................................24

112 Cong. Rec. 23046-47 (1966).............................................................................................24

114 Cong. Rec. 3427 (1968) ....................................................................................................25

114 Cong. Rec. 4049 (1968) ....................................................................................................25

114 Cong. Rec. 4065 (1968) ....................................................................................................25

114 Cong. Rec. 4689-90 (1968)...............................................................................................25

114 Cong. Rec. 4975 (1968) ....................................................................................................31

114 Cong. Rec. 5214 (1968) ....................................................................................................26

114 Cong. Rec. 5216 (1968) ....................................................................................................27

114 Cong. Rec. 5643 (1968) ....................................................................................................26

114 Cong. Rec. 9573 (1968) ....................................................................................................26

H.R. 14765 (1966) ...................................................................................................................24

*Hearings Before the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency on S. 1358, S. 2114, and S. 2280, Relating to Civil Rights and Housing* (Aug. 23, 1967) ........................................................................................................................................25

HUD, No. 8024.01, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* (REV-2 1995)................................................................................................................... 32-34

James F. Blumstein, *Defining and Proving Race Discrimination:  Perspectives on the Purpose vs. Results Approach from the Voting Rights Act*, 69 VA. L. REV. 633 (1983) .............................28

1 JOHN P. RELMAN, HOUSING DISCRIMINATION PRACTICE MANUAL (2005) ......... 17, 19-20, 28, 32

Laurence H. Tribe, *Comment, in* ANTONIN SCALIA, A MATTER OF INTERPRETATION:  FEDERAL COURTS AND THE LAW 74-75 (Princeton University Press) (1998)................................................21

Marshall D. Stein, *The Fair Housing Act of 1968 and the Civil Rights Act of 1866:  The Test for Liability in Housing Discrimination Cases*, *in* ISSUES IN HOUSING DISCRIMINATION: A CONSULTATION/HEARING OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS (1985)............24

Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18266 (Apr. 15, 1994)................32

Raymond J. Celeda, *The Civil Rights Act of 1968: Background and Title-by-Title Analysis* (Congressional Research Service 1968) .....................................................................................31

W. David Lawson, *Legislative History and the Need to Bring Statutory Interpretation Under the Rule of Law*, 44 STAN. L. REV. 383 (1992).......................................................... 21-22

I.    **PLAINTIFF HAS NOT SHOWN THAT THIS COURT HAS PERSONAL JURISDICTION OVER THE HOLDING COMPANY OR THE REIT.**

Plaintiff has failed to show that this Court has personal jurisdiction over either Accredited Home Lenders Holding Company (the "Holding Company") or Accredited Mortgage Loan REIT Trust ("REIT"). In order to survive a motion to dismiss, Plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," so that a "claim to relief . . . is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65, 1974 (2007). Plaintiff has failed to satisfy this standard. All of the necessary jurisdictional facts are before the court, and they clearly show that this court does not have personal jurisdiction over the Holding Company or the REIT.

A.    **Plaintiff's Claims Do Not "Arise From" the Holding Company or the REIT's Contacts with the District.**

This Court does not have specific jurisdiction over the Holding Company or the REIT because Plaintiff's claims do not "arise from" specific contacts of these entities with the District. *See* D.C. Code § 13-423(b).

The Holding Company has had ***no contacts*** with the District of Columbia for purposes of jurisdictional analysis. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss ("Mem.") at 6. Nonexistent contacts cannot give rise to Plaintiff's claims.

Additionally, Plaintiff's claims against the REIT do not "arise from" the REIT's *de minimis* contacts with the District. *See* Mem. at 8-9. Plaintiff's claims are based on its allegations that Accredited's lending policies led to certain loans *not being originated*. The REIT's securitization trusts only hold loans that AHL actually originated, and the REIT has no involvement with loans until they have been originated. *See* Opp'n Mem. Attach. A, Ex. 1 at 1-5; *id.* Attach. A, Ex. 2, at 2-2; Redding Decl. ¶ 3.

1

Even if Plaintiff's interpretation of the SEC filings were correct (and it is not),[1] the Redding Declaration shows that neither the Holding Company nor the REIT has had any contacts with the District of Columbia sufficient to establish personal jurisdiction over either entity. *See* Redding Decl. ¶¶ 2-5. Given the paucity and inaccuracy of Plaintiff's factual allegations, the Redding Declaration should be dispositive in the personal jurisdiction analysis. *See, e.g.*, *Johnson v. Long Beach Mortg. Loan Trust*, 451 F. Supp. 2d 16, 29 (D.D.C. 2006) (explaining that a court need not accept the plaintiff's allegations as true, as the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts"); *Ulico Cas. Co. v. Fleet Nat'l Bank*, 257 F.Supp.2d 142, 144 (D.D.C. 2003) (same).

Finally, Plaintiff's reliance on *Johnson* is misplaced. In *Johnson*, the court had specific jurisdiction over the defendant because the court found that the defendant's contacts with the District actually were the sources of controversy. *Johnson*, 451 F. Supp. 2d at 29-30. That is simply not the case here.

---

[1]     Plaintiff mischaracterizes (or misunderstands) the Holding Company's SEC filings in claiming that the filings show that the Holding Company and REIT "originate[] mortgage loans in … the District of Columbia." Opp'n Mem. at 9. Public companies (such as the Holding Company) report to the SEC on their own activities, as well as the activities of their subsidiaries. The Holding Company's most recent 10-K makes clear that the filing reflects activities of the Accredited *family of companies*, and not just the Holding Company. *See* Accredited Home Lenders Holding Company, Form 10-K, at 6 (Aug. 2, 2007) ("In this Form 10-K, unless the context requires otherwise, 'Accredited,' 'Company,' 'we,' 'our,' and 'us' means Accredited Home Lenders Holding Co. **and its subsidiaries**." (emphasis added)). (Excerpts from this most recent 10-K are attached hereto as Exhibit A.) Thus, the statement that "we originate mortgage loans in . . . the District of Columbia," refers generally to the collected Accredited *family of companies*, and not specifically to the Holding Company. *See* Opp'n Mem. Attach. A, Ex. 1, at 1-3; *Id.* Attach. A, Ex. 2, at 2-4 to 2-5; Redding Decl. ¶ 5. Indeed, other parts of the Holding Company's SEC filings—including parts Plaintiff attached to its Opposition Memorandum— clarify that only Accredited Home Lenders, Inc. ("Accredited" or "AHL") originates loans. *See, e.g.*, *id.* Attach. A, Ex. 1 at 1-5 (explaining that the loans are "originated by AHL"); *id.* Attach. A, Ex. 2 at 2-2 (same). Thus, the SEC filings do not provide a basis for finding that either the Holding Company or REIT has originated any loans in the District of Columbia.

**B.    Plaintiff Has Alleged No Facts That Could Plausibly Show That This Court Has General Jurisdiction Over the Holding Company or the REIT.**

Accredited argued in its principal brief that this Court does not have general jurisdiction over either the Holding Company or the REIT.  Mem. at 5-8.  However, Plaintiff does not appear to have addressed this issue in its Opposition Memorandum.  As such, the Court should consider the Plaintiff to have conceded the issue of general jurisdiction.  *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002).[2]

**C.    Plaintiff's "Alter Ego" Theory is Without Merit.**

"Veil-piercing is an extraordinary procedure" that is only used in "extreme circumstances."  *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1370 (D.C. Cir. 1982).  Although Plaintiff claims to have "sufficiently allege[d]" that the Holding Company and the REIT are alter egos of Accredited, Opp'n Mem. at 11, the only potential allegation of "alter ego" relationships in the Complaint appears to be that "[e]ach of the Defendants was and is the agent, employee, and representative of the other Defendants."  Compl. ¶ 17.  Plaintiff has presented no facts suggesting that the Holding Company or the REIT are agents of Accredited, and "[b]are allegations of agency … are insufficient."  *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 62 F. Supp. 2d 13, 21 (D.D.C. 1999).[3]

---

[2]    To the extent that Plaintiff asserts that its passing reference in its Opposition Memorandum to a potential "alter ego" argument constitutes argument on the general jurisdiction issue, this argument is easily dismissed for the reasons discussed below.

[3]    Even if Plaintiff had alleged an "alter ego" theory other than on the basis of agency, Plaintiff has provided insufficient grounds to pierce the corporate veil.  The only facts Plaintiff arguably has alleged in support of an alter ego argument are (1) that Mr. Redding is employed by both the Holding Company and Accredited; (2) that Accredited and the REIT are subsidiaries of the Holding Company; and (3) that the REIT and Accredited are economically and operationally dependent on each other.  Opp'n Mem. at 11.  Nothing about Mr. Redding's dual employment provides support for Plaintiff's alter ego theory.  Such dual employment by senior officers and directors is commonplace and unremarkable.  *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 68 (1998).  Additionally, a parent company's ownership—even sole ownership—of a subsidiary

*(continued on following page...)*

3

**D.     Discovery on Personal Jurisdiction is Unnecessary Because All of the Relevant Jurisdictional Facts Are Already Before the Court.**

Finally, jurisdictional discovery is unnecessary because the only facts before the Court consistently show that this Court does not have personal jurisdiction over the Holding Company or REIT.  *See, e.g.*, *Acker v. Royal Merch. Bank and Fin. Co., Ltd.*, No. Civ.A.98-00392(CK), 1999 WL 1273476, at *5-6 (D.D.C. 1999).[4]

## II.     PLAINTIFF LACKS STANDING.

Accredited has demonstrated that Plaintiff lacks standing to pursue its asserted claims, showing that Plaintiff failed to identify a "concrete and demonstrable injury," *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990), that "perceptibly impaired" its activities, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[5]  Predictably, Plaintiff responds by arguing that an allegation that paraphrases the language of *Havens Realty*—that it was forced to expend resources—sufficiently establishes standing.  Opp'n Mem. at 15-16.  Plaintiff's argument that even "rudimentary" allegations are sufficient, *id.* at 17-18, however, ignores the Supreme Court's

---

*(...continued from previous page)*

is insufficient to justify piercing the corporate veil.  *See, e.g.*, *Capital Hill Healthcare Group*, 242 B.R. 199, 204-05 (Bankr. D.D.C. 1999).  Finally, Plaintiff does not satisfy its pleading requirements merely by alleging that "parent and subsidiary are in the same business and have worked together in the past."  *Material Supply Int'l*, 62 F. Supp. 2d at 21.  Plaintiff's conclusory allegation about "alter ego" is insufficient to satisfy Plaintiff's burden of establishing jurisdiction.  *See, e.g.*, *Twombly*, 127 S.Ct. at 1974.

[4]     In addition, discovery regarding personal jurisdiction is inappropriate because Plaintiff has not provided a "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce."  *City of Moundridge v. Exxon Mobil Corp.*, 244 F.R.D. 10, 15 (D.D.C. 2007) (citations and quotation marks omitted); *see also Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp.2d 34, 56 n.24 (D.D.C. 2005) (denying jurisdictional discovery where the plaintiff "merely mention[ed in its opposition brief] that discovery would further support its arguments" and did not "represent[] what information discovery would disclose which would elucidate … the jurisdictional issue").

[5]     In its Opposition, Plaintiff expressly concedes that its alleged injury is not based on a vague "frustration of mission" or expenditures associated with its investigation and litigation

*(continued on following page...)*

recent clarification in *Twombly* of the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion.  Specifically, complaint allegations must contain "**enough facts to state a claim to relief that is *plausible* on its face."**  *Twombly*, 127 S.Ct. at 1974 (emphasis added).

In *Twombly*, the Court clarified that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1964-65 (citations and quotation marks omitted).  The Court also emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  *Id.* (internal citation and quotation marks omitted).  In so holding, the Court expressly rejected the "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45-47 (1957), giving the language, which the Court felt had been taken too literally, "its retirement."  *Twombly*, 127 S.Ct. at 1969.

Thus, the facts alleged in Plaintiff's complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, and sufficient "to state a claim for relief that is plausible on its face."  *Id.* at 1974.  As Accredited has demonstrated, Plaintiff's "naked assertion" of resource injury fails this "plausibility standard," as it does not sufficiently put forth factual allegations "plausibly suggesting" such an injury.  *Id.* at 1966; *see also id.* at 1964-65 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . .

---

*(...continued from previous page)*

against Accredited.  Opp'n Mem. at 16-17.  By failing to rebut Accredited's arguments, Plaintiff also concedes that it is not basing standing on any alleged injury of one of its members.

[A] complaint [must have] enough factual matter (taken as true) to suggest [that an injury occurred].") (internal quotation marks omitted); *id.* at 1966 ("[A] naked assertion...gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . .").

Plaintiff baldly alleges expenditures on educational programs, Opp'n Mem. at 15, but never identifies the programs sufficiently to state how they are directly attributable to Accredited's alleged conduct or could have counteracted it. And it is important that Plaintiff does so. Without such allegations it does not appear that Plaintiff's claim for relief—which rests entirely on those programs—could plausibly be satisfied.

Plaintiff mischaracterizes Accredited's argument when it contends that granting Accredited's Motion on standing grounds would limit standing to entities that can "force Accredited to change its lending policies." Opp'n Mem. at 18. This is not Accredited's argument. Accredited is asking only that this Plaintiff show that it actually has standing. To do this, Plaintiff must meet its basic burden of alleging facts that "state a claim for relief that is plausible on its face." *Id.* at 1974. In its current form, Plaintiff's complaint fails to show that relief is plausible because its allegations do not explain what specifically it has done in an attempt to counteract what it alleges.[6] The Court should not accept the allegation of unspecified "educational programs" that can have no reasonable connection to Accredited's alleged conduct.

In the alternative, Accredited has proposed that Plaintiff be required to provide additional evidence as to how Accredited's alleged conduct is related to Plaintiff's alleged expenditure of

---

[6]    It is not surprising that Plaintiff did not take the opportunity in its Opposition Memorandum to provide examples of its educational programs "designed" to counteract Accredited's alleged activities. Accredited submits that this is because there could not plausibly be any such program that could do what Plaintiff alleges. *See* Mem. at 16-18. Allowing a case

*(continued on following page...)*

resources.  Accredited has provided examples of courts ordering amendment, evidence or hearings on the standing issue.  Mem. at 18 & n.8.  Requiring Plaintiff to submit to preliminary discovery into the standing injury issue would greatly enhance judicial economy and greatly reduce the large costs associated with allowing Plaintiff's case to proceed.

Plaintiff's failure of pleading—even at this stage in the litigation—fails to satisfy Plaintiff's burden of demonstrating standing to bring suit.  *Twombly*, 127 S.Ct. at 1974; *see also Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 191-92 (D.D.C. 2007).  Accordingly, the Court should dismiss Plaintiff's claims.

## III.    PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM UNDER SECTION 3604 OF THE FAIR HOUSING ACT.

Plaintiff's interpretation of Section 804 of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, is inconsistent with the structure of the FHA, the canons of statutory construction, the larger statutory regime governing mortgage lending, and the governing law in this Circuit.  All of these factors weigh heavily in favor of finding that Section 3604 does not apply to mortgage lending.[7]

At the outset, it is important to note that Accredited does not argue that the FHA is inapplicable to mortgage lending.  Section 805 of the FHA, 42 U.S.C. § 3605, clearly applies to mortgage lending.  Thus, Plaintiff's interpretation of Section 3604 is not necessary for the FHA to apply to mortgage lending.  Instead, Plaintiff's flawed interpretation of Section 3604 would

---

*(...continued from previous page)*
to proceed where a claim for relief is facially implausible is what the Supreme Court's "plausibility standard" is intended to prohibit.  *Twombly*, 127 S.Ct. at 1974.

[7]    In its principal motion, Accredited referred to the provisions of the FHA and other statutes by their section numbers within the Act, rather than the section numbers as codified in the U.S. Code.  However, since Plaintiff uses the U.S. Code section numbers throughout its Opposition Memorandum, Accredited has adopted the same convention in its reply to minimize confusion.

not serve to further the purpose of the FHA, but instead would serve only to increase the potential liability of lenders and the resultant pressure to settle even unmeritorious claims.

### A.     The Structure of the FHA Shows That Section 3604 Does Not Apply to Mortgage Lending.

While Plaintiff uses much ink to show that Section 3604 has been interpreted broadly, *see* Opp'n Mem. at 20-24, this does not mean that Section 3604 should be interpreted so broadly as to swallow Section 3605—which Plaintiff agrees applies to mortgage lending.  As Accredited shows in its principal brief, when the FHA was first enacted, Section 3605 applied *only* to mortgage lending while the relevant language of Section 3604 has remained unchanged.  *See* Mem. at 20-21.  As originally enacted, any interpretation of Section 3604 that applied it to mortgage lending would have rendered Section 3605 entirely superfluous—and, therefore, such an interpretation was and is impermissible.  *See* Mem. at 20 (citing cases).  While the language of Section 3605 has changed, the relevant language—and, therefore, the meaning—of Section 3604 has not.  *See, e.g.*, *Nat'l Ass'n of Homebuilders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532 & n.8 (2007) (explaining that the modification of one statutory provision does not implicitly change the meaning of another); *United States v. Madigan*, 300 U.S. 500, 569 (1937) (same).  Because Section 3604 could not have borne an interpretation so broad upon enactment as to apply to mortgage lending, it cannot do so now.[8]

Plaintiff's reliance on Section 803 of the FHA, 42 U.S.C. § 3603, to save its interpretation of Section 3604 is misplaced.  *See* Opp'n Mem. at 26-27.  Section 3603 provides an exemption from Section 3604's coverage in two limited circumstances:  (1) "any single-

---

[8]      The cases Plaintiff cites to show the broad applicability of Section 3604 are inapposite. Whatever the merits of applying Section 3604 to insurance, appraisals, etc., those services are not expressly covered by another section of the FHA—and, therefore, do not raise the same issues regarding interpretations that render another provision of the Act superfluous.

family house sold or rented by an owner," provided numerous conditions are met; and (2) "rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence." 42 U.S.C. § 3603(b). Thus, the exemption in Section 3603 applies only to property owners who sell or rent their property—and, therefore, would not apply in any transaction that was subject to Section 3605. Both in its current version and as enacted, Section 3605 applies only to mortgage loans made for the purpose of "purchasing, constructing, improving, repairing, or maintaining a dwelling." *See* Mem. at 20-21; 42 U.S.C. § 3605(b)(1)(A). Accredited cannot envision any circumstance whatsoever where a property owner selling or renting a property (and qualifying for the Section 3603 exemption) would apply for a loan subject to Section 3605 as part of the same transaction—and Plaintiff has not suggested any. Indeed, Section 3605 originally contained a proviso explaining that Section 3605 has no impact on the exemption in Section 3603. *See* Pub. L. 90-284, § 805 (providing "[t]hat nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b)"). Thus, notwithstanding Section 3603, Plaintiff's interpretation of Section 3604 would render Section 3605 wholly superfluous.

> **B.** **The Equal Credit Opportunity Act Shows That Section 3604 of the Fair Housing Act Does Not Apply to Mortgage Lending.**

Accredited demonstrated in its principal brief that the Equal Credit Opportunity Act ("ECOA") shows that Congress understood only Section 3605—and not Section 3604—to apply to mortgage lending. Section 706(i) of ECOA, 15 U.S.C. § 1691e(i), prohibits a person from recovering both under ECOA and Section 3605. Thus, if a plaintiff brings a mortgage lending-related claim under both ECOA and Section 3605, the plaintiff can recover only under one of the Acts. However, if Section 3604 could apply to mortgage lending as Plaintiff suggests, a plaintiff

would be able to recover under both ECOA and the FHA.  It is inconceivable that Congress intended to prohibit dual recovery if a plaintiff brings a claim under Section 3605 (the section that expressly applies to mortgage lending) but not if a plaintiff brings a claim under Section 3604 (a section that does not mention mortgage lending).[9]  Thus, Plaintiff's interpretation of Section 3604 would lead to an absurd result that weighs heavily against such an interpretation.

Plaintiff attempts to save its theory by reference to Section 706(k) of ECOA, 15 U.S.C. § 1691e(k), but this provision does not change the foregoing analysis.  Section 1691e(k) merely references the "Fair Housing Act"—it does not specifically reference Section 3604 or suggest in any way that Section 3604 applies to mortgage lending.  Nor does anything in this section suggest that the plain language of the dual recovery prohibition in Section 1691e(i)—which expressly references only Section 3605—applies to claims brought under Section 3604.  Indeed, Section 1691e(k) does not even refer to private actions under either the ECOA or the FHA, but creates requirements applicable only to the federal banking agencies.[10]  Section 1691e(k) does not provide any support for Plaintiff's interpretation of Section 3604.

C.    **The Court Decisions That Apply Section 3604 to Mortgage Lending Address Neither the Language of Section 3605 as Enacted Nor the Dual Recovery Prohibition in ECOA.**

While a few courts have held that Section 3604 applies to mortgage lending, the analysis in these decisions is unpersuasive because the courts do not address—presumably because the parties did not brief—the language of Section 3605 of the FHA as originally enacted in

---

[9]    Additionally, because the remedies available to civil plaintiffs are the same under sections 3604 and 3605, *see* 42 U.S.C. § 3613, there is no indication that Congress intended violations of Section 3604 to be exempt from ECOA's dual recovery prohibition.

[10]    Section 1691e(k) provides that (1) if a federal banking regulator has reason to believe (a) that a violation of the ECOA has occurred, and (b) that the alleged violation would also be a violation of the FHA; and (2) if the federal banking regulator does not refer the matter to the

*(continued on following page...)*

determining whether this interpretation of Section 3604 renders Section 3605 superfluous. For example, one of the cases upon which this Court relied in *National Fair Housing Alliance v. Prudential Insurance Company of America*, 208 F. Supp. 2d 46 (D.D.C. 2002), is the Seventh Circuit's decision in *N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992)—a case in which the Seventh Circuit held that Section 3604 applies to insurance (not lending). The Seventh Circuit found that Sections 3604 and 3605 merely "overlap", and that therefore applying Section 3604 to insurance would not render Section 3605 superfluous. *American Family*, 978 F.2d at 298. This decision addressed insurance under the current version of Section 3605, which now applies not only to lending but also to a broader number of financing-related activities. However, as discussed above and in Accredited's principal brief, Section 3605 originally applied expressly and exclusively to mortgage lending. If the relevant language of Section 3604 (which has remained unchanged since the FHA was enacted) could have applied to mortgage lending, Sections 3604 and 3605 would not merely overlap—Section 3605 would have been rendered wholly superfluous. While Section 3605 has been amended to cover additional financial activities, the amendment of Section 3605 cannot change the meaning of Section 3604. Section 3604 must be interpreted to mean the same thing today that it did when first enacted. *See, e.g.*, *Nat'l Ass'n of Homebuilders*, 127 S.Ct. at 2532 & n.8; *Madigan*, 300 U.S. at 569. Whatever the applicability of Section 3604 to insurance, Section 3604 cannot apply to lending.[11]

---

(...continued from previous page)

Attorney General, then the federal banking regulator is required to report the alleged violation to the Secretary of Housing and Urban Development. *See* 15 U.S.C. § 1691e(k).

[11]     Plaintiff mischaracterizes the district court's opinion in *Fuller v. Teachers Ins. Co.*, No. 5:06-cv-438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007). The court in *Fuller* concludes that the Fourth Circuit's holding in *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir. 1984)— that Section 3604 does not apply to *insurance*—has been overtaken by subsequent legislation

(continued on following page...)

Additionally, the few court decisions interpreting Section 3604 as applying to mortgage lending are unpersuasive because none of these decisions considers this interpretation in light of the dual recovery prohibition of ECOA.  As discussed above and in Accredited's principal motion, an interpretation of Section 3604 as applying to mortgage lending leads to the absurd result of permitting dual recovery under both ECOA and the FHA if the FHA claim is brought under Section 3604, but not if it is brought under Section 3605.  Section 706(i) of ECOA, 15 U.S.C. § 1691e(i), shows that Congress understood that only Section 3605 applies to mortgage lending.  The courts' omission of Section 1691e(i) from the analysis—again, presumably because the parties failed to brief the issue—leaves this analysis unpersuasive.

Finally, Plaintiff overstates the relevance of Judge Green's opinion in *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).  In *Hargraves*, Judge Green did not address any of the arguments that Accredited raises in this case—apparently because none of the parties raised them.  Specifically, Judge Green did not address the issue of whether Section 3605 precludes the applicability of Section 3604 to mortgage lending.[12]  Judge Green also did not analyze the impact of the ECOA dual recovery prohibition on the interpretation of Section 3604.  Because the arguments Accredited has raised before this Court do not appear to have been presented to or considered by Judge Green, the *Hargraves* opinion is of limited relevance here.

---

*(...continued from previous page)*

and rulemakings regarding the applicability of the FHA to insurance.  *Fuller*, 2007 WL at *3 to *6.  The *Mackey* court's application of the canons of statutory construction to Sections 3604 and 3605 remains valid.  *See, e.g.*, *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1554 n.27 (5th Cir. 1996) (explaining that "the plain language of [sections 3604 and 3605] seems to indicate that § 3605 is the vehicle for discrimination claims involving the financing of residential housing").

[12]     The parties did raise, however, the issue of whether Section 3604 could apply to home equity loans.  Judge Green noted that this was a "close issue," but did not reach it since the plaintiff abandoned this argument.  *Hargraves*, 140 F. Supp. 2d at 22.

**D.    HUD's Regulations Do Not Indicate Whether Section 3604 Applies to Mortgage Lending.**

Plaintiff overstates the Department of Housing and Urban Development's ("HUD") "clear and controlling interpretation." Opp'n Mem. at 24. The HUD regulations Plaintiff cites simply mirror the broad language of Section 3604. There is no reference whatsoever to mortgage lending in any of the regulations cited by Plaintiff. *See* 24 C.F.R. §§ 100.50(b) and 100.70(b). And, even if HUD's regulations could be interpreted as applying Section 3604 to mortgage lending, such an interpretation of Section 3604 cannot be reasonable for the reasons discussed above—and, therefore, is not entitled to deference.

Plaintiff also overstates the relevance of HUD's 1978 General Counsel memorandum. The memorandum discusses whether Section 3604 applies to *insurance*, not mortgage lending. *See* Opp'n Mem. Attach. B, at 1 ("[Y]ou have requested our views on the applicability of the Federal Fair Housing Act to property insurance activities.").[13] While the memorandum references the district court's decision in *Laufman v. Oakley Building & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976), it does so merely as an indication of how courts have interpreted Section 3604 to reach a variety of activities. *See id.* at 2 ("Section [3604(a)] has been construed . . . . The statutory language . . . has been applied . . . . The rationale of these decisions . . . ."). Thus, the memorandum does not "explicitly endorse[]" *Laufman*, as Plaintiff claims, but merely references *Laufman* and other court decisions as support for its analysis with respect to insurance. An agency's reliance on case law is not entitled to deference.[14] And, even if the

---

[13]    Similarly, the court decisions citing this memorandum address whether the FHA applies to insurance. *See Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1354 (6th Cir. 1995); *Nationwide Mut. Ins. Co.*, 52 F.3d at 1354; *American Family*, 978 F.2d at 300.

[14]    *See, e.g.*, *TEVA Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (explaining that an agency's reliance on discredited case law "renders its decision arbitrary and capricious" and noting that "[a]n [agency] order may not stand if the agency has misconceived the law");

*(continued on following page...)*

13

memorandum could be viewed as relevant to whether Section 3604 applies to mortgage lending, the memorandum's analysis would be flawed because it references neither Section 3605 nor the dual recovery prohibition of ECOA. This fundamental flaw shows that this memorandum—which is not even a rulemaking—is not entitled to deference.

Finally, Plaintiff's reliance on the Department of Justice's ("DOJ") civil litigation is misplaced. *See* Opp'n Mem. at 26 n.8. DOJ has no rulemaking or interpretive authority under the FHA. *See* 42 U.S.C. § 3614a. Additionally, in bringing claims under both Sections 3604 and 3605, there is no indication that DOJ considered the language of Section 3605 as enacted or the implications of ECOA's dual recovery prohibition. As a result, DOJ's actions are neither entitled to deference nor persuasive.

> **E.    Even if Section 3604 Applied to Mortgage Lending, Plaintiff Has Failed to State a Claim Under Section 3604 Upon Which Relief May be Granted.**

Plaintiff avoids Accredited's argument regarding subsection (a) of Section 3604 by setting up the "straw man" of "monopoly" and then knocking that "straw man" down. *See* Opp'n Mem. at 29. While subsection (a) may not require a showing of monopoly market power, it does require that Plaintiff allege facts that plausibly show that Accredited's alleged actions *actually*—not just theoretically—adversely affect the availability of housing. The D.C. Circuit has explained that Section 3604(a), by its plain terms, "reach[es] only discrimination that adversely affects the availability of housing." *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714 (D.C. Cir. 1991). In other words, Plaintiff must allege actual, not merely hypothetical, adverse effects to the availability of housing. Rather than satisfy this pleading

---

*(...continued from previous page)*
*PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 795-798 (D.C. Cir. 2004) (explaining that an agency's reliance on case law is not entitled to deference, and that deference

*(continued on following page...)*

requirement, Plaintiff has argued that the one fact that would show whether Accredited's alleged actions actually affect the availability of housing—Accredited's miniscule market share—is "irrelevant." Opp'n Mem. at 29. Thus, Plaintiff has failed to allege facts sufficient to state a plausible claim under subsection (a). *See Twombly*, 127 S.Ct. at 1974 (requiring that complaint allegations must contain "***enough facts*** to state a claim to relief that is ***plausible*** on its face" (emphasis added)).[15]

Plaintiff provides no meaningful argument with respect to subsection (b) of Section 3604. While Plaintiff elsewhere cites the D.C. Circuit's opinion in *Clifton Terrace*, Plaintiff understandably avoids discussion of *Clifton Terrace* with respect to subsection (b). As Accredited discusses in its principal brief, *Clifton Terrace* shows that subsection (b) applies only to those that provide "housing services and facilities." Mem. at 26. While Plaintiff makes conclusory allegations that Accredited provides "housing services and facilities," it has alleged no facts to support this claim. *See Twombly*, 127 S.Ct. at 1974. Plaintiff's allegations support only a claim that Accredited is a lender. Accredited does not provide housing or services or facilities attendant to housing—and Plaintiff's does not sufficiently allege otherwise. Mem. at 26.

Similarly, with respect to subsection (c), Plaintiff's complaint contains conclusory statements but no factual allegations that Accredited made, printed or published a statement

---

*(...continued from previous page)*
is appropriate only where the agency "bring[s] its experience to bear in light of competing interests at stake").
[15]    Plaintiff overstates the D.C. Circuit's holding in *Clifton Terrace* regarding the applicability of Section 3604 to mortgage lending. Opp'n Mem. at 22. Plaintiff's ellipses are telling. In dicta, the D.C. Circuit merely listed mortgage lending as one of many types of services that "might result in the denial of housing . . . ." *Clifton Terrace*, 929 F.2d at 719-20. The case was not about mortgage lending, and the court did not engage in any analysis of

*(continued on following page...)*

"with respect to the sale or rental of a dwelling . . . ."  42 U.S.C. § 3604(c).  The reference in the statute to the sale of "a dwelling" (i.e., a single, specific dwelling) shows that the language was intended to address statements with respect to the sale or rental of particular dwellings.  To read this subsection as applying to lending advertisements, which are not related to any particular dwelling, is to stretch the statutory text beyond any recognized meaning of the words.

## IV.    DISPARATE IMPACT CLAIMS ARE NOT COGNIZABLE UNDER THE FAIR HOUSING ACT.

Plaintiff devotes 20 pages of its Opposition Memorandum to its attempt to distract the Court from focusing on the text of the FHA in light of the Supreme Court's recent decision in *Smith v. City of Jackson*.  The Supreme Court has affirmed repeatedly that the search for Congress's intent begins and ends with what the statute says and what it does not.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).  While Plaintiff derisively refers to a focus on the text of the statute as "mechanical" and "formalistic", the Supreme Court has consistently affirmed—and, in *Smith v. City of Jackson*, reaffirmed—the primacy of the statutory text.  Understandably, Plaintiff wishes the Court to focus its attention elsewhere.

### A.    Plaintiff Mischaracterizes the Supreme Court's Opinion in *Smith v. City of Jackson*.

*Smith v. City of Jackson*, 544 U.S. 228 (2005), clarifies that a statute permits disparate impact claims only if it contains "effects" language similar to Title VII and the Age Discrimination in Employment Act ("ADEA")—language that Congress did not include in the FHA.  It is surprising that Plaintiff would argue that this argument is a "unique interpretation" of

---

*(...continued from previous page)*
whether Section 3604 applies to mortgage lending, how Section 3605 interacts with Section 3604, or how ECOA's dual recovery prohibition impacts the analysis.

*Smith.* Opp'n Mem. at 30. The view that *Smith* clarifies the FHA is not unique. Indeed, even Plaintiff's counsel has observed that *Smith* "may have implications for the direction the Supreme Court will take should it decide to address the applicability of disparate impact claims under the Fair Housing Act in a future case." 1 JOHN P. RELMAN, HOUSING DISCRIMINATION PRACTICE MANUAL § 2:24, at 2-72 (2005).

Plaintiff not only misrepresents the uniqueness of Accredited's argument, but also mischaracterizes the holding in *Smith.* Contrary to Plaintiff's claim, *Smith* makes clear that it is the "effects" language in the statute—not a distinction between "individual" and "person" and not the "any person," "because of," and "based on" construction—that authorizes disparate impact claims in Title VII and the ADEA. The following excerpt from *Smith*—with the Court's emphasis—makes this abundantly clear:

> Neither § 703(a)(2) [of Title VII] nor the comparable language in the ADEA simply prohibits actions that "limit, segregate, or classify" persons; rather the language prohibits such actions that "deprive any individual of employment opportunities or ***otherwise adversely affect*** his status as an employee, because of such individual's" race or age. *Ibid.* (explaining that in disparate-impact cases, "the employer's practices may be said to 'adversely affect [an individual's status] as an employee'" (alteration in original) (quoting U.S.C. § 2000e-2(a)(2))). Thus, the text focuses on the ***effects*** of the action on the employee rather than the motivation for the action of the employer.

*Smith*, 544 U.S. at 235-36 (emphasis in original). While the Court explains in a footnote that the distinction between "individual" and "employees" as those terms are used in the ADEA supports this interpretation, this footnote also emphasizes that it is the "effects" language that permits disparate impact claims:

> Thus, an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification ***adversely affects*** the employee because of that employee's age—the very definition of disparate impact.

*Id.* at 236 n.6 (emphasis added).  This is also the way the dissenters in *Smith* understood the

*Smith* plurality opinion:

> The plurality instead reads paragraph (a)(2) to prohibit employer actions that "adversely affect [an individual's] status as an employe[e] because of such individual's age."  Under this reading, "because of . . . age" refers to the ***cause of the adverse effect*** rather than the ***motive for the employer's action***.

*Id.* at 250 (O'Connor, J., dissenting) (emphasis in original).  There can be no question after *Smith*

that disparate impact claims under Title VII and the ADEA are authorized by the "effects"

language, not the "any person," "because of," and "based on" construction.  Where this "effects"

language is absent from the statute—as is the case with the FHA—disparate impact claims are

not permitted.  *See* Mem. at 32-33 & Ex. B.

The D.C. Circuit also understands *Smith* as basing the permissibility of disparate impact

claims on the presence of "effects" language in the statute.  In analyzing the anti-discrimination

provision of ECOA—which is substantially similar to the anti-discrimination provision of the

FHA—the D.C. Circuit explained:

> Both Title VII and the Age Discrimination in Employment Act (ADEA) prohibit actions that "***otherwise adversely affect***" a protected individual. *See* 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2).  The Supreme Court has held that ***this language gives rise to a cause of action for disparate impact*** discrimination under Title VII and the ADEA. *See Smith v. City of Jackson*, 544 U.S. 228, 125 S.Ct. 1536, 1540, 161 L.Ed.2d 410 (2005) (ADEA); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (Title VII).  ECOA contains no such language.

*Garcia v. Johanns*, 444 F.3d 625, 633 n.9 (D.C. Cir. 2006) (emphasis added).  While the D.C. Circuit ultimately did not have to reach the issue, it clearly signaled that statutes lacking the "effects" language—such as ECOA and the FHA—do not support disparate impact claims.[16]

Plaintiff also mischaracterizes Accredited's arguments when it states that Accredited claims "that the analogy to Title VII in considering the issue under the FHA is impermissible after *Smith*."  Opp'n Mem. at 46.  Quite the opposite, the analogy to Title VII is central to Accredited's argument.  The anti-discrimination provisions of the FHA mirror those in Section 703(a)(1) of Title VII (as well as Section 4(a)(1) of the ADEA)—and the Supreme Court has made clear that Section 703(a)(1) supports disparate treatment claims (requiring a showing of discriminatory intent), but not disparate impact claims.  However, the anti-discrimination provisions of the FHA contain no "effects" language comparable to Section 703(a)(2) of Title VII (or Section 4(a)(2) of the ADEA).  Thus, the FHA lacks the statutory language that supports disparate impact claims in Title VII.  The analogy to Title VII compels the conclusion that the FHA does not permit disparate impact claims.

### B.    Plaintiff's Additional Arguments Are Inaccurate and Irrelevant.

In their effort to distract this Court from *Smith* and its holding that disparate impact claims are based on the "effects" language of a statute—language absent from the FHA— Plaintiff advances several other arguments urging the Court to ignore the plain language of the FHA.  These arguments are irrelevant to the interpretation of the FHA.  Where, as here, the

---

[16]     It is astonishing that Plaintiff would suggest otherwise, as Plaintiff's counsel has previously written that *Smith* based its decision on the "effects" language of the ADEA:  "In Smith, the Supreme Court affirmed the use of the disparate impact test in Age Discrimination in Employment Act (ADEA) cases.  The Court noted that the text of the ADEA, which broadly prohibits practices that ***otherwise affect*** an employee's status because of age, and EEOC regulations authorizing relief under a disparate impact theory, supported the conclusion that a

*(continued on following page...)*

language of the statute is plain, the analysis begins *and ends* with the statutory text.  *See, e.g.*, *Alexander*, 532 U.S. at 288.  Arguments based on materials outside the plain language of the text are irrelevant to, and cannot alter the meaning of, the plain language.

Even if Plaintiff's additional arguments were relevant, they are inaccurate.  Plaintiff's highly selective discussion of the legislative history of the FHA distorts rather than clarifies the intent of Congress.  Plaintiff also mischaracterizes the purpose of the FHA, the relevance of pre-*Smith* decisions by the lower courts, and the relevance of HUD materials referencing disparate impact court decisions.  While Plaintiff's additional arguments are irrelevant given *Smith* and the plain language of the FHA, Accredited believes the Court may benefit from an accurate discussion of these issues.

Finally, perhaps recognizing the inaccuracies in each of its additional arguments, Plaintiff appears to argue that these arguments collectively create a right to bring disparate impact claims where the plain language of the statute does not.  Even if Plaintiff's individual arguments were correct (and they are not), no amount of non-statutory materials can alter the plain language of the statute so as to create a right that Congress did not.  *See, e.g.*, *Alexander*, 532 U.S. at 288 ("We have never accorded dispositive weight to context shorn of text . . . in interpreting statutes generally . . . legal context matters only to the extent it clarifies text."); *MCI Telecomms. Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 230-32 (1994) (noting that even when the Court itself in other contexts has determined an alternative policy may better serve the legislative purpose, the statutory text controls).

---

*(...continued from previous page)*
violation of the ADEA may be proven under the disparate impact theory."  1 RELMAN, *supra*, § 2:24, at 2-72 (emphasis added).

### 1.    The Legislative History of the FHA Shows That Congress Did Not Intend Disparate Impact Claims to be Cognizable.

Plaintiff's Opposition Memorandum focuses heavily on a highly selective and inaccurate discussion of legislative history in an attempt to show that Congress meant the FHA to apply to adverse effects of facially-neutral policies, even though Congress did not enact language in the FHA to achieve this result.  Even if Plaintiff's discussion of legislative history were accurate (and it is not), it cannot add to the language of the statute.  The Supreme Court has explained that "the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone.  The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President."  *W.Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991).  The statutory text cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."  *Id.*[17]

While there are no conference reports, committee reports, etc. for the FHA, there is significant legislative history in the form of (1) the larger body of anti-discrimination laws, and

---

[17]    The Supreme Court's reluctance to rely on the statements of individual legislators during debates is well founded.  Such statements lend themselves "to a kind of ventriloquism" pursuant to which "[t]he Congressional Record or committee reports are used to make words appear to come from Congress's mouth which were spoken or written by others (individual Members of Congress, congressional aides, or even enterprising lobbyists)."  *See, e.g.*, *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 73-74 (Scalia, J., dissenting); *Neal v. Honeywell Inc.*, 33 F.3d 860, 862-63 (7th Cir. 1994) ("[A]ll laws . . . are compromises among competing interests . . . . [W]hether one of these interests triumphs over the other, or whether instead they coexist uneasily, is determined not by natural justice but by the political process, which created a text."); *accord* Laurence H. Tribe, *Comment, in* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 74-75 (1997) (emphasis added) (explaining that "[t]he text of the law is not just evidence about how much one interest . . . should be preferred over another . . . ; the text is the *decision* about what to do" regarding the accommodation of competing interests—"a decision approved by the Constitution's own means, bicameral approval and presidential signature."); W. David Lawson, *Legislative History and the Need to Bring Statutory Interpretation Under the Rule of Law*, 44 STAN. L. REV. 383, 383-84 (1992) ("Members of Congress can make law by 'manufacturing' legislative history, thereby evading the

*(continued on following page...)*

(2) the evolution of the FHA itself.  Plaintiff omits any discussion of this history.  And even if the statements of individual legislators during debates were probative of Congressional intent, Plaintiff's highly selective citations to these statements distorts the views of the individual legislators upon which it focuses.  Accredited provides a more complete discussion of the statements of individual legislators during the debates of the FHA.  All of these materials support the analysis of the statutory text discussed above:  the FHA does not permit, and was not intended to permit, disparate impact claims.

a) *The Differences Between the FHA and Other Anti-Discrimination Statutes Show That Congress Did Not Intend Disparate Impact Claims to be Cognizable Under the FHA.*

Plaintiff omits from its Opposition Memorandum any discussion of how the FHA fits into the *corpus juris* of anti-discrimination law.  The FHA was not the first federal anti-discrimination statute—and the differences between the FHA and previous anti-discrimination statutes are important to understanding Congress's intent in formulating the language of the FHA.  *See, e.g.*, *W.Va. Univ. Hosps.*, 499 U.S. at 100 (explaining that where the language of a statute is ambiguous, courts must "construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law").  When the FHA is compared to the previous anti-discrimination statutes, it becomes evident that Congress did not intend the FHA to permit disparate impact claims.

When Congress enacted Title VII in 1964—four years before the enactment of the FHA—it crafted two different anti-discrimination provisions:  one (§ 703(a)(1)) that makes it unlawful for an employer to "discriminate against" an individual "because of" the individual's

---

*(...continued from previous page)*
Constitutional requirements for legislating that assure that laws receive the appropriate representative consent.").

membership in a protected class, and one (§ 703(a)(2)) that prohibits employers from taking actions that "adversely affect" an individual's employment status.  Pub. L. 88-352, § 703(a), 78 Stat. 241 (1964).

When Congress enacted the ADEA in 1967—the year before it enacted the FHA— Congress similarly crafted two anti-discrimination provisions:  one (§ 4(a)(1)) that makes it unlawful for an employer to "discriminate against" an individual "because of" the individual's membership in a protected class, and one (§ 4(a)(2)) that prohibits employers from taking actions that "adversely affect" an individual's employment status.  Pub. L. 90-202, § 4(a), 81 Stat. 602 (1967).

In contrast, when Congress enacted the FHA in 1968, Congress crafted the FHA's anti-discrimination provisions using only the "discriminate against . . . because of" formulation found in subsection (a)(1) of both Title VII § 703 and ADEA § 4.  Pub. L. 90-284, § 805, 82 Stat. 73 (1968).  Congress did not enact "effects" language comparable to subsection (a)(2) of Title VII § 703 and ADEA § 4.  The FHA does not contain a provision with the "adversely affect" formulation that the Supreme Court in *Smith* found to be the basis for disparate impact claims under Title VII and the ADEA.  When anti-discrimination statutes enacted closely in time contain similar language, "it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."  *Smith*, 544 U.S. at 233-34.  However, when such statutes have significant differences in language, it must be presumed that Congress intended the provisions to have different meanings.  *See, e.g.*, *Acree v. Republic of Iraq*, 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts, J., concurring).  If Congress had intended the FHA to permit disparate impact claims as it did with Title VII and the ADEA, then Congress would have incorporated

23

into the FHA the "adversely affects" language it used in Title VII and the ADEA.  It did not, and this is dispositive of congressional intent.[18]

      *b)*      *The Evolution of the FHA Shows That Congress Intended That the FHA Prohibit Only Disparate Treatment, Not Disparate Impact.*

The FHA did not simply spring into existence in 1968; rather, it was the culmination of a three-year legislative effort.  This effort began in 1966, with the introduction of Title IV of the Civil Rights Act of 1966.  *See* H.R. 14765 (1966).[19]  Title IV contained a provision for a Fair Housing Board that could hear and adjudicate complaints of violations of the Act.  *Id.* § 408.  This provision created intense opposition because it would have permitted a prima facie case of housing discrimination to be made based solely on results, without a showing of discriminatory intent.[20]  Cloture was defeated twice, and the bill was laid aside.[21]  One of the principal reasons the bill was defeated was the provision that would have permitted disparate impact claims.  Senator Dirksen, whose opposition was central to the defeat of the 1966 bill and critical to the passage of the FHA in 1968, called the disparate impact provision "the greatest assault upon the due process clause of the Constitution that anybody has ever undertaken . . . ."  112 Cong. Rec.

---

[18]    *See, e.g.*, *W.Va. Univ. Hosps.*, 499 U.S. at 101 ("[I]t is our role to make sense rather than nonsense out of the *corpus juris*. . . . [I]t is not our function to eliminate clearly expressed inconsistency of policy and to treat alike subjects that different Congresses have chosen to treat differently. . . .  Where what is at issue is not a contradictory disposition within the same enactment, but merely a difference between the more parsimonious policy of an earlier enactment and the more generous policy of a later one, there is no more basis for saying that the later Congress forgot than for saying that the earlier Congress felt differently.").

[19]    For a detailed discussion of the evolution of the legislation that became the Fair Housing Act, see Marshall D. Stein, *The Fair Housing Act of 1968 and the Civil Rights Act of 1866: The Test for Liability in Housing Discrimination Cases*, *in* 1 ISSUES IN HOUSING DISCRIMINATION: A CONSULTATION/HEARING, at 94 (U.S. Comm'n on Civil Rights, 1985).

[20]    *See, e.g.*, 112 Cong. Rec. 17196 (1966) (Rep. Whitener); *id.* at 22313-14 (Sen. Long) (same).

[21]    *See* 112 Cong. Rec. 22670 (1966) (1st cloture defeated); *id.* at 23042-43 (2d cloture defeated); *id.* at 23046-47 (laid aside consideration for 1966).

22618 (1966) (Sen. Dirksen).[22]  The Senate hearings the following year further confirmed that

the disparate impact provision of Title IV was a central reason for the bill's failure.[23]

When fair housing legislation was reintroduced in 1968, the disparate impact provision

that had been present in the 1966 bill had been removed.  Nevertheless, the first cloture vote in

the Senate failed.  114 Cong. Rec. 3427 (1968).  Subsequently, Senator Mondale announced that

there were changes to the bill in an effort at compromise and in the hope of getting Senator

Dirksen's support.  One of these compromises was a clarification that the prima facie case could

not be established based on results alone.  *Id.* at 4049.  Even then, a second cloture vote failed.

*Id.* at 4065.  Additional changes to the bill were made, which Senator Ervin explained would

prohibit a person being liable under the Act if the person had a motive "other than a racial

motive."  *Id.* at 4689-90.  In other words, a showing of discriminatory intent would be required.

> c)    *The Debates Over the FHA Show That Congress Intended That the*
> *FHA Prohibit Only Disparate Treatment, Not Disparate Impact.*

Numerous statements by the bill's two principal proponents—Senators Mondale and

Brooke—confirm that the Fair Housing Act was intended to reach only intentional

discrimination, not disparate impact.  For example, Senator Brooke explained that "[a] person

can sell his property to anyone he chooses as long as it is by personal choice and not because of

***motivation of discrimination***."  114 Cong. Rec. 3427 (1968) (emphasis added).  Similarly,

Senator Mondale explained that "The bill permits an owner to do everything that he could do

---

[22]    Senator Javitz noted that Sen. Dirksen's lack of support was indispensable if cloture were
to be invoked and the act passed, but was not forthcoming "because Title IV was included in the
bill."  *See* 112 Cong. Rec. 23013-14 (1966) (Sen. Javitz).

[23]    *Hearings Before the Subcommittee on Housing and Urban Affairs of the Committee on
Banking and Currency on S. 1358, S. 2114, and S. 2280, Relating to Civil Rights and Housing*
(Aug. 23, 1967), at 171 (Sen. Muskie); *id.* at 389 (Sen. Proxmire); *id.* at 418 (Sens. Meany and
Proxmire).

anyhow with his property . . . except to refuse to sell it to a person **solely on the basis of his color**. **That is all it does**." *Id.* at 5643 (emphasis added).[24]

Plaintiff's reliance on other broad statements by Senator Mondale is misplaced. The statements by Sens. Brooke and Mondale cited above interpret the actual provisions of the legislation. In contrast, the statements quoted by Plaintiff are broad statements regarding why fair housing legislation should be supported generally. *See* Opp'n Mem. at 31-32. The statements directed to the actual provisions of the legislation must be given greater weight.[25] Furthermore, even if Senator Mondale's statements regarding "effects" of actions could be read to indicate his personal views of the legislation, the statute lacks any similar reference to "effects."

Plaintiff also mischaracterizes the Baker Amendment. *See* Opp'n Mem. at 32-33. Senator Baker's amendment would have provided "that an individual [home]owner, otherwise exempted, may employ a real estate agent, but that he may not instruct the real estate agent to discriminate." 114 Cong. Rec. 5214 (1968). It would not have created a requirement of discriminatory intent, as Plaintiff suggests—as shown above, Congress understood such a requirement already to exist in the legislation. The Baker Amendment was defeated because it would be very difficult to establish that a homeowner had provided a discriminatory instruction

---

[24]    The proponents of the legislation in the House similarly emphasized that claims require a showing of discriminatory intent:  "In addition, under the provisions of this legislation the burden of proof rests with the person alleging discrimination, who must in any court case which arises under this law, prove discrimination."  114 Cong. Rec. 9573 (1968) (Rep. Steiger).

[25]    *See, e.g.*, *Regan v. Wald*, 468 U.S. 222, 237 (1984) ("Oral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself.  To permit what we regard as clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President.")

to the real estate agent.[26]  In other words, the concerns regarding the Baker Amendment related

to the difficulty in proving a discriminatory instruction between seller/renter and real estate

agent—it had nothing to do with whether a showing of discriminatory intent is required.

> d)    *Comments by Legislators Made Decades Later are not Probative of Congress's Intent in Enacting the FHA.*

Finally, Plaintiff claims that legislative history from 1988—twenty years after the FHA

was enacted—somehow is relevant to what Congress intended when it enacted the FHA.  Such

arguments have been rejected by the Supreme Court.  *See, e.g.*, *United States v. X-Citement

Video, Inc.*, 513 U.S. 64, 77 n.6 (1994) ("[T]he views of one Congress as to the meaning of an

Act passed by an earlier Congress are not ordinarily of great weight, and the views of the

committee of one House of another Congress are of even less weight." (citations omitted));

*Weinberger v. Rossi*, 456 U.S. 25, 35 (1982) ("Such *post hoc* statements of a congressional

Committee are not entitled to much weight.").

Plaintiff is also incorrect that the reenactment doctrine has any applicability here.  First,

the 1988 amendments merely amended the FHA—they did not reenact the statute.  Second, the

reenactment doctrine only applies where a judicial interpretation is "well established."  *See, e.g.*,

*Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  At the time of the 1988 amendments, courts were

divided over whether the FHA permitted disparate impact claims.  Indeed, Judge Greene's

opinion in *Brown v. Artery Org., Inc.*, 654 F. Supp. 1106 (D.D.C. 1987) both holds that disparate

---

[26]    This is made particularly clear in the comments of Senator Percy when viewed in context: "I am concerned that there are any number of subtle signals that go between a real estate broker and a seller or renter in an informal conversation unrelated even to the rental or the sale agreement.  If, for instance, the renter or seller said to the broker, "Aren't these riots terrible things?  I suppose you know where I stand on civil rights?"  Would that not constitute . . . an instruction to the broker that he could not fail to interpret? . . . If I understand this amendment, it would require proof that the single homeowner had specified racial preference.  I maintain that proof would be impossible to produce."  114 Cong. Rec. 5216.

impact claims cannot be brought against private individuals and discusses the disagreement in the case law. *Id.* at 1114-15. Thus, there was no "well established" or consistent interpretation of the FHA, further making the reenactment doctrine inapplicable. *See, e.g.*, *Pierce v. Underwood*, 487 U.S. 552, 567 (1988).

> **2.     The General Purpose of the FHA Does Not Support Disparate Impact Claims.**

The Supreme Court has referred to "the proposition that the statute at hand should be liberally construed to achieve its purposes" as "the last redoubt of losing causes." *Director v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995). Plaintiff argues that the difficulty of proving intent, combined with the broad purpose of the FHA, support the conclusion that the FHA permits disparate impact claims. Plaintiff's assertion begs the question of what Congress intended to prohibit. If Congress intended to prohibit only actions motivated by discriminatory intent[27]—as Accredited shows above—then Congress reasonably could determine that a prima facie case requires a showing of discriminatory intent.[28] In any event, it is for Congress, not the courts, to determine how legislation should accomplish its purposes.

The reasoning underlying Plaintiff's argument has been rejected by the Supreme Court:

---

[27] Several commentators have noted that disparate impact claims do not, in fact, punish actions motivated by discrimination but rather further notions of distributive justice. *See, e.g.*, James F. Blumstein, *Defining and Proving Race Discrimination: Perspectives on the Purpose vs. Results Approach from the Voting Rights Act*, 69 VA. L. REV. 633 (1983); *accord Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 ("'Discrimination' is a term that covers a wide range of *intentional* unequal treatment." (emphasis added)). Indeed, Plaintiff's counsel has noted that even actions intended to *prevent* discrimination can lead to disparate impact liability: "A defendant with the best of intentions—indeed, even a defendant who undertakes a particular policy in the express hope of eliminating any possible discrimination—can still be held liable if plaintiff pursues a disparate impact claim." 1 RELMAN, *supra*, § 2:24. Whether legislation should target only actions motivated by discrimination, or whether the legislation should seek to further notions of distributive justice (as Title VII and the ADEA arguably do) is a decision that must be left to Congress alone.

> That principle may be invoked, in case of ambiguity, to find
> present rather than absent elements that are essential to operation
> of a legislative scheme; but it does not add features that will
> achieve the statutory "purposes" more effectively.   Every statute
> proposes, not only to achieve certain ends, but also to achieve them
> by particular means—and there is often a considerable legislative
> battle over what those means ought to be.

*Id.* at 135-36.  Judge Easterbrook has similarly explained that "the essential question is not which way the statute points but how far it directs one to go"  and that "[n]o principle of statutory construction says that after identifying the statute's accommodation of competing interests, the court should give the favored party a little extra."  *Neal*, 33 F.3d at 862.  Thus, an interpretation of the FHA that goes beyond the text of the statute does not simply further the purposes of the statute, it changes the statute.  *See, e.g.*, *Love v. Johanns*, 439 F.3d 723, 732 (D.C. Cir. 2006) (explaining that "'liberal construction' and interpretation based on legislative purpose can only go so far.  Where the meaning of the statute and regulations is clear, a contrary reading would become destruction of the statutory scheme." (citations omitted)); *see also Washington v. Davis*, 426 U.S. 229, 248 (1976) (explaining that any "extension of [disparate impact] beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription").[29]

---

*(...continued from previous page)*

[28]    Plaintiffs can still rely on statistical evidence as circumstantial evidence of discriminatory intent.  *See, e.g.*, *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998).

[29]    The Supreme Court's holdings that Title VII and the ADEA permit disparate impact claims are not inconsistent with this view.  While the Court relied on both the purpose and the text of the statute, *Smith* makes clear that disparate impact claims are supported by the "effects" language of the statute.  However, the "because of" language could plausibly be interpreted as referring to the "motive of the employer's action" rather than the "cause of the adverse effect." *See, e.g.*, *Smith*, 544 U.S. at 249 (O'Connor, J., dissenting).  A broad reading of the purpose of the statute was the basis for holding that "because of" did not refer to the employer's intent. *Smith* makes clear, however, that disparate impact claims are rooted in the "effects" language of the statute and not the broad purpose.

Plaintiff's argument is further shown to be invalid when viewed in light of other anti-discrimination statutes that have similarly broad purposes but do not permit disparate impact claims. As Accredited showed in its principal brief, several anti-discrimination statutes—Title IX, Title VI, the Equal Education Opportunities Act, and Title II—have been held not to permit disparate impact claims. *See* Mem. Ex. B. Like the FHA, these laws also have broad purposes. For example, the Supreme Court described Title VI as "majestic in sweep." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978). Nevertheless, the Supreme Court has held that Title VI does not permit disparate impact claims. *See Alexander*, 532 U.S. at 280-81.[30] Broad purposes are not enough to make disparate impact claims cognizable absent the requisite statutory language. Where the statute lacks the "effects" language, the statute does not permit disparate impact claims—no matter how broad the purpose of the statute. *See, e.g.*, *Alexander*, 532 U.S. at 285-87 (holding that where Congress has not expressly created a disparate impact cause of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

Finally, Plaintiff's argument that the purpose of the FHA requires the broadest reading possible that is permissible under the Constitution mischaracterizes Section 3601. *See* Opp'n Mem. at 41. The words "within constitutional limitations" were intended to be restrictive, rather than expansive. Many members of Congress were concerned that fair housing legislation exceeded Congress's authority under the Constitution. The reference to constitutional limits was added to make clear that the FHA was not intended to exceed Congress's constitutional

---

[30]    The other statutes that do not permit disparate impact have similarly broad purposes. *See, e.g.*, *Jackson*, 544 U.S. at 174-75 (discussing broad reach of Title IX); *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (discussing broad reach of Title II).

authority.[31]  Indeed, Senator Mondale explained that the language of Section 3601 "is to be read in context with the entire bill"—in other words, the specific provisions of the FHA determine its scope.  114 Cong. Rec. 4975 (1968).  Nothing in the legislative history suggests that Congress intended this language to require that the Act be interpreted as broadly as possible under the Constitution—and certainly not more broadly than the text of the Act itself permits.

>    3.    *Smith* **Shows That Court Decisions Finding Disparate Impact Claims Cognizable Under the FHA are No Longer Viable.**

Accredited showed in its principal brief that the case law permitting disparate impact claims under the FHA is no longer tenable after the Supreme Court's decision in *Smith*.  Accredited stands by its position:  these cases all derive from and rely on the same reasoning as decisions *Smith*—and the discussion above—shows are flawed.

*Smith* is not the first time the Supreme Court has clarified a statutory interpretation that contradicts the consensus among the courts of appeal.  In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court considered whether Section 10(b) of the Securities Exchange Act covered aiding and abetting liability.  The First through Eleventh Circuits had all held that Section 10(b) does cover aiding and abetting liability, and the D.C. Circuit had suggested that it does.  *See id.* at 192 n.1 (Stevens, J., dissenting) (citing cases).  Notwithstanding this apparent consensus in the courts of appeal, the Supreme Court held

---

[31]    *See, e.g.*, Raymond J. Celeda, *The Civil Rights Act of 1968: Background and Title-by-Title Analysis*, at LRS-40 (Congressional Research Service 1968) ("The reference to 'constitutional limits' was added by an amendment offered by Mr. Miller of Iowa who explained that it was intended to make 'clear that the provision for fair housing must be within constitutional limitations upon Congress in so providing.'  Senator Hart of Michigan, floor manager on the bill, accepted the Iowa Senator's amendment on the basis of this explanation and so long as it was clearly understood that it was not an "acknowledgement that we consciously intend to legislate beyond the reach of the Constitution . . .' 114 Cong. Rec. S 2061 (daily ed. March 4, 1968)").

that Section 10(b) does not cover aiding and abetting liability.  Thus, reliance on even a large

number of cases is no substitute for adherence to the statutory text.

> ### 4.    HUD Has Not Issued Regulations Regarding Disparate Impact, and its Views Are Not Entitled to Deference.

Plaintiff overstates HUD's "endorsement" of disparate impact theory under the FHA.

HUD has not promulgated regulations regarding disparate impact under the FHA.  *See, e.g.*, 1

RELMAN, *supra*, § 2:24 ("HUD has not issued regulations addressing the use of disparate impact

theory under the Fair Housing Act . . . .").  Because HUD has not promulgated regulations

addressing disparate impact, there is no regulation to which this Court can or may defer.

Additionally, HUD's materials show that HUD has simply been following the courts'

interpretation of the FHA, not engaging in its own analysis of the statutory language.  HUD's

*Title VIII Complaint Intake, Investigation & Conciliation Handbook* makes clear that HUD is

simply relying on judicial interpretation of the FHA.[32]  Similarly, and contrary to Plaintiff's

assertion, the joint "Policy Statement on Discrimination in Lending" merely summarizes the case

law regarding the FHA.  *See* 59 Fed. Reg. 18266, 18268 (Apr. 15, 1994) ("The courts have

recognized three methods of proof of lending discrimination under the ECOA and the FH Act: . .

."); *id.* at 18269 ("Although the precise contours of the law on disparate impact as it applies to

lending discrimination are under development . . . .").  Where an agency's position is based on its

understanding of case law, that position is not entitled to deference.  *See, e.g.*, *TEVA Pharms.*

*USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (explaining that an agency's reliance on

---

[32]    *See id.*, No. 8024.1, at 2-2 (REV-2 2005) ("[T]he lower courts have generally held that these precedents from the employment discrimination field should be followed in interpreting the Fair Housing Act."), *available at* http://www.hudclips.org/sub_nonhud/cgi/selecthbk.cgi (select "search" and 8024.1); *see also id.* at 2-3 ("This chapter discusses the analytical structure and the proof necessary to establish and rebut the three types of claims—single-motive, mixed-motive,

*(continued on following page...)*

discredited case law "renders its decision arbitrary and capricious" and noting that "[a]n [agency] order may not stand if the agency has misconceived the law"); *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 795-798 (D.C. Cir. 2004) (explaining that an agency's reliance on case law is not entitled to deference, and that deference is appropriate only where the agency "bring[s] its experience to bear in light of competing interests at stake").

Even if HUD's materials could be viewed as more than mere reliance on case law, HUD's views would not be entitled to deference because they are contrary to the text of the statute. A regulatory agency is not authorized to attempt to effectuate its interpretation of a statute by prohibiting conduct the statute permits. As Justice O'Connor has explained: "an agency's legislative regulations will be upheld if they are 'reasonably related' to the purposes of the enabling statute, . . . we would expand considerably the discretion and power of agencies were we to interpret 'reasonably related' to permit agencies to proscribe conduct that Congress did not intend to prohibit." *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 614 (1983) (O'Connor, J., concurring).[33] "'[R]egulations that would proscribe conduct by the recipient having only a discriminatory ***effect*** . . . do not simply 'further' the purpose of [the statute]; they go well ***beyond*** that purpose.'" *Alexander*, 532 U.S. at 286 n.6 (quoting with approval *Guardians*, 463 U.S. at 613 (O'Connor, J., concurring) (emphasis in original)). As discussed above and in Accredited's principal brief, the text of the FHA does not permit disparate impact claims. Any HUD interpretation inconsistent with this view is invalid.

---

*(...continued from previous page)*
and discriminatory impact—*that have been recognized* under the Fair Housing Act." (emphasis added)).

[33]    *See also Guardians*, 463 U.S. at 613 ("'Reasonably related to' simply cannot mean 'inconsistent with.'"); *American Federation of Gov't Employees, AFL-CIO v. Gates*, 486 F.3d 1316, 1321-22 (D.C. Cir. 2007) ("If the relevant statutory language is plain but is inconsistent with the [agency's] regulations, we must hold the regulations invalid.").

## V.    EVEN IF THE FHA PERMITTED DISPARATE IMPACT CLAIMS, PLAINTIFF FAILS TO STATE A COGNIZABLE DISPARATE IMPACT CLAIM.

Plaintiff fails to state a claim because its complaint misapprehends what constitutes a policy for disparate impact analysis.  Plaintiff slices too thinly Accredited's lending policy as illustrated in its *Loan Program Guide*.  Accredited's policy is not to make certain loans when the loan is secured by various types of property.  Metropolitan row houses comprise but one of those property types.  *See* Compl. Ex. I; *see also* Mem. Ex. C.  Nevertheless, Plaintiff attempts to extract the two words "row houses" from the sentence containing the various property type limitations and reimagine those two words as an independent, self-sufficient lending policy.  Plaintiff may not state a cognizable disparate impact claim based on a mere fraction of a policy.  *See, e.g.*, *Rudder v. District of Columbia*, 890 F. Supp. 23 (D.D.C. 1995) (viewing different tests that evaluate different skill sets as components of a single, unitary policy).

Because Plaintiff bases its claim on a mere fraction of a policy, Plaintiff also understates the population group necessary to state a cognizable disparate impact claim.  Plaintiff cites precedent regarding "appropriate comparables" that is irrelevant to determining the *total* population affected by a policy.  No case cited by Plaintiff in its Opposition Memorandum supports Plaintiff's surprising proposition that a population group consisting of a tiny fraction of those affected by the policy is adequate for disparate impact analysis.  HUD's guidance makes this very point:  "The proper focus of the statistical inquiry requires . . . a determination of the *overall* group of persons who are affected by the respondent's policy."  HUD, No. 8024.01, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2-32 (REV-2 1995) (emphasis added).  While the total group affected may be smaller than a nationwide group of persons, to state a cognizable disparate impact claim Plaintiff must adopt a population sample large enough to encompass persons affected by all parts of Accredited's property type limitation policy (e.g.,

manufactured homes, etc.). Plaintiff's attempt to isolate the metropolitan row house component from the rest of Accredited's lending policy presents to the Court a distorted picture of Accredited's lending practices. The statistical inquiry upon which Plaintiff's complaint is based cannot be used alone to show disparate impact. Therefore, Plaintiff has failed to state a claim under the FHA.

Plaintiff's attempt to base its disparate impact claim on a fraction of a policy and an overly narrow geographic area is also inconsistent with federal law. Under Plaintiff's view, lenders would be required to analyze separately not only each individual lending policy but each component of each policy, as applied to each individual loan product, to determine how the component affected borrowers and potential borrowers in each individual local market. Such a requirement is fundamentally inconsistent with numerous federal laws designed to facilitate the creation and operation of a national mortgage lending industry. *See, e.g.*, Home Owners' Loan Act, 12 U.S.C. § 1461 et seq.; Alternative Mortgage Transactions Parity Act, 12 U.S.C. §§ 3801; Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1735f-7a; Secondary Mortgage Market Enhancement Act, Pub. L. 98-440 (codified in scattered sections of titles 12 and 15 of the U.S. Code).

## CONCLUSION

For the reasons discussed in its principal motion and those discussed above, Defendants request that Plaintiff's Complaint, or, in the alternative, portions of Plaintiff's Complaint, be dismissed.

Respectfully submitted,

Date: December 7, 2007

_____/s/_____
Matthew P. Previn

Matthew P. Previn (DC Bar No. 460228)
Kirk D. Jensen (DC Bar No. 477629)

BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
202-349-8000 (telephone)
202-349-8080 (fax)

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 7, 2007, a copy of the above and foregoing was electronically filed in this case and was duly served upon counsel of record by operation of the Court's ECF system

_____/s/_____
Matthew P. Previn

**EXHIBIT A**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
  For the fiscal year ended December 31, 2006

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
  For the transition period from          to

### Commission File Number 001-32275

# ACCREDITED HOME LENDERS HOLDING CO.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **04-3669482**<br>(I.R.S. Employer<br>Identification No.) |

**15253 Avenue of Science**
**San Diego, California 92128**
(Address of principal executive offices) (Zip Code)

**Registrant's telephone number, including area code: 858-676-2100**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on<br>Which Registered |
|---|---|
| **Common Stock, $.001 Par Value** | **NASDAQ** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   or   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   or   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   or   No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   or   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2007 was $343,447,677.

The number of outstanding shares of the registrant's common stock as of July 26, 2007 was 25,124,190.

Source: ACCREDITED HOME LEND, 10-K, August 02, 2007

*In this Form 10–K, unless the context requires otherwise, "Accredited," "Company," "we," "our," and "us" means Accredited Home Lenders Holding Co. and its subsidiaries.*

**PART I**

#### ITEM 1.    Business

#### General Development of Our Business

Accredited is a mortgage company operating throughout the United States and in Canada. We originate, finance, securitize, service, and sell non–prime mortgage loans secured by residential real estate. Founded in 1990, our company is headquartered in San Diego, California.

On June 4, 2007, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with LSF5 Accredited Investments, LLC, a Delaware limited liability company ("Parent"), and LSF5 Accredited Merger Co., Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Purchaser"). The Agreement was amended on June 15, 2007.

Pursuant to the Merger Agreement, and upon the terms and subject to the conditions thereof, Purchaser commenced a tender offer (the "Offer") to acquire all of our outstanding shares of common stock, par value $0.001 per share, of Accredited at a purchase price of $15.10 per share, net to the holder thereof in cash (the "Offer Price"). Pursuant to the Merger Agreement, as soon as practicable after the consummation of the Offer and subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement, Purchaser will merge with and into Accredited (the "Merger") and we will become a wholly owned subsidiary of Parent. In the Merger, the shares of Accredited remaining outstanding following the consummation of the Offer, other than shares held by Parent, Purchaser or by stockholders who have validly exercised their appraisal rights under Delaware law, will be converted into the right to receive the Offer Price.

The obligation of Purchaser to accept for payment and pay for the shares tendered in the Offer is subject to the satisfaction or waiver of a number of closing conditions set forth in the Merger Agreement. It is also a condition to Purchaser's obligation to accept for payment and pay for the shares tendered in the Offer that more than 50% of our outstanding shares of common stock shall have been validly tendered in accordance with the terms of the Offer and not properly withdrawn (the "Minimum Condition"). The Minimum Condition may not be waived by Purchaser without our prior written consent.

The closing of the Merger is subject to customary closing conditions, and, depending on the number of shares held by Parent and Purchaser after Purchaser's acceptance of the shares properly tendered in connection with the Offer, approval of the Merger by holders of our outstanding shares of common stock remaining after the completion of the Offer. Accordingly, there can be no assurance that the Merger will be consummated. (See "Risk Factors—Risks Related to the Proposed Merger.")

The Merger Agreement includes customary representations, warranties and covenants by us, Parent and Purchaser, made to each other as of specific dates. We have agreed to operate our business in the ordinary course until the Merger is consummated. We have also agreed not to solicit or initiate discussions with third parties regarding other proposals to acquire us and to certain restrictions on our ability to respond to any such proposal. The Merger Agreement also includes customary termination provisions for both us and Parent. Depending on the circumstances of a termination of the Merger Agreement, we or Parent may be required to pay a termination fee.

The assertions embodied in the Merger Agreement's representations and warranties were made solely for purposes of the contract among us, Parent and Purchaser and may be subject to important qualifications and limitations agreed to by us, Parent and Purchaser in connection with the negotiated terms. Moreover, some of

6

Source: ACCREDITED HOME LEND, 10–K, August 02, 2007

those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from those generally applicable to stockholders or may have been used for purposes of allocating risk among us, Parent and Purchaser rather than establishing matters as facts.

A copy of the Merger Agreement is attached as Exhibit 2.1 to our Current Report on Form 8–K filed on June 4, 2007. The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement.

Effective October 1, 2006, we acquired Aames Investment Corporation ("Aames") pursuant to an Agreement and Plan of Merger dated as of May 24, 2006. Aames was a public REIT that managed a portfolio of non–prime residential mortgage loans and, through its principal subsidiary, originated, sold, and serviced residential mortgage loans through both wholesale and retail channels.

On September 29, 2006, we acquired the common stock of AaRCS, LLC ("AaRCS") an indirect wholly owned subsidiary of Aames. AaRCS, a vendor management services company, was merged with and now operates as our vendor management subsidiary, Vendor Management Services, LLC dba Inzura Settlement Services.

On June 23, 2006, we purchased the wholesale business of Aames for cash. We completed this purchase prior to closing our merger with Aames in an effort to reduce attrition of Aames employees and maximize the potential synergies from the combination of our and Aames's wholesale businesses.

The Aames acquisitions have been accounted for using the purchase method and, accordingly, the consolidated financial statements include the activity of the above companies from their respective dates of acquisition. (See Note 2 in the consolidated financial statements–"Business Combinations" for additional detail.)

In July of 2004, we formed Accredited Home Lenders Canada, Inc. ("AHLC"), as a wholly owned Canadian subsidiary, and funded our first Canadian mortgage loan in November that same year. AHLC is a mortgage banking company that originates and finances mortgage loans for Canadian borrowers who are not normally eligible for traditional prime mortgages from the major Canadian banks. AHLC is currently originating mortgage loans in the provinces of Alberta, British Columbia, Manitoba, Ontario and Quebec and has current plans to expand beyond those five provinces.

In May 2004, we formed Accredited Mortgage Loan REIT Trust (the "REIT"), a Maryland real estate investment trust, as a wholly owned subsidiary for the purpose of acquiring, holding and managing real estate mortgages. The REIT elected to be taxed as a real estate investment trust and to comply with the provisions of the Internal Revenue Code with respect thereto. Accordingly, the REIT will generally not be subject to federal or state income tax to the extent that it timely distributes its taxable income to its shareholders and satisfies the real estate investment trust requirements and certain asset, income and share ownership tests are met. In August 2004, the REIT completed a public offering of 3,400,000 9.75% Series A Perpetual Cumulative Preferred Shares ("Series A Preferred Shares"), and in September and October 2004 sold an additional 693,678 Series A Preferred Shares pursuant to the exercise of the underwriters' over–allotment option and a reopening of the public offering.

## Description of Our Business

We are a mortgage company, operating throughout the United States and in Canada, that originates, finances, securitizes, services and sells non–prime mortgage loans secured by residential real estate. We focus on borrowers who may not meet conforming underwriting guidelines because of higher mortgage loan–to–value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties. We originate mortgage loans primarily based upon the borrowers' willingness and ability to repay the mortgage loan and the adequacy of the collateral. Our experienced management team has developed incentive programs, technology tools and business processes that focus our employees on originating non–prime mortgage loans with the financial and other characteristics that should provide a target profit for us.

7

Source: ACCREDITED HOME LEND, 10–K, August 02, 2007