# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| NATIONAL COMMUNITY | ) | |
| REINVESTMENT COALITION, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Case No. 1:07-cv-01357-EGS |
|  | ) | |
| ACCREDITED HOME LENDERS | ) | |
| HOLDING COMPANY, *et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |

_____)

## PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S NOTICE OF SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff National Community Reinvestment Coalition submits this notice to inform the Court that, since Plaintiff's opposition brief was filed, at least two United States District Courts have explicitly rejected the argument that, because of *Smith v. City of Jackson*, 544 U.S. 228 (2005), disparate impact claims are no longer cognizable under the federal Fair Housing Act. *See Zamudio v. HSBC N. Am. Holdings Inc.*, No. 07-C-4315, 2008 WL 517138, at *2 (N.D. Ill. Feb. 20, 2008); *Garcia v. Country Wide Fin. Corp.*, No. 07-1161-VAP, slip op. at 7-11 (C.D. Cal. Jan. 17, 2008) (copy attached as Attachment 1). This is one of the arguments asserted by Defendants in their motion to dismiss, currently pending before the Court. Both *Zamudio* and

*Garcia*, like this case, address claims of lending discrimination.

Respectfully submitted,

  /s/ Glenn Schlactus
John P. Relman (Bar No. 405500)
Bradley H. Blower (Bar No. 421112)
Glenn Schlactus (Bar No. 475950)
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888

*Attorneys for Plaintiff*

April 22, 2008

# ATTACHMENT

# 1

O

1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                       CENTRAL DISTRICT OF CALIFORNIA
10
11  GABRIEL GARCIA,              )    Case No. EDCV 07-1161-VAP
                                 )    (JCRx)
12              Plaintiff,       )
                                 )    **[Motion filed on November 8,**
13       v.                      )    **2007]**
                                 )
14  COUNTRY WIDE FINANCIAL       )    **AMENDED ORDER GRANTING IN**
    CORPORATION and              )    **PART AND DENYING IN PART**
15  COUNTRYWIDE HOME LOANS,      )    **DEFENDANTS' MOTION TO**
    INC.,                        )    **DISMISS**
16                               )
                Defendants.      )
17  _____ )
18
19       Defendants' Motions to Dismiss came before the Court
20  for hearing on January 7, 2008.  After reviewing and
21  considering all papers filed in support of, and in
22  opposition to, the Motion, as well as the arguments
23  advanced by counsel at the hearing, the Court GRANTS IN
24  PART and DENIES IN PART Defendants' Motion to Dismiss.
25
26                        **I. BACKGROUND**
27  **A.  Procedural History**
28       Plaintiff Gabriel Garcia filed a putative class
    action Complaint ("Compl.") on September 12, 2007,

1   alleging that Defendants Countrywide Financial

2   Corporation and Countrywide Home Loans, Inc.

3   (collectively, "Defendants") violated and continue to

4   violate (1) the Equal Credit Opportunity Act ("ECOA");

5   (2) the Fair Housing Act ("FHA"); and (3) the Civil

6   Rights Act, 42 U.S.C. §§ 1981 and 1982.

7

8      On November 8, 2007, Defendants filed a Motion to

9   Dismiss ("Mot.") pursuant to Federal Rule of Civil

10   Procedure 12(b)(6).  Plaintiff filed an Opposition

11   ("Opp'n") on December 3, 2007.  On December 10, 2007,

12   Defendants filed a Reply.

13

14     **B.  Plaintiff's Allegations**

15     Nationwide, minority consumers "have less-than-equal

16   access to loans at the best prices and on the best terms

17   that their credit history, income, and other individual

18   financial considerations merit."  (Compl. ¶ 13 (citing

19   Joint Center for Housing Studies, The Dual Mortgage

20   Market: The Persistence of Discrimination in Mortgage

21   Lending (2005).)  Even after controlling for a borrower's

22   gender, income, property location, and loan amount,

23   federally mandated lender disclosures show that Hispanic

24   and black borrowers were 37.5 to 50 per cent more likely

25   to receive a higher-rate home loan than non-Hispanic

26   whites.  (Id. ¶ 15-16.)

27   ///

28

1       Defendants represent themselves as "America's #1 home
2  lender" and "America's #1 Lender to Minorities." (Id. ¶
3  19.)  They originate and fund mortgage loans through loan
4  officers, brokers and a network of correspondent lenders
5  (collectively "loan originators"). (Id.)  These loan
6  originators act as Defendants' agents in originating
7  loans. (Id. ¶¶ 26-27.)

8

9       Defendants encourage and offer incentives to these
10 loan originators to increase interest rates, charge
11 additional fees, and include prepayment penalties and
12 other less favorable terms in loans to certain borrowers.
13 (Id. ¶ 3.)  As a direct result of these policies,
14 minorities receive residential loans with higher interest
15 rates and higher fees and costs than similarly situated
16 non-minority borrowers.  (Id.)

17

18      Specifically, Defendants employ discretionary loan
19 pricing procedures that cause minority borrowers to
20 purchase loans with prepayment penalties and other
21 unfavorable terms, and to pay subjective fees such as
22 yield spread premiums and other mortgage-related finance
23 charges, at higher rates than similarly situated non-
24 minority borrowers. (Id.  ¶ 21.)  Defendants' loan
25 originators receive more compensation when they steer
26 borrowers into loans with these higher interest rates,
27 penalties and fees. (Id. ¶ 22.)

28

1   Moreover, these discretionary charges are unrelated
2  to any objective risk-based credit evaluation.  When a
3  loan applicant provides credit information to Defendants
4  through a loan originator, Defendants perform an initial
5  objective credit analysis, evaluating numerous risk-
6  related credit variables, including debt-to-income
7  ratios, loan-to-value ratios, credit bureau histories,
8  debt ratios, bankruptcies, automobile repossessions,
9  prior foreclosures, payment histories, and credit scores.
10  (Id. ¶ 29.)  From these objective factors, Defendants
11  derive a risk-based financing rate called the "par rate."
12  (Id. ¶ 30.)

13

14   Defendants, however, authorize and offer incentives
15  to their loan originators to charge discretionary, non-
16  risk-based fees in addition to the "par rate," including
17  "yield spread" or "broker premiums."  (Id. ¶ 31.)  This
18  practice causes persons with identical or similar credit
19  scores to pay differing amounts for obtaining credit, and
20  disparately impacts Defendants' minority borrowers.  (Id.
21  ¶ 34.)  Specifically, Defendants' use of yield spread
22  premiums and other discretionary fees disproportionately
23  and adversely affects minorities relative to similarly
24  situated non-minorities.  (Id. ¶ 35.)

25

26   Defendants have intentionally discriminated against
27  minority borrowers through these policies and procedures,
28

1 systematically giving them mortgage loans with less
2 favorable conditions than were given to similarly
3 situated non-minority borrowers. (Id. ¶ 21, 36.)  This
4 pattern of discrimination is a direct result of
5 Defendants' mortgage lending policies and procedures,
6 cannot be justified by business necessity, and could be
7 avoided by alternative policies and procedures that have
8 less discriminatory impact and no less business efficacy.
9 (Id.  ¶¶ 21, 25, 26.)

10

11     These discriminatory practices directly damaged
12 Plaintiff.  (Id. ¶ 37.)  On or about February 27, 2006,
13 Plaintiff obtained $415,000 in financing from Defendants
14 to purchase a single-family house.  (Id.)  The loan
15 originator and Defendants knew that Plaintiff was a
16 minority borrower, and because of Defendants'
17 discriminatory practices, Plaintiff received a loan on
18 worse terms with higher costs than similarly situated
19 non-minority borrowers.  (Id.  ¶¶ 40-41.)  Specifically,
20 Plaintiff paid a $8,300 "broker origination fee," a
21 $1,250 "broker administration fee," a $550 "processing
22 fee," a $830 yield spread premium, a $150 "loan tie in
23 fee" and a $995 "underwriting fee." (Id. ¶ 39.)  All of
24 these fees were assessed pursuant to Defendants' credit
25 pricing policies.  (Id.)
26 ///
27 ///
28

5

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007). In addition, the Court must accept all material allegations in the complaint -- as well as any reasonable inferences to be drawn from them -- as true. <u>See</u> <u>Doe v. United States</u>, 419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic</u>, 127 S. Ct. at 1964-65 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id</u>. at 1965.

6

1    Although the scope of review is limited to the
2  contents of the complaint, the Court may also consider
3  exhibits submitted with the complaint, <u>Hal Roach Studios,</u>
4  <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19
5  (9th Cir. 1990), and "take judicial notice of matters of
6  public record outside the pleadings," <u>Mir v. Little Co.</u>
7  <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

8
9                      **III. DISCUSSION**
10    Defendants argue that (1) the FHA and ECOA do not
11 authorize disparate impact claims; (2) Plaintiff fails to
12 state a disparate impact claim; (3) Plaintiff fails to
13 state a claim for intentional discrimination; (4)
14 Plaintiff does not have standing to assert claims on
15 behalf of minority populations of which he is not a
16 member; (5) Plaintiff fails to allege liability on the
17 part of Defendant Countrywide Financial Corporation,
18 Inc.; and (6) Plaintiff's allegations regarding tolling
19 of the statute of limitations should be stricken.  The
20 Court considers each of these arguments in turn.

21
22 **A.   Disparate Impact Under the FHA and ECOA**
23    Plaintiff alleges that Defendants violate the FHA and
24 ECOA, in part, because Defendants' policies have a
25 negative disparate impact on minority borrowers.  The
26 Fair Housing Act, in relevant part, states that "it shall
27 be unlawful":
28

                               7

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). In the Ninth Circuit, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment or disparate impact. Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1996).

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). A plaintiff can establish an ECOA claim under a theory of disparate treatment or disparate impact. Miller v. American Exp. Co., 688 F.2d 1235, 1240 (9th Cir. 1982).

Defendant argues that the Ninth Circuit cases recognizing disparate impact claims under FHA and ECOA "were wrongly decided" and "cannot be good law in light of the subsequent Supreme Court decision in Smith v. City of Jackson." (Mot. at 14 (citing Smith v. City of Jackson, 544 U.S. 228 (2005)).) In Smith, the Supreme Court held a plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act

8

1   ("ADEA").  <u>Smith</u>, 544 U.S. at 235-39.  The Court compared

2   the text of the ADEA to the text of Title VII, and

3   reasoned that both statutes authorized disparate impact

4   claims when they prohibited "actions that deprive any

5   individual of employment opportunities or *otherwise*

6   *adversely affect* his status as an employee, because of

7   such individual's race or age."  <u>Id.</u> at 235 (emphasis in

8   original; citations omitted).

9

10  　　Defendants argue that the FHA and ECOA do not support

11  disparate impact claims because, unlike the ADEA and

12  Title VII, they do not contain text expressly prohibiting

13  actions that "otherwise adversely affect" individuals

14  based on their protected status.  (Mot. at 15-16.)

15  <u>Smith</u>, however, did not hold that a statute *must* contain

16  this "effects" language in order to authorize disparate

17  impact claims.  Indeed, the Court did not rely only on

18  this textual analysis of the statutes, but also held that

19  the purpose and legislative history of the ADEA, as well

20  as unanimous circuit court treatment of the Act,

21  supported disparate treatment claims.  <u>Smith</u>, 544 U.S. at

22  236-39.

23

24  　　Like the Supreme Court in <u>Smith</u>, the Ninth Circuit

25  relied on the purposes of the ECOA in determining that

26  Act supports disparate impact claims.  <u>See Miller</u>, 688

27  F.2d at 1239-40.  It held that "not requiring proof of

28

9

1   discriminatory intent is especially appropriate in

2   analysis of ECOA violations because discrimination in

3   credit transactions is more likely to be of the

4   unintentional, rather than the intentional, variety."

5   Id. at 1239 (citations omitted).

6

7       Moreover, all eleven circuits that have considered

8   the matter have concluded that the FHA supports disparate

9   impact claims.  See 2922 Sherman Ave. Tenants' Ass'n v.

10  District of Columbia, 444 F3d 673, 679 (D.C. Cir. 2006)

11  (analyzing circuit holdings); Note, The Fair Housing Act

12  and Disparate Impact in Homeowners' Insurance, 104 Mich.

13  L. Rev. 1993, 2006-07 & n.117 (listing cases).

14  Furthermore, in Village of Arlington Heights v.

15  Metropolitan Housing Development Corp., the Supreme Court

16  affirmed summary judgment against the plaintiffs on all

17  claims requiring discriminatory intent, finding that the

18  plaintiffs had failed to prove such intent, but remanded

19  for consideration of an FHA claim, thus implying that

20  discriminatory intent was not necessary for an FHA claim.

21  Village of Arlington Heights v. Metropolitan Housing

22  Development Corp., 429 U.S. 252, 270-71 (1977).

23

24      Indeed, the Ninth Circuit has recognized the

25  viability of disparate impact claims under the FHA after

26  Smith.  See Affordable Housing Dev. Corp. v. City of

27  Fresno, 433 F.3d 1182, 1195-96 (9th Cir. 2006) (affirming

28

a judgment for the defendants but recognizing the
viability of such a claim).  The Sixth Circuit similarly
has recognized the continuing viability of ECOA disparate
impact claims.  See Golden v. City of Columbus, 404 F.3d
950, 964-65 (6th Cir. 2005) (same).  Accordingly, this
Court declines to hold that Smith overturned Ninth
Circuit precedent recognizing disparate impact claims
under the FHA and ECOA.

**B.   Disparate Impact**

     In analyzing discrimination claims under the FHA,
courts have borrowed the analysis that they use in
assessing claims under Title VII.  Gamble, 104 F.3d at
304.  To establish discrimination through disparate
impact, a plaintiff must (1) identify a specific practice
of the Defendant; (2) identify a significant
discriminatory impact on the protected class of which the
plaintiff is a member; and (3) demonstrate that the
identified practice causes the identified discriminatory
impact.  Paige v. California, 291 F.3d 1141, 1144-45 (9th
Cir. 2002); Gamble, 104 F.3d at 304.  The causation
requirement may be inferred through statistical evidence
showing a sufficiently substantial disparity.  Id.

     **1.   Specific Practice**

     Defendants argue that Plaintiff fails to challenge a
sufficiently specific practice on the part of Defendants.

(Mot. at 6-10.)  To establish discrimination based on
disparate impact, a plaintiff must "isolate[e] and
identify[y] the *specific* . . . practices that are
allegedly responsible for any observed statistical
disparities."  <u>Smith</u>, 544 U.S. at 241 (emphasis in
original; citations omitted).  In <u>Smith</u>, plaintiffs
challenged a pay plan that granted proportionately
greater pay raises to employees with less than five years
of tenure, arguing that the plan had a discriminatory
impact on older employees.  <u>Id.</u> at 231.  The Supreme
Court held that the plaintiffs failed to identify the
specific practice being challenged, and that imposing
liability for the pay plan in general could "result in
employers being potentially liable for the myriad of
innocent causes that may lead to statistical imbalances."
<u>Id.</u> at 241.  Additionally, the Court stressed that the
plaintiffs could not successfully challenge the plan as a
whole because it "was based on reasonable factors other
than age."  <u>Id.</u>

    The Ninth Circuit similarly has rejected challenges
to a defendant's overall processes.  In <u>Stout v. Potter</u>,
postal inspectors challenged the process by which a
review panel screened applicants for promotion.  <u>Stout v.
Potter</u>, 276 F.3d 1118, 1121 (9th Cir. 2002).  The Ninth
Circuit held that by merely attacking "the decision-
///

making process" or "the process by which the [screening] Panel evaluated applications," the plaintiffs failed toidentify a "specific employment practice or selection criterion." <u>Id.</u> at 1124.  The court explained,

> Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact. A decisionmaking process may be analyzed as a single employment practice if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis.

<u>Id.</u>  In <u>Stout</u>, the court did not treat the decision-making process as a single practice because the overall process consisted of discrete elements and the plaintiffs failed to argue that the various elements could not be separated for analysis.  <u>Id.</u> at 1124-25.

Similarly, the Ninth Circuit has frowned on a challenge to a complex market-based process.  In <u>AFSCME v. State of Wash.</u>, the plaintiffs attacked the state's practice of setting salaries based on biennial studies assessing prevailing market rates for each position. <u>AFSCME v. State of Wash.</u>, 770 F.2d 1401, 1403 (9th Cir. 1985.)  The Ninth Circuit held that "the decision to base compensation on the competitive market . . . involves the assessment of a number of complex factors not easily ascertainable, an assessment too multifaceted to be appropriate for disparate impact analysis." <u>Id.</u> at 1406.

13

1    In contrast, challenges to subjective decision-making
2    practices are more likely to survive initial pleading
3    attacks.  In <u>Watson v. Fort Worth Bank and Trust</u>, the
4    plaintiff challenged her employer's practice of promoting
5    employees based on the "subjective judgment of
6    supervisors who were acquainted with the candidates and
7    with the nature of the jobs to be filled."  <u>Watson v.</u>
8    <u>Fort Worth Bank and Trust</u>, 487 U.S. 977, 982 (1988).  The
9    Court held that "subjective or discretionary employment
10   practices may be analyzed under the disparate impact
11   approach," but did not decide whether the plaintiff had
12   made out a *prima facie* claim for disparate impact
13   discrimination.  <u>Id.</u> at 991, 1000.

14

15   Here, Plaintiff challenges Defendants' practice of
16   authorizing and offering incentives to their loan
17   originators to charge discretionary, non-risk-based fees
18   in addition to the "par rate," including "yield spread"
19   or "broker premiums."  (Compl. ¶ 31.)  Like the practice
20   challenged in <u>Watson</u>, Defendants' practice allows
21   subjective decision-making that is alleged to result in a
22   discriminatory impact.  Unlike the practice challenged in
23   <u>Smith</u>, the challenged decision-making, is *not*, on its
24   face, based on objective factors other than prohibited
25   discrimination.  <u>See</u> <u>Smith</u>, 544 U.S. at 241 (stressing
26   that the challenged plan is based on reasonable factors
27   other than age).

28

1    Defendants argue that, like the practice challenged
2  in <u>AFSCME</u>, the practice attacked here is merely a "policy
3  of allowing pricing to be responsive to supply and demand
4  and other market forces." (Mot. at 9 (quotations
5  omitted).)  Plaintiff, however, alleges that Defendants'
6  assessment of fees in addition to the "par rate" is *not*
7  based on market-based factors such as risk or
8  creditworthiness, and indeed is unrelated to legitimate
9  business necessity. (Compl. ¶ 25, 28-35.)  From this, it
10 is reasonable to infer that the challenged practices do
11 not merely allow pricing to be responsive to market
12 forces.  In the context of a motion to dismiss, the Court
13 takes as true these allegations and reasonable inferences
14 therefrom.  <u>See Doe</u>, 419 F.3d at 1062.

15

16    Finally, unlike in <u>Stout</u>, Plaintiff does not
17 challenge the overall process by which Defendants
18 determine borrowers' rates and fees.  Instead, Plaintiff
19 challenges only the practice of allowing and
20 incentivizing individual loan originators to assess
21 additional, non-risk-based fees. (Compl. ¶ 31.)  In the
22 context of a  motion to dismiss, this is sufficient to
23 give Defendants "fair notice of what the plaintiff's
24 claim is and the grounds upon which it rests."  <u>See</u>
25 <u>Conley</u>, 355 U.S. at 47; <u>Bell Atlantic</u>, 127 S. Ct. at
26 1964.
27 *///*
28

**2.   Significant Discriminatory Impact**

To establish disparate impact discrimination, a plaintiff must demonstrate that there is a significant disparity in outcomes between minorities and similarly situated non-minorities.  See, e.g. Wards Cove, 490 U.S. at 651-53.  Here, Defendants argue that the nationwide statistics cited by Plaintiff "fail[] to allege a disparate impact because the cited data is not specific to Countrywide."  (Mot. at 10.)  As Plaintiff points out, however, he is not required at the pleading stage to produce statistical evidence proving a disparate impact on Defendants' customers -- all that is required is fair notice of the claims and the grounds upon which they rest, sufficient to raise a right to relief above the speculative level.  Bell Atlantic, 127 S. Ct. at 1964-65 (citations omitted); see also Swierkeiwicz v. Sorema, 534 U.S. 506, 514-15 (2002) (no heightened pleading standard to state a discrimination claim).  Here, Plaintiff does allege that Defendants' minority customers, specifically, pay disproportionately higher fees for mortgages than Defendants' nonminority customers.  (See Compl. ¶¶ 21, 22, 24, 35.)  Moreover, he provides statistical evidence of a nationwide disparate impact which, combined with an allegation that Defendants are "America's #1 home lender," is enough to raise above the speculative level Plaintiff's allegation that Defendants' minority buyers ///

1   pay disproportionately high fees.  (<u>See</u> Compl. ¶¶ 13-16,

2   19.)

3

4       Defendants also argue that Plaintiff fails to allege

5   that "the relevant groups of whites and Hispanics are

6   similarly-situated."  (Mot. at 10-11.)  The Complaint,

7   however, does allege that Defendants charge minorities

8   higher fees "even after controlling for borrowers'

9   gender, income, property location, and loan amount."

10  (Compl. ¶ 15.)  Moreover, Plaintiff alleges that

11  Defendants charge minorities higher fees than others with

12  the same "par-rate," a number which takes into account

13  numerous risk-related credit variables, including debt-

14  to-income ratios, loan-to-value ratios, credit bureau

15  histories, debt ratios, bankruptcies, automobile

16  repossessions, prior foreclosures, payment histories, and

17  credit scores.  (<u>Id.</u> ¶ 29.)  Finally, Plaintiff alleges

18  Defendants' use of yield spread premiums and other

19  discretionary fees disproportionately and adversely

20  affects minorities "relative to similarly situated non-

21  minorities."  (<u>Id.</u> ¶ 35.)  Accordingly, Plaintiff has

22  alleged that there is a significant disparate impact on

23  minorities compared to similarly situated non-minorities.

24

25      **3.  Causation**

26      To allege causation, Plaintiff must allege facts

27  sufficient to raise above a speculative level the

28

17

inference that, but for Defendants' challenged policy,
minorities would not receive higher-cost loans than
similarly situated non-minority borrowers.  See Bell
Atlantic, 127 S. Ct. at 1964-65.  Here, Plaintiff alleges
that Defendants' policy of allowing and offering
incentives to its loan originators to add fees in
addition to the "par rate" directly causes minorities to
receive home loans with higher interest rates and higher
fees and costs.  (Compl. ¶¶ 3, 21, 24, 35, 62, 80.)
Defendants argue that these allegations are conclusory
and that Plaintiff fails to "allege a set of facts from
which causation plausibly can be inferred."  (Mot. at
13.)

Defendants claim that the higher costs imposed on
minority borrowers could be explained by such borrowers'
lower average credit scores.  (Id.)  This explanation
ignores Plaintiff's allegation that Defendants impose the
challenged discretionary fees *in addition to* the "par
rate," which is calculated based on a borrower's credit
score.  (Compl. ¶¶ 15, 29.)  Indeed, Plaintiff alleges
that the higher costs imposed on minority borrowers
cannot be explained by any factor other than Defendants'
challenged policies.  (Compl. ¶ 15.)  These allegations
are sufficient to raise above a speculative level the
inference that, but for Defendants' policy of offering
incentives for discretionary fees, minorities would not

1   receive higher-cost loans than similarly situated non-
2   minority borrowers.  Accordingly, Plaintiff has stated a
3   claim for disparate impact discrimination.

4

5   **C.   Disparate Treatment**

6        To show disparate treatment based on race, a
7   plaintiff must establish that the defendant was *motivated*
8   to discriminate against the plaintiff on the basis of
9   race.   See <u>AFSCME</u>, 770 F.2d at 1406-07.  Where a
10  plaintiff challenges a defendant's policy, the plaintiff
11  must establish that the defendant implemented the policy
12  "because of, not merely in spite of," its adverse effects
13  on the protected group.  <u>Personnel Adm'r of Massachusetts</u>
14  <u>v. Feeney</u>, 442 U.S. 256, 279 (1979).

15

16       Here, Plaintiff alleges that Defendants have
17  intentionally discriminated against minority borrowers
18  through their policy of offering incentives for
19  discretionary loan fees, and that Defendants
20  intentionally designed this policy to discriminate
21  against minority borrowers.  (<u>Compl.</u> ¶¶ 21, 36.)
22  Plaintiff maintains that this policy perpetuates past
23  racial discrimination in mortgage lending.  (<u>Id.</u> at 12-
24  18.)

25

26       To state a claim for disparate treatment, Plaintiff
27  must provide more than mere conclusory allegations of
28

1  Defendants' intent to discriminate.  See Bell Atlantic,

2  127 S. Ct. at 1964-65.  Rather, the allegations in the

3  complaint "must be enough to raise a right to relief

4  above the speculative level."  Id. at 1965.  Here,

5  Plaintiff provides no factual allegations regarding

6  intent to discriminate beyond his bare assertion that

7  Defendants "intentionally discriminated" and that

8  Defendants' policy "by design discriminates against

9  minority borrowers."  (Compl. ¶¶ 21, 36.)  These

10  assertions are not enough to raise Plaintiff's right to

11  relief for disparate treatment above the speculative

12  level.  See Bell Atlantic, 127 S. Ct. at 1965.

13  Accordingly, Plaintiff has failed to state a claim for

14  disparate treatment.

15

16  **D.  Standing**

17        To satisfy Article III's standing limitations, a

18  plaintiff must demonstrate that:  (1) he or she has

19  suffered an "'injury in fact' -- an invasion of a legally

20  protected interest which is (a) concrete and

21  particularized, and (b) actual or imminent, not

22  conjectural or hypothetical"; (2) there is a causal

23  connection between the injury and the conduct complained

24  of -- the injury is "fairly traceable" to the challenged

25  action of Defendants, and not the result of the

26  independent action of some third party not before the

27  court; and (3) it is "likely," as opposed to merely

28

1   "speculative," that the injury will be redressed by a

2   favorable judicial decision.  <u>Lujan v. Defenders of</u>

3   <u>Wildlife</u>, 504 U.S. 555, 560-561 (1992) (citations

4   omitted).  "In the class action context, Article III

5   standing simply requires that the class representatives

6   satisfy standing individually."  <u>In re Verisign, Inc.</u>,

7   2005 WL 88969, *4 (N.D. Cal. 2005).

8

9       Defendants argue that Plaintiff cannot establish

10  standing to sue on behalf of potential class members of

11  minority groups other than Hispanics.  (Mot. at 19-20.)

12  To establish Article III standing, however, Plaintiff

13  must only show that he has standing to sue on his own

14  behalf.  <u>In re Verisign</u>, 2005 WL at *4.  Whether he may

15  represent the claims of the class is a separate inquiry,

16  governed by Federal Rule of Civil Procedure 23.  <u>Id.</u>

17

18      Defendants do not argue that Plaintiff does not have

19  standing to sue on his own behalf.  Indeed, Plaintiff has

20  alleged he has suffered an actual injury that is fairly

21  traceable to Defendants' acts, and the type of injury he

22  alleges (discriminatory fees) is redressible by a federal

23  court.  (<u>See</u> Compl. ¶¶ 39-41 (alleging that as a result

24  of Defendants' discriminatory credit pricing policies,

25  Plaintiff received a loan on worse terms with higher

26  costs than similarly situated non-minority borrowers).)

27  ///

28

1 Accordingly, Plaintiff has established Article III
2 standing.[1]

3

4 **E.   Liability of Defendant Countrywide Financial**
5       **Corporation, Inc.**

6       Plaintiff's Complaint does not distinguish between
7 the two named Defendants.  (Compl. ¶ 1.)  Nonetheless,
8 Defendants argue that Defendant Countrywide Financial
9 Corporation ("CFC") cannot be liable because Plaintiff
10 "states no factual allegations at all as to CFC."  (Mot.
11 at 21.)  The Complaint, however, alleges numerous acts by
12 CFC.  Every allegation of an act by Defendants is an
13 allegation of an act by both CFC and Countrywide Home
14 Loans, Inc.  (See Compl. passim.)  For instance, the
15 Complaint alleges Plaintiff obtained a residential loan
16 from "CONTRYWIDE," which he defines as Countrywide
17 Financial Corporation *and* Countywide Home Loans, Inc.
18 (See Compl. ¶¶ 1, 37-38.)  The Complaint also alleges

19

20 ─────────────────────
21      [1]At the hearing on this matter, Defendants' counsel
argued that Plaintiff lacks Article III standing to
represent minority groups of which he is not a part under
22 the Ninth Circuit holding in Black Coalition v. Portland
School Dist. No. 1.  Black Coalition held that a
23 plaintiff has no standing to challenge a policy or
procedure which has not adversely affected that
24 individual plaintiff's interests.  Black Coalition v.
Portland School Dist. No. 1., 484 F.2d 1040, 1042-43
25 (1973).  In contrast, Plaintiff here challenges a policy
that he alleges directly and adversely affected him.
26 Moreover, while Black Coalition considered an appeal of a
district court judgment in a class action, here a class
27 has not yet been certified, so the issue of whether
Plaintiff may represent all members of the class is not
28 yet properly before the Court.

1  that Defendants collectively designed, implemented, and
2  oversee the allegedly discriminatory policy of allowing
3  loan officers to add discretionary fees to the
4  objectively determined "par rate." (Compl. ¶¶ 3, 21-25,
5  29-36.)
6
7       Defendant argues that these allegations are untrue
8  and cannot be proven as to CFC, but for the purposes of a
9  Motion to Dismiss, the Court takes Plaintiff's
10 allegations as true.  <u>Doe</u>, 419 F.3d at 1062.
11 Accordingly, the Court declines to dismiss Defendant CFC.
12
13 **F.   Motion to Strike Allegations re Tolling of the**
14 **     Statute of Limitations**
15      Under Federal Rule of Civil Procedure 12(f), a party
16 may ask the court to strike any "insufficient defense or
17 any redundant, immaterial, impertinent, or scandalous
18 matter."  Fed. R. Civ. Proc. 12(f).  "'Immaterial' matter
19 is that which has no essential or important relationship
20 to the claim for relief or the defenses being pleaded. .
21 . . 'Impertinent' matter consists of statements that do
22 not pertain, and are not necessary, to the issues in
23 question."  <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527
24 (9th Cir. 1993), <u>rev'd on other grounds by</u> <u>Fogerty v.</u>
25 <u>Fantasy, Inc.</u>, 510 U.S. 517 (1994).
26 ///
27 ///
28

                                  23

"Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." <u>Cal. Dept. of Toxic Substances Control v. Alco Pacific, Inc.</u>, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002). Thus, "courts often require 'a showing of prejudice by the moving party' before granting the requested relief," and "[u]ltimately, whether to grant a motion to strike lies within the sound discretion of the district court." <u>Id.</u> (citing <u>Fantasy</u>, 984 F.2d at 1528). A court should deny "[a] motion to strike under Rule 12(f) . . . unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation." <u>Gay-Straight Alliance Network v. Visalia Unified Sch. Dist.</u>, 262 F. Supp. 2d 1088, 1099 (E.D. Cal. 2001).

Defendant moves to strike the allegations in paragraphs 51-58 of the Complaint. (Mot. 21-22.) These paragraphs allege that class members' claims did not accrue until shortly before the filing of the action, that Defendants fraudulently concealed their discriminatory practices, and that Defendants' discriminatory conduct is continuing and recurrent. (Compl. ¶¶ 51-55.) Accordingly, Plaintiff alleges that "[t]he statute of limitations applicable to any claims

1   that Plaintiff or other class members have brought or

2   could bring as a result of the unlawful and fraudulent

3   concealment and course of conduct described herein, have

4   been tolled."  (<u>Id.</u> ¶ 58.)

5

6       Defendants argue that the allegations in paragraphs

7   51-58 of the Complaint are irrelevant because the named

8   Plaintiff filed his claim within all applicable statutes

9   of limitations.  (Mot. 21-22.)  This argument is

10  premature.  Until the Court has ruled on the issue of

11  class certification, it cannot be shown that the

12  allegations regarding other class members "could have no

13  possible bearing on the issues in the litigation."  <u>See</u>

14  <u>Gay-Straight Alliance Network</u>, 262 F. Supp. 2d at 1099.

15

16      Defendants further argue that the Court should strike

17  Plaintiff's allegations of fraudulent concealment because

18  Plaintiff failed to plead with particularity sufficient

19  facts showing fraudulent conduct.  (Mot. at 22-23.)

20  Indeed, one pleading fraudulent concealment "must plead

21  with particularity the facts which give rise to the

22  claim.  <u>Conerly v. Westinghouse Elec. Corp.</u>, 623 F.2d

23  117, 120 (9th Cir. 1980); <u>see also</u> Fed. R. Civ. Proc.

24  9(b).  Here, Plaintiff merely alleges that Defendants

25  "took steps to conceal [their] fraudulent and unfair

26  conduct," but fails to allege what steps were taken, how

27  those steps were intended to mislead Plaintiff and class

28

 1   members, or why those steps would lead a reasonable
 2   person to be misled into believing that he did not have a
 3   claim for relief.  See Conerly, 623 F.2d at 120.  In his
 4   Opposition, Plaintiff does not contest that the Complaint
 5   fails to plead fraudulent concealment properly.
 6
 7       Plaintiff has failed to plead fraudulent concealment
 8   with sufficient particularity, and Plaintiff's
 9   allegations regarding fraudulent concealment are
10   stricken.
11
12       Finally, Defendants argue that Plaintiff's
13   allegations of a continuing violation are insufficient as
14   a matter of law to justify tolling the statute of
15   limitations under the "continuing violation" doctrine.
16   (Mot. at 24-25.)  Defendants cite Ledbetter v. Goodyear
17   Tire & Rubber Co. Inc., which held that the statute of
18   limitations was not tolled when the alleged
19   discriminatory act was a pay decision that occurred
20   before the limitations period, even though the plaintiff
21   continued to receive lower pay during the limitations
22   period.  Ledbetter v. Goodyear Tire & Rubber Co. Inc.,
23   127 S. Ct. 2162, 2166-69 (2007).  The Court held that a
24   limitations period does not recommence "upon the
25   occurrence of subsequent nondiscriminatory acts that
26   entail adverse effects resulting from the past
27   discrimination."  Id. at 2169.
28

1     Unlike the plaintiff in <u>Ledbetter</u>, however, Plaintiff
2   here alleges a discriminatory act -— Defendants' sale to
3   him of an allegedly high-cost loan —- which occurred
4   during the limitations period. (Compl. ¶ 37.)  Indeed,
5   in an FHA case similar to this one, the Supreme Court
6   tolled the statute of limitations under a "continuing
7   violation" theory.  <u>See</u> <u>Havens Realty Corp. v. Coleman</u>,
8   455 U.S. 363, 380 (1982).  In <u>Havens Realty</u>, the
9   plaintiffs alleged five specific incidents of alleged FHA
10  violations.  <u>Id.</u>  Only one of the incidents, involving
11  only one of the plaintiffs, occurred within the
12  limitations period.  <u>Id.</u>  Nevertheless, the Court tolled
13  the statute as to the other incidents involving the other
14  plaintiff.  <u>Id.</u>  The Court held, "where a plaintiff,
15  pursuant to the Fair Housing Act, challenges not just one
16  incident of conduct violative of the Act, but an unlawful
17  practice that continues into the limitations period, the
18  complaint is timely when it is filed within 180 days of
19  the last asserted occurrence of that practice."  <u>Id.</u> at
20  380-81.

21

22     Here, Plaintiff alleges an occurrence of Defendants'
23  allegedly discriminatory practice within the statute of
24  limitations.  (Compl. ¶ 37.)  Thus, his allegations
25  regarding a "continuing violation" as to other potential
26  class members are not irrelevant, redundant, or
27  scandalous, and are accordingly not stricken.

28

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss as to Plaintiff's claims of disparate treatment discrimination under the FHA, ECOA, and 42 U.S.C. §§ 1981 and 1982 with leave to amend, DENIES the Motion to Dismiss as to Plaintiff's claims of disparate impact discrimination, and STRIKES the allegations of fraudulent concealment in paragraphs 53, 57, and 58 of the Complaint.

Defendants shall answer or otherwise respond to the Complaint by January 23, 2008.

Dated:  January 17, 2008

_Virginia A. Phillips_
VIRGINIA A. PHILLIPS
United States District Judge